# 23-0006

# United States Court of Appeals

*for the*

# Second Circuit

———————————◆———————————

ANDREW KOSIBA,

*Plaintiff-Appellant,*

— v. —

CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC.,

*Defendant-Appellee.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK (CENTRAL ISLIP)

**SUPPLEMENTAL APPENDIX**
**Volume 1 of 2 (Pages SA-1 to SA-284)**

HARRIS BEACH PLLC
Daniel J. Palermo, Esq.
Roy W. Breitenbach, Esq.
*Attorneys for Defendant-Appellee*
99 Garnsey Road
Pittsford, New York 14534
(585) 419-8946

Andrew Kosiba
*Pro Se Plaintiff-Appellant*
33 Neal Path
South Setauket, New York 11720
(631) 495-9968

i

## TABLE OF CONTENTS

**Page**

### Volume 1

Complaint, dated December 8, 2021 ......................... SA-1

Amended Complaint, dated March 3, 2022 .............. SA-45

Second Amended Complaint,
dated May 18, 2022 ............................................... SA-165

Response to Defendant's Motion to Dismiss,
dated July 8, 2022 ................................................. SA-271

### Volume 2

Report and Recommendations,
dated November 18, 2022 ...................................... SA-285

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   DEC - 8 2021   ★

LONG ISLAND OFFICE

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### 225 Cadman Plaza East, Brooklyn, NY 11201

ANDREW KOSIBA

    PLAINTIFF

v.

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.

    DEFENDANT

_____/

CV-21 6416

CASE NO. _____

BROWN, J.

LINDSAY, M.J.

## COUNT I – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF
## UNDER THE AMERICANS WITH DISABILITIES ACT

    Plaintiff, Andrew Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for discrimination on the basis of disability, and for prohibited actions taken on the basis of this disability under the "regarded as" prong; and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur*, and alleges the following:

## JURISDICTION AND VENUE

1.     This court has original and exclusive jurisdiction under Title I of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

2.     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

3.     The incidents and facts giving rise to this complaint have occurred within the last one hundred eighty days.  The plaintiff has commenced a complaint against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 7, 2021.  The case is pending and the EEOC does not currently have the ability to schedule any time for a meeting, but is conducting an investigation with plaintiff's employer.

**PARTIES**

4.     Plaintiff, Andrew Kosiba, resides in Suffolk County, New York at the address of 33 Neal Path; South Setauket and is a qualified individual with a disability within the meaning of the ADA.  The plaintiff is an employee of the defendant, which is a "covered entity" within the meaning of the Act.

5.     The defendant's principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York  11735.

-2-

SA-3

## PLAIN STATEMENT

**6.**    The defendant regards the plaintiff as having a disability and the plaintiff has been subjected to adverse employment actions prohibited under 29 CFR § 1630.2 (g) (iii) as a result of the defendant perceiving a physical or mental impairment in the plaintiff.

**7.**    The reactions and perceptions of the defendant and its employees while interacting with or working with the plaintiff have demonstrated the defendant's perception that the plaintiff has an impairment of the immune system and an impairment of the respiratory system.

**8.**    Defendant regards plaintiff as disabled and has mis-classified him as a potential or actual source of contagious disease by assuming plaintiff has an impairment of the immune system and an impairment of plaintiff's respiratory system without any individualized assessment establishing that he needs any "accommodations" (mitigation measures) or is a direct threat.

**9.**    The defendant is requiring the plaintiff to accept its "accommodations" (mitigation measures) or suffer the adverse employment action of being terminated.

**10.**    Defendant's policy requires plaintiff's participation and defendant will coerce, threaten or retaliate against the plaintiff with adverse employment actions if plaintiff does not comply.

**11.**    The defendant took adverse employment actions because of perceiving the plaintiff as impaired.

**12.**    The defendant has adopted a new and discriminatory policy that "mandates" accommodations such as intravenous injections which are under

SA-4

Emergency Use Authorization ("EUA")  and other "mitigation measures" without acknowledging plaintiff's right of refusal.

**13.**   Apparently the defendant regards all unvaccinated employees as having a **condition** (being unvaccinated), and apparently perceives this condition affecting the employee's "respiratory" and "immune" systems.

**14.**   The defendant is not basing its perception of this condition on any medical diagnosis or individualized assessment.

**15.**   The affirming action of regarding plaintiff as impaired and disabled is that plaintiff has suffered adverse employment actions including the coercive, threatening, and intimidating demand to vaccinate or be terminated because of being regarded as disabled.

## STATEMENTS OF FACT

**16.**   The plaintiff is regarded as having a disability by the defendant.

**17.**   The plaintiff therefore has a disability under the protection of the ADA.

**18.**   The plaintiff was an employee of the defendant and is a qualified individual with a disability.

**19.**   The plaintiff does not have an impairment but is being treated by the defendant as if plaintiff has an impairment.

**20.**   The plaintiff duly noticed the defendant that he was claiming protection under the ADA because of being regarded as disabled.

**21.**   The defendant took adverse employment actions because of perceiving the plaintiff as impaired.

SA-5

**22.**     The defendant has made a record of plaintiff's disability by mis-classifying the plaintiff as having an impairment of the immune system and an impairment of the respiratory system.

**23.**     The plaintiff may proceed under the "regarded as" prong and this court has jurisdiction under the "regarded as" prong of the ADA.

**24.**     The complaint thereby satisfies the criteria for stating a *prima facie* cause of action for these reasons, along with the fact that the defendant has made a record of such disability as further alleged herein.

**25.**     The ADA also protects individuals such as the plaintiff for whom submitting to certain accommodation measures would create impairments. The accommodations include, but are not limited to, taking injections under Emergency Use Authorization (EUA) which are being promoted as vaccines but which are not legally vaccines; submitting to repetitive, non-job-related medical examinations (nasal tissue testing, temperature checks); being placed under isolation, segregation and quarantine without due process; using medical devices for mitigation measures[1] (masks); disclosing plaintiff's medical records and history for non-job-related matters and participating in clinical trials and epidemiological experiments as a condition of employment.

**26.**     If the plaintiff had previously made at least one requests for reasonable modifications, but has since withdrawn such requests as he only requires to be left alone to do his job without being harassed, coerced and discriminated against based upon disability.

**27.**     In fact, defendant's "COVID-19" policies impair the plaintiff from performing his employment duties because the defendant will not permit plaintiff

---

[1]Section 201(h) Food, Drug & Cosmetic Act

SA-6

to do his job without first submitting to the defendant's accommodations ("mitigation measures").

**28.** Defendant's policies also violate the plaintiff rights to medical privacy and informed consent.

**29.** Defendant and its policies failed to advise the plaintiff of the absolute risks and absolute benefits for accepting the accommodation of taking  injections, under EUA guidelines, for the contagious disease that the defendant regards the plaintiff as having.

**30.** Defendant also failed to advise the plaintiff of his right to accept or reject such accommodation as it is falls under an "emergency use authorization" period.

**31.** Additionally,  defendant failed to advise the plaintiff that no vaccines, which have been approved by the Food & Drug Administration, are commercially available to the plaintiff, or are yet in production.

**32.**  Additionally, the so-called "vaccines" that are being promoted as vaccines do not actually prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SarsCOV2" purported "diseases".

**33.** Additionally the employer has failed to identify or propose other accommodations which do not require medical devices or injections.

**34.** The defendant's responses to the requests made by the plaintiff to cease the discrimination and harassment were in fact non-responsive, a true and correct copy of each is included with Exhibit A.

**35.** A "pandemic" or "emergency" is not a legal defense for violating rights. The court should be advised that the defendant believes that its legal violations are

SA-7

justified by claiming there is a "pandemic". This is not a legal defense, just like ignorance of the law is not a legal defense.

**36.**    The plaintiff requests that the court take judicial notice of the official mortality rates of the State of New York and the United States for the years from 2017, 2018, 2019 and 2020 in which the standard deviation is zero, the very definition of no verifiable "pandemic".

**37.**    No laws have changed that would create either a new duty of care or a new insurable risk for the defendant; and no new laws have created any new legal duty or obligation for an employer to violate the medical privacy rights of anyone.

**38.**    Certain employees of the defendant present with symptoms of mental illness.   The court should also note that the defendant's employees: Tony Pellicano, Director of HR, Chritine Bracco, the Director of HR, Kim Kranz, President, along with Mary Frawley, Director of Patient Services and also plaintiff's supervisor Elizabeth Nallan-Potter each present with symptoms of Factitious Disorder by Proxy as defined in the <u>Diagnostic and Statistical Manual for Mental Health</u>, Fifth Edition.  People with this disorder falsely claim another person as sick, injured or having problems functioning, claiming that medical attention is needed. It appears that these employees have each made such a determination of the plaintiff and engaged in conduct which has given rise to this complaint and each may not be competent to serve in their official capacity because of this mental illness.

**39.**    The plaintiff has been employed continuously by the defendant for approximately twenty years.

**40.**    In March of 2021, the defendant began regarding the plaintiff as having a disability of an impaired immune system and an impaired respiratory system; and began responding to the plaintiff as if he was carrying a contagious disease.

**41.**    Defendant has never conducted the required individualized assessment to determine whether or not the plaintiff is or was ever a direct threat to anyone.

**42.**    On November 28, 2021 the defendant terminated the plaintiff's employment for attempting to exercise and enjoy his rights that are protected by the Americans with Disabilities Act.

**43.**    The defendant had expressed to the plaintiff that regarding these accommodations, the plaintiff's right to informed consent was not violated because he could quit at any time.  This clearly violates 29 CFR Part 1630.9(d).

**44.**    Plaintiff received a memo dated September 1, 2021 from Anthony Pellicano, and Dr. Jason Golbin, titled "Covid-19 Vaccinations". A true and correct copy is included as part of Exhibit A.

**45.**    This memo instructed plaintiff to undertake accommodations for his perceived impairments such as getting tested bi-weekly and undertaking an injection process.

**46.**    On September 27, 2021 Plaintiff attempted to find a resolution with Christine Bracco, Director of HR, by sending a "Notice of Employment Discrimination and Retaliation Based Upon Disability", which asked her to address the plaintiff's request for due process and concerns regarding discrimination based on a perceived disability. Plaintiff met with Christine Bracco, Director of HR on September 28, 2021 and she told the plaintiff there was nothing else they could do and her hands were tied.

- 8 -

**47.** Plaintiff notified the defendant that he was documenting the discrimination; and encouraged Defendant to review the NY Benchbook Guide compilation of Public Health laws and the due process they require, hoping to draw their attention to the requirement for an actual medical diagnosis prior to prescribing injections and mitigation measures. No response was given by the defendant.

**48.** 59. On October 5, 2021 Plaintiff filed a Charge of Discrimination and Harassment with the EEOC via email and certified mail.

**49.** On November 17, 2021 Plaintiff received an email form Christine Bracco, Director of Human Resources and Tony Pellicano, Chief HR Officer, stating, if Plaintiff doesn't receive an injection by November 22, 2021 he will be placed on leave without pay for 2 weeks. After that time if the plaintiff hasn't submitted to the accommodation of taking medication, the so-called "COVID-19 Vaccination, he would be terminated. The email threatens plaintiff with the retaliation of docking his pay and being terminated if he does not submit to this policy.

**50.** Defendant's memo demonstrated the defendant's perception that the plaintiff has an impairment of the immune system and an impairment of the respiratory system and considers the plaintiff as a potential or actual source of a contagious disease without any individualized assessment establishing that plaintiff actually needs any accommodations or is a direct threat; and that defendant is taking adverse employment actions because of this perceived disability.

**51.** On November 28, 2021 the plaintiff returned from his vacation and received a letter from Christine Bracco, Director of HR, that he has been placed on unpaid leave until December 6, 2021 and his employment will be terminated if he fails to receive the experimental injection.

SA-10

**52.**    On November 29, 2021, Plaintiff responded to Christine's letter in an email (Exhibit A) explaining that he has no intention of resigning his position. Taking an experimental injection was never a condition of his employment and he is ready, able and willing to return to work.  Plaintiff has made great efforts to timely notice the defendant that he is both fit for service and has complied with all requests for response.

**53.**    In addition, defendant is clearly classifying employees by injection status, making a record of this perceived condition and threatening adverse employment actions against employees who have the condition of being unvaccinated.

**54.**    Defendant's policies also violate the plaintiff rights to medical privacy and informed consent.

**55.**    Defendant's policies fail to advise the plaintiff of the risks and benefits for accepting the accommodation of taking injections for the contagious disease that the defendant regards the plaintiff as having or potentially having.

**56.**    Defendant fails to advise the plaintiff of his right to accept or reject such accommodation as it is falls under an "emergency use authorization" period.

**57.**    Additionally,  defendant fails to advise the plaintiff that no vaccines have been approved by the Food & Drug Administration which are commercially available to the plaintiff, or are yet in production.

**58.**    Additionally, the injections which are being promoted as vaccines do not prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SARS-Cov2" purported "diseases".

SA-11

**59.** Plaintiff was terminated as of November 22, 2021, for being unvaccinated. There is no end-date when defendant will not consider plaintiff's unvaccinated classification as warranting termination.

**60.** The defendant has a duty of care to aid and encourage the plaintiff in exercising and enjoying his rights under the ADA. The defendant has thereby neglected its duty of care.

**61.** Defendant's new policies are illegal because they are discriminatory and constitute adverse employment actions.

**62.** Defendant has used policies and procedures that are discriminatory, harassing, retaliatory, intimidating, threatening, coercive. The policies interfere with ADA rights and constitute adverse employment actions and this is prohibited under the ADA.

**63.** Specifically, the defendant has failed to ensure the equal access or accessibility of the premises where the plaintiff is assigned to work. The plaintiff has thereby been prevented from enjoying equal access and the benefits of employment enjoyed by other employees.

**64.** The defendant continued without cessation to discriminate against the plaintiff based upon disability as demonstrated by the communications sent to the plaintiff by the defendant. All written communications are attached as Exhibit A.

**65.** Such discrimination persists notwithstanding the existence of readily available, well-established, accommodations, including, but not limited to refraining from engaging with the plaintiff in any conversation pertaining to the application of such mitigation measures and/or allowing the plaintiff to work in a

SA-12

position that would eliminate the need for the accommodation measures offered by the defendant.

**EUA Medical Interventions and Clinical Trials**

66.    The defendant has failed or refused to advise the plaintiff of the absolute risks or absolute benefits of such interventions and failed or refused to advise the plaintiff that he has a choice to accept or refuse such interventions (EUA injections, masking, submitting tissue samples) as set forth in 21 USC §360bbb-3 *et seq.*

67.    Defendant also failed or refused to advise the plaintiff of his right to accept or reject such accommodation as it is falls under an "emergency use authorization" period and the plaintiff is not required to participate in clinical trials, studies or epidemiological experiments as a condition for employment or as an accommodation measure.

68.    Additionally, defendant fails to advise the plaintiff that no vaccines that have been approved by the Food & Drug Administration are commercially available to the plaintiff, or are yet in production.

69.    Additionally, the so-called vaccines that are being promoted as vaccines do not prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SarsCOV2" purported "diseases".

70.    Additionally, the employer has not proven that there are no other accommodations available which do not require injections or medical devices.

71.    Since defendant is unfortunately attempting to enforce policies even the federal government cannot, it naturally falls on the employer to assume the responsibilities of satisfying informed consent and rights at all levels.

- 12 -

**FDA defines masks when used for mitigation purposes as a medical device.**

72.    Plaintiff requests that this court take judicial notice of Section 201(h) of the Food, Drug and Cosmetic Act and its Final Guidance titled, "Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff", published in September of 2017, in which the Food & Drug Administration **defines** wearing a mask for mitigation purposes as a medical device and the application of a medical device or contrivance.  A true and correct copy of this is included as Exhibit B.

73.    Plaintiff further requests judicial notice of the fact that the Food & Drug administration has never **approved** wearing such face masks, but only "authorized" them without any supporting medical or clinical data establishing any medical necessity or efficacy for wearing such contrivances.

## 74.   ALLEGATIONS OF DEFENDANT'S VIOLATIONS OF TITLE I OF THE ADA, 42 U.S.C. §12101 *et sequitur*.

**75.**    Plaintiff re-alleges each of the statements of fact herein and the allegations contained in the preceding paragraphs and the plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**76.**    Title I of the ADA prohibits employment discrimination on the basis of disability in all aspects of employment.

§ 1630.4 Discrimination prohibited.

(a) In general - (1) It is unlawful for a covered entity to discriminate on the basis of disability against a qualified individual in regard to:

(i) Recruitment, advertising, and job application procedures;

(ii) Hiring, upgrading, promotion, award of tenure, demotion, transfer, layoff, termination, right of return from layoff, and rehiring;

(iii) Rates of pay or any other form of compensation and changes in compensation;

(iv) Job assignments, job classifications, organizational structures, position descriptions, lines of progression, and seniority lists;

(v) Leaves of absence, sick leave, or any other leave;

(vi) Fringe benefits available by virtue of employment, whether or not administered by the covered entity;

(vii) Selection and financial support for training, including: apprenticeships, professional meetings, conferences and other related activities, and selection for leaves of absence to pursue training;

(viii) Activities sponsored by a covered entity, including social and recreational programs; and

(ix) Any other term, condition, or privilege of employment.

**No Evidence of Direct Threat**

**77.**    Defendant regards plaintiff as disabled with an impaired respiratory system and an impaired immune system; and reacts to and perceives plaintiff

as a potential or actual source of contagious disease without any individualized assessment.

**78.**　The very nature of discrimination is to take action based upon an unjustified negative attitude or opinion that is not based upon factual evidence. The defendant expresses the attitude toward the plaintiff as if the plaintiff is a direct threat to others, yet has never complied with any of the individual assessment criteria, to wit:

29 CFR Sections 1630.2(r):

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

      (1) The duration of the risk;

      (2) The nature and severity of the potential harm;

      (3) The likelihood that the potential harm will occur; and

      (4) The imminence of the potential harm."

**79.**　The defendant has made no meaningful efforts to remediate itself on the law, and has only referred to statements made on the CDC's website and the EEOC's website that mention the ADA, but this clearly does not qualify as an individualized medical assessment.

**Prohibited Medical Examinations and Inquiries**

**80.**　Among other things, Title I prohibits employers (the defendant) from requiring medical examinations or making disability-related inquiries of

employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c).

81.    An employer is entitled only to the information necessary to determine whether the employee can perform the essential functions of the job with or without reasonable accommodations and the defendant has failed to identify any set of facts that would qualify under this limitation.

§ 1630.13(b) Prohibited medical examinations and inquiries.

(b) Examination or inquiry of employees. Except as permitted by § 1630.14, it is unlawful for a covered entity to require a medical examination of an employee or to make inquiries as to whether an employee is an individual with a disability or as to the nature or severity of such disability.

(c) Examination of employees. A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. A covered entity may make inquiries into the ability of an employee to perform job-related functions.

82.    Defendant has never conspicuously disclosed that complying with an injection requirement, repetitive tissue-testing requirement, quarantining without due process requirement and a facial masking requirement are an **essential function of the job** of PhysicalTherapist; and it was never previously an essential function of plaintiff's job.

83.    The plaintiff must satisfy the PhysicalTherapist job requirements for educational background, employment experience, skills, licenses, and any other qualification standards that are job related; and be able to perform those tasks that are essential to the job, with or without reasonable accommodation.[2]

---

1.    [2]https://www.eeoc.gov/publications/ada-your-responsibilities-employer

Generally speaking employees that have been performing their essential job functions prior to the employer regarding them as disabled, easily meet this requirement.

84.   The plaintiff's remedy, with assistance from the court, is **to request the defendant to terminate its perceptions** that the plaintiff's unvaccinated condition includes its associated assumptions of regarding the plaintiff's respiratory and immune system as impaired. The perception thus being eliminated, the employee returns to his antecedent *status quo* employment status.

**Medical Records are Confidential**

85.   Defendant appears to be widely sharing its non-job-related medical classification of the plaintiff with many employees without any regard to confidentiality.

> § 1630.13 continues:
>
> (1) Information obtained under paragraph (c) of this section regarding the medical condition or history of any employee shall be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record, except that:
>
> (i) Supervisors and managers may be informed regarding necessary restrictions on the work or duties of the employee and necessary accommodations;
>
> (ii) First aid and personnel may be informed, when appropriate, if the disability might require emergency treatment; and
>
> (iii) Government officials investigating compliance with this part shall be provided relevant information on request.

(2) Information obtained under paragraph (c) of this section regarding the medical condition or history of any employee shall not be used for any purpose inconsistent with this part.

**86.**   The defendant is widely sharing its classification of perceiving plaintiff as disabled or impaired and unvaccinated with many employees who are tasked with assessing plaintiff's use of the mitigation measures; which leads to co-workers treating plaintiff as impaired and harassing plaintiff with repetitive emails and intimidating interactions.

**87.**   Defendant is widely sharing its classification of plaintiff as unvaccinated with numerous employees who are tasked with recording plaintiff's vaccination status; which leads to harassing plaintiff with repetitive emails and threats of termination.

**88.**   Plaintiff was terminated on November 22, 2021 on the basis of being unvaccinated. These factors are based solely upon defendant's perception of plaintiff's physical condition.

**89.**   Plaintiff is also repetitively asked to disclose his injection status without any notice regarding the data retention policy or who receives the data and for what purpose.

**Defendant is not running a voluntary health program.**

§ 1630.14

(d) Other acceptable examinations and inquiries. A covered entity may conduct voluntary medical examinations and activities, including voluntary medical histories, which are part of an employee health program available to employees at the work site.

(1) Employee health program. An employee health program, including any disability-related inquiries or

medical examinations that are part of such program, must be reasonably designed to promote health or prevent disease. A program satisfies this standard if it has a reasonable chance of improving the health of, or preventing disease in, participating employees, and it is not overly burdensome, is not a subterfuge for violating the ADA or other laws prohibiting employment discrimination, and is not highly suspect in the method chosen to promote health or prevent disease. A program consisting of a measurement, test, screening, or collection of health-related information without providing results, follow-up information, or advice designed to improve the health of participating employees is not reasonably designed to promote health or prevent disease, unless the collected information actually is used to design a program that addresses at least a subset of the conditions identified. A program also is not reasonably designed if it exists mainly to shift costs from the covered entity to targeted employees based on their health or simply to give an employer information to estimate future health care costs. Whether an employee health program is reasonably designed to promote health or prevent disease is evaluated in light of all the relevant facts and circumstances.

(2) Voluntary. An employee health program that includes disability-related inquiries or medical examinations (including disability-related inquiries or medical examinations that are part of a health risk assessment) is voluntary as long as a covered entity:

(i) Does not require employees to participate;

(ii) Does not deny coverage under any of its group health plans or particular benefits packages within a group health plan for non-participation, or limit the extent of benefits (except as allowed under paragraph (d)(3) of this section) for employees who do not participate;

(iii) Does not take any adverse employment action or retaliate against, interfere with, coerce, intimidate, or threaten employees within the meaning of Section 503

SA-20

of the ADA, codified at 42 U.S.C. 12203 and 29 CFR Part 1630.14(c).

**90.** Defendant has never conspicuously disclosed that the discriminatory policy is a voluntary health program.

**91.** Defendant has never provided an absolute risk/absolute benefit analysis of the discriminatory policy; this disqualifies the discriminatory policy as a health program by design.

**92.** Defendant has interfered with plaintiff's enjoyment of his ADA rights which lends credence to the allegation that the discriminatory policy is a subterfuge for violating the ADA or other laws prohibiting employment discrimination.

**Limiting, Segregating and Classifying**

**93.** Defendant has violated and continues to violate Title I of the ADA, 42 U.S.C. §12112(b) implemented by 29 CFR Parts 1630.5.

§ 1630.5 Limiting, segregating, and classifying.

It is unlawful for a covered entity to limit, segregate, or classify a job applicant or employee in a way that adversely affects his or her employment opportunities or status on the basis of disability.

**94.** Defendant has violated and continues to violate Title I of the ADA, 42 U.S.C. §12112(b) implemented by 29 CFR Parts 1630.5.

**95.** Defendant has mis-classified plaintiff as "disabled" under the "regarded as" prong and made a "record of" this perceived disability.

**96.** Defendant classified the plaintiff as unvaccinated and has discriminated and retaliated against plaintiff upon this basis.

**97.** Defendant mis-classified the plaintiff based upon perceived disability because it refused to acknowledge plaintiff's enjoyment of his rights under the ADA.

SA-21

**98.** Defendant terminated plaintiff's employment based on these classifications.

**99.** The law prohibits the defendant from imposing any accommodation measures upon the plaintiff, and yet the defendant has undertaken several adverse employment actions to intimidate, harass, coerce and retaliate against the plaintiff for not accepting defendant's accommodations and otherwise exercising and enjoying his rights under the ADA, specifically, 29 CFR Part 1630.9(d).

**100.** If the plaintiff had previously made at least one request for reasonable modifications, plaintiff has since withdrawn such request.

**§ 1630.9**

(d) An individual with a disability is not required to accept an accommodation, aid, service, opportunity or benefit which such qualified individual chooses not to accept.

**101.** Defendant offered mitigation measures as accommodations to the perceived disability and plaintiff chose not to accept.

**102.** Defendant limited the accommodation measures[3], such as examinations, disclosures of medical records that were not job-related, experimental injections, medical interventions, equipment or products, to only those chosen by the defendant.

**103.** The plaintiff is not required to accept any accommodations and has not waived any rights to informed consent. The defendant had expressed to the plaintiff that regarding these accommodations, the plaintiff's right to informed

_____

[3] 29 CFR Part 1630.2(j)(5)(i)

consent was not violated because he could quit at any time.  This clearly violates 29 CFR Part 1630.9(d).

**104.**  The defendant has not indicated that the accommodations offered are reasonable or necessary to enable the plaintiff to perform essential functions of the employment position held.

**105.**  The plaintiff explained and disclosed to the defendant that the accommodations offered by the defendant would create a disability for the plaintiff that substantially limits one or more major life activities, including, but not limited to: breathing, normal cell growth, normal immune system functioning and communications.

**106.**  The defendant has never expressed that plaintiff's refusal to accept such accommodations would have fundamentally altered the work environment or caused any undue burden upon the defendant.  In fact, the defendant's policies regarding the so-called forced medical examinations and interventions have already fundamentally altered the work environment.

**107.**  In fact, the defendant is not required to provide any accommodation under the "regarded as" prong.

§ 1630.9
(e) A covered entity... is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (§ 1630.2(g)(1)(iii)).

**108.**  However, the list of adverse employment actions taken by the defendant against the plaintiff such as harassing the plaintiff with coercive and threatening emails; refusing to process plaintiffs discrimination claims; classifying the plaintiff as unvaccinated; isolating and segregating the plaintiff; falsely classifying the plaintiff as "resigned" based on injection status; and refusing to recognize

plaintiff's rights of refusal, penalizing the plaintiff with two weeks of unpaid leave and then terminating the plaintiff's employment for attempting to exercise and enjoy rights that are protected by the ADA, which demonstrates that defendant retaliated against plaintiff because it perceived him as impaired.

**109.** Plaintiff demands a jury trial.

**110. WHEREFORE,** Plaintiff demands judgment against the defendant for compensatory damages and that the court declare that Defendant's discriminatory actions and/or violations as set forth in this Complaint violate Title I of the Americans with Disabilities Act under 42 U.S.C. §12101 and implemented under 29 CFR Part 1630 *et sequitur*;

**111.** And an order enjoining the defendant, along with its officers, agents, and employees, and all others in active concert or participation with them, from:

**112.** Engaging in discriminatory acts and/or omissions against the plaintiff because of (perceived) disability; and an order enjoining the defendant from implementing practices and policies in a manner that is inaccessible to individuals with disabilities, specifically the plaintiff, within the meaning of Title I of the ADA;

**113.** And ordering defendant to:

**114.** Comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and,

**115.** Provide appropriate auxiliary aids and services; modify policies, practices, and procedures; and/or require alternative methods to ensure the accessibility of its premises and services to individuals with disabilities, specifically the plaintiff; and,

**116.** Take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of the defendant's discriminatory conduct to the position that plaintiff would have been in, but for the Defendant's conduct, beginning with the plaintiff; and,

**117.** Take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

**118.** Award monetary damages to the plaintiff, in an appropriate amount for injuries suffered as the result of Defendant's failure to comply with the requirements of Title I of the ADA, 42 U.S.C. §12101; and,

**119.** Assess a civil penalty against the Defendant in an amount authorized by 42 U.S.C. §12101 to vindicate the public interest and make the plaintiff whole; and,

Order such other relief as the interests of justice may require.

**120.   COUNT II – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT**

Plaintiff, Andrew Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for Retaliation, Coercion, Interference and Intimidation and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur*, and alleges the following:

## JURISDICTION AND VENUE

**121.** This court has original and exclusive jurisdiction under Title I of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Retaliation, Coercion, Threats and Interference"; as implemented by 29 CFR Part 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers, medical examinations and interventions.

**122.**   Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**123.**   The incidents and facts giving rise to this complaint have occurred within the last one hundred eighty days.  The plaintiff commenced a complaint against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 5, 2021.

## PARTIES

**124.** Plaintiff, Andrew Kosiba, resides in Suffolk County, New York at the address of 33 Neal Path; South Setauket and is a qualified individual with a disability within the meaning of the ADA.  The plaintiff is an employee of the defendant, which is a "covered entity" within the meaning of the Act.

**125.**  The defendant's principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York  11735.

## PLAIN STATEMENT

**126.**  The defendant perceived and mis-classified the plaintiff as impaired and unvaccinated and retaliated against the defendant upon this basis. The affirming adverse employment action of classifying the plaintiff as unvaccinated is that plaintiff was terminated on November 22, 2021 on the basis of being unvaccinated.

## 127.  STATEMENTS OF FACT

**128.**  Plaintiff re-alleges each of the statements of fact herein and the allegations contained in the preceding paragraphs and the plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**129.**  Defendant and its agents: including, but not limited to,  Christine Bracco refused to communicate with the plaintiff; refused to investigate the discrimination; refused to assist the plaintiff; refused to help him find a resolution to the discrimination or mitigate the harassment.  They each interfered with plaintiff's rights under the ADA.

**130.**  The November 17, 2021 email (Exhibit A) clearly demonstrates that the defendant is regarding the plaintiff as disabled and is intending adverse employment actions if plaintiff does not get injected or submit to defendant's accommodation measures by the November 22nd, deadline. It does not mention plaintiff's right of refusal under EUA guidelines4, there is no mention of plaintiff

---

[4] Title 21, Chapter 9 V, Part E §360bbb–3a. Emergency use of medical products

having the right to refuse the defendant's accommodations under the ADA5, there is no mention made of plaintiff having the right of informed consent. Defendant is interfering with the plaintiff's rights by obfuscation and by refusing to acknowledge them.

**131.** On November 22, 2021, plaintiff is placed on a two week unpaid leave because defendant regards him as impaired and has taken adverse employment actions against him.

**132.** Plaintiff was terminated as of November 22, 2021 under the disguise of being placed on unpaid leave, for being unvaccinated. There is no end-date when defendant will not consider plaintiff's unvaccinated classification therefore this letter must be seen for what it is: a letter of termination based upon perceived disability.

**133.** Plaintiff also suffered the adverse employment action of choosing between taking an experimental drug, or other mitigation measures with no liability coverage or having his employment terminated without any diagnosis establishing that he is a direct threat and needs such medical treatment in the first place.

**134.** The list of adverse employment actions taken by the defendant against the plaintiff such as: harassing the plaintiff with coercive and threatening emails; refusing to process plaintiffs discrimination claims; classifying the plaintiff as unvaccinated; isolating and segregating the plaintiff; falsely classifying the plaintiff as "resigned" based on injection status;  and refusing to recognize plaintiff's rights of refusal, penalizing the plaintiff with two weeks of unpaid leave and then terminating the plaintiff's employment for attempting to exercise and

---

5 29 CFR Part 1630.9 (d) & (e)

enjoy rights that are protected by the ADA, which demonstrates that defendant retaliated against plaintiff because it perceived him as impaired.

## ALLEGATIONS OF DEFENDANT'S VIOLATIONS
## OF TITLE I OF THE ADA, 42 U.S.C. §12101 *et sequitur.*

**135.**  The ADA also prohibits employers from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing under the ADA, Title 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c), to wit:

**Retaliation**

> § 1630.12 Retaliation and coercion.
>
> (a) Retaliation. It is unlawful to discriminate against any individual because that individual has opposed any act or practice made unlawful by this part or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision contained in this part.

**136.**  The plaintiff was threatened to be terminated and was terminated because of his unvaccinated condition and has successfully stated a violation of the act simply because he has been subjected to an action prohibited under the law because of perceived physical impairment.

**137.** The impairment **experienced** by the plaintiff in connection with his respiratory and immune systems is neither transitory nor minor from the defendant's point of view because the defendant has no end date when it will not regard this status as warranting termination.

SA-29

**138.** Therefore the ruse of placing plaintiff on unpaid leave is also effectively termination because there is no end date.

**139.** Nor can the defendant claim it was unaware of its own perception at the date of termination because the very basis for termination is the unvaccinated condition of the plaintiff and the attendant deficiencies associated with the plaintiff's respiratory and immune systems.

**140.** Defendant adopted a new discriminatory policy and discriminated against the plaintiff based on perceived disability; when plaintiff opposed the unlawful policy, defendant retaliated against the plaintiff by terminating his employment through the ruse of classifying plaintiff as "resigned"; however, the evidence shows that plaintiff was terminated because he was deemed a direct threat without individualized assessment and because he was classified as unvaccinated.

**Coercion, Interference or Intimidation**

§ 1630.12

(b) Coercion, interference or intimidation. It is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part.

**141.** Additionally, the defendant has coerced, intimidated and interfered against the plaintiff by:

**142.** a.) coercing the plaintiff to submit to the accommodation measures, medical interventions and examinations and other health control measures, even though the defendant was duly advised by the plaintiff that the plaintiff was not subject to any health control measures by any court orders, and that the

defendant was not empowered by any court order or other legal duty to impose such interventions, examinations or control measures upon the plaintiff[6]; and,

**143.** b.) allowing other employees to coerce, intimidate or verbally ridicule and abuse the plaintiff in violation of the defendant's duty of care; and,

**144.** c.) threatening the plaintiff with the termination of his employment and,

**145.** d.) threatening the plaintiff with exclusion because of his disability.

**146.** Defendant coerced the plaintiff on many occasions by demanding plaintiff submit to experimental medical treatments without first performing an individualized assessment to gather the medical evidence necessary to base such a "demand" upon.

**147.** Defendant effectively coerced the plaintiff by refusing to provide a risk/benefit analysis as required for true informed consent; and refused to recognize the plaintiff's right to refuse medical treatment or participate in a clinical study, thus interfering with plaintiff's enjoyment of protected rights.

**148.** Defendant interfered with the exercise and enjoyment of plaintiff's rights by refusing to document the discrimination, process his opposition to the prohibited practices or aid the plaintiff in the enjoyment of his rights.

**149.** Defendant interfered with plaintiff's enjoyment of his rights under the ADA by providing employer "COVID-19 Vaccinations" forms which offered only medical or religious exemption as the available "opt-out" choices. This interfered with plaintiff's ADA rights because it limited plaintiff's right to invoke ADA protections under the 'regarded as" prong, including without limitation, the right

---

[6]Chapters 1.23 through 1.43 of the New York State Public Health Manual.

SA-31

to be free of discrimination and retaliation based upon disability, such as being terminated or segregated because of one's physical condition.

**150.** The EEOC has offered guidance on interference and states:

> "Examples of interference include: issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g., a fixed leave policy that states 'no exceptions will be made for any reason');"[7]

**151.** Defendant interfered with plaintiff's rights by then classifying plaintiff as noncompliant when plaintiff notified the defendant that plaintiff was exercising his rights of refusal based upon his rights under the ADA and informed consent.

**152.** Defendant deceptively tried to persuade plaintiff that his only remedy to the illegal policy demands would be to ask for a medical or religious exemption from these discriminatory policies and practices, thereby creating a false record that is without legal merit and creates a substantial prejudice against the plaintiff to seek a remedy in court.

**153.** Defendant only presented a medical or religious exemption, and did not mention that ADA accommodations are available; which is obfuscation of and interference with the exercise and enjoyment of plaintiffs rights held under the ADA, particularly 42 USC 12203(b) and 29 CFR 1630.12(b).

**No Undue Burden**

**154.** The defendant has failed to demonstrate any facts constituting any undue burden it would incur because of plaintiff's choice to refuse the accommodations offered by the defendant.  Defendant cited no facts including:

---

[7] https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues

29 CFR Part 1630 *et sequitur*.

> (i) The nature and net cost of the accommodation needed under this part, taking into consideration the availability of tax credits and deductions, and/or outside funding;

> (ii) The overall financial resources of the facility or facilities involved in the provision of the reasonable accommodation, the number of persons employed at such facility, and the effect on expenses and resources;

> (iii) The overall financial resources of the covered entity, the overall size of the business of the covered entity with respect to the number of its employees, and the number, type and location of its facilities;

> (iv) The type of operation or operations of the covered entity, including the composition, structure and functions of the workforce of such entity, and the geographic separateness and administrative or fiscal relationship of the facility or facilities in question to the covered entity; and

> (v) The impact of the accommodation upon the operation of the facility, including the impact on the ability of other employees to perform their duties and the impact on the facility's ability to conduct business.

**No Fundamental Alterations**

**155.** The defendant has failed to demonstrate how the plaintiff's refusal to accept the defendant's accommodations would have fundamentally altered the manner in which the defendant carried out its usual operations; in fact, the defendant has already substantially altered the manner in which it normally carries out its operations by attempting to force its accommodations against the will of all of its employees.

**No Safety Risk**

**156.**  The defendant has failed to identify any legitimate safety requirements that would be necessary for the safe operation of its business.  It has failed to identify or demonstrate any safety requirements pertaining to the accommodations that are based on actual risks and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

**Harm and Injury suffered by the plaintiff.**

**157.**  The injury suffered by the plaintiff is thereby concrete and particularized and it is actual and imminent.  The injury alleged in the complaint, including the pleading and exhibits, clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical.  The injury described therein is at least fairly traceable to the challenged action, conduct and policies of the defendant.

**158.**  The harm (injury) already suffered by the plaintiff includes, but is not limited to, having to choose between waving medical privacy rights, and submitting to medical interventions and examinations without the benefits of informed consent, and being regarded as if he has a contagious disease without any individualized assessment according to any medical or scientific standards or having his employment terminated.

**159.**  Once violated, these rights cannot be recovered.  The medical privacy rights are the plaintiff's intangible property rights which are not required to be waived as a condition of employment and include the right to refuse to participate in any epidemiological experiments or clinical trials.

**160.** Defendant's policies demonstrate soundly and convincingly, that its policies inflict future harm against the plaintiff who is regarded as having a disability or invisible disability and that the defendant fully intends to continue

these policies and that the defendant fully intends to retaliate and continue retaliating against the plaintiff as alleged herein.

**161.** The defendant continues to discriminate against the plaintiff in violation of each of the foregoing sections.  Among other things, this law prohibits the defendant from requiring medical examinations or making disability-related inquiries of the plaintiff unless such examination or inquiry is shown to be job-related and consistent with business necessity.  The defendant is entitled only to the information necessary to determine whether the plaintiff can perform the essential functions of the job with or without reasonable accommodations without posing a direct threat.  The defendant has failed or refused to comply with this law, even making the outrageous claim that the plaintiff can either submit to complying with the accommodations or have his employment terminated, regardless of the defendant's legal duties or the law.

**162.** It is important to note that none of the personnel in human resources that were involved in this matter ever once cited any legal authority that countermands the ADA.

**163.** Furthermore, defendant never cited any legal authority or obligation that has created any new duty of care or insurable risk to impose the discriminatory policies.

**164.** Furthermore, the defendant failed to identify any insurable risk for engaging in the administration of medical examinations, interventions or protecting anyone from what is being claimed as a "pandemic" or "public health danger".

**165.** Additionally, defendant fails to cite any insurable risk for the same or for those suffering any adverse health consequences as a result of complying with

the accommodations administered by unlicensed, untrained, uninsured and un-equipped employees of the defendant.

**166.** Even one's own licensed and insured physician requires informed consent as a condition of administering any medical examination or intervention upon the patient. No laws have changed and the defendant is without any legal authority or obligation to engage in these practices, and especially engage in harassment, discrimination and retaliation in violation of federal law.

**167.** As a result of Defendant's actions the plaintiff has experienced discrimination, segregation, isolation, retaliation, coercion, interference, loss of wages and termination and disruption in his career.

**168.** Plaintiff demands a jury trial.

**169. WHEREFORE**, Plaintiff demands judgment against the defendant for compensatory damages and that the court declare that Defendant's retaliatory, coercive, interfering and intimidating actions and/or violations as set forth in this Complaint violate Title I of the Americans with Disabilities Act under 42 U.S.C. §12101 and implemented under 29 CFR Part 1630 *et sequitur*;

**170.** And an order enjoining the defendant, along with its officers, agents, and employees, and all others in active concert or participation with them, from:

**171.** Engaging in retaliation, coercion, interference and intimidation and/or omissions against the plaintiff because of his disability; and an order enjoining the defendant from implementing practices and policies in a manner that is inaccessible to individuals with disabilities, specifically the plaintiff, within the meaning of Title I of the Americans with Disabilities Act (ADA);

**172.** And ordering defendant to:

- 35 -

**173.** Comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and,

**174.** Provide appropriate auxiliary aids and services; modify policies, practices, and procedures; and/or require alternative methods to ensure the accessibility of its premises and services to individuals with disabilities, specifically the plaintiff; and,

**175.** Take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of the defendant's discriminatory conduct to the position that he would have been in, but for the Defendant's conduct, beginning with the plaintiff; and,

**176.** Take such affirmative steps as may be necessary to prevent the recurrence of any retaliation, coercion, interference and intimidation and to eliminate, to the extent practicable, the effects of such conduct.

**177.** Award monetary damages to the plaintiff, in an appropriate amount for injuries suffered as the result of Defendant's failure to comply with the requirements of Title I of the ADA, 42 U.S.C. §12101; and,

**178.** Assess a civil penalty against the Defendant in an amount authorized by 42 U.S.C. §12101 to vindicate the public interest and make the plaintiff whole; and,

**179.** Order such other relief as the interests of justice may require.

**180.  COUNT III – COMPLAINT FOR WRONGFUL TERMINATION OF EMPLOYMENT**

**181.**  The plaintiff, Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for wrongful termination of employment and alleges the following:

**JURISDICTION AND VENUE**

**182.**  The Eastern District Court has original jurisdiction over claims for wrongful termination for employment and related employment agreements.

**183.**  The plaintiff resides in Nassau County and his mailing address is 33 Neal Path; South Setauket, New York.

**184.**  The defendant is a resident in the state of New York, with its principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York  11735.

**185.**  The material facts for all times material to this complaint took place in Nassau County, New York.

**STATEMENTS OF FACT**

**186.**  On the date of November 22, 2021, the plaintiff's employment was terminated without notice.

**187.**  The plaintiff advised the defendant on several occasions by documenting the harassment and coercion via plaintiff's confidential communications filed with the Human Resources.

**188.**  This documentation addressed the fact that defendant's actions were not legal and not binding upon the plaintiff and that the defendant had no duty to act under these new terms.   True and correct copies of these written communications are attached as Exhibit A.

SA-38

**189.** The defendant ignored the plaintiff, refused to do an intake, falsely declared plaintiff has "resigned" and terminated his employment for discriminatory reasons on November 22, 2021.  The communications exhibited with this complaint are included as Exhibit A.

**190.** Defendant is not a licensed physician and not supervised under any licensed physician yet wants to impose a medical intervention upon the plaintiff as a condition for employment in violations of the plaintiff's right to informed consent and Americans with Disabilities Act.

**191.** Defendant stated that while it may require a forced medical intervention without any medical qualification or licensing, the plaintiff is somehow required to get permission from a licensed physician in order to exercise his right to informed consent.  Why does the plaintiff need a licensed physician to exercise his right to informed consent and the defendant does not need any licensed physician to violate plaintiff's rights regarding medical interventions?

## ALLEGATIONS

**192.** Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**193.** The plaintiff's employment was wrongfully terminated by the defendant for discriminatory reasons.

**194.** Upon defendant's change in the employment conditions purportedly requiring the plaintiff to get EUA injections, wear a mask while working, and other mitigation measures, plaintiff was suddenly expected to waive his rights to informed consent on the unfounded presumption that the plaintiff had an impaired immune system, impaired respiratory system, and was a carrier of a

contagious disease, all without having first made any individualized assessment as to whether or not the plaintiff was a direct threat to anyone.

**195.** Beginning from the date the plaintiff was hired, plaintiff has been compensated for his labor and the services he has provided the defendant at regular intervals. Plaintiff had a reasonable expectation to continue working for the defendant. The defendant's termination of the plaintiff's employment was in violation of the employment contract and was made without notification or adequate notification to the plaintiff.

**196.** The terms of the job description are alleged herein and include the written policies of the defendant, a true and correct copy of which is attached as Exhibit C.

**197.** The conditions of plaintiff's employment with the defendant did not require the defendant to waive any of his rights.

**198.** The conditions of the plaintiff's employment with the defendant did not require the plaintiff to accept the defendant's medical advice.

**199.** The conditions of the plaintiff's employment with the defendant did not include terms that allowed the defendant to engage in the unlicensed practice of medicine and the defendant is not insured or otherwise indemnified for practicing medicine.

**200.** The conditions of the plaintiff's employment with the defendant did not include terms that made the defendant the plaintiff's physician or otherwise require the plaintiff to act upon medical advice given by the defendant.

**201.** Plaintiff's employment was wrongfully terminated in retaliation for exercising his rights under the ADA. Also, the plaintiff has certain intangible private property rights which include the right to care for his own health and

choose his own physician and health care practices while also avoiding habits and practices that the plaintiff believes might ruin or risk his good health.

**202.** The plaintiff also has the intangible private property right to make decisions that affect his health with informed consent; that is, plaintiff has a right to review all risk and benefit analyses and results from relevant clinical studies prior to making any decision to adopt new practices regarding his health.

**203.** The defendant refused to comply with the law and violated the plaintiff's property rights, specifically those enumerated under the state's Patient's Bill of Rights and informed consent.

**204.** Defendant is an employer and prohibited from firing or otherwise retaliating against employees, specifically the plaintiff, who report workplace safety violations or participate in investigations into such violations.

**205.** New conditions of employment violated the Americans with Disabilities Act and involved the defendant's conduct which included imposing mitigation measures and retaliation in violation of the ADA.

**206.** New conditions of employment violated the long-standing safety standards adopted by the Occupational Safety and Health Administration and involved the defendant's conduct which included imposing medical interventions in violation of the law prohibiting the unlicensed practice of medicine.

**207.** Plaintiff's employment was also wrongfully terminated because the plaintiff refused to accept a medical intervention sought to be imposed by the defendant where such medical intervention was not permitted to be imposed by law or to be imposed by the defendant and violated the plaintiff's right to informed consent.

**208.** As a direct and proximate result of the defendant's actions, the plaintiff's employment was wrongfully terminated by the defendant.

**209.** The defendant's actions were willful and negligent. After plaintiff's objections and attempts to re-mediate the defendant on the law and his rights, the defendant continued violating the law and violating the plaintiff's rights as alleged herein.

**210.** The defendant did not act under color of law or claim of lawful authority. The defendant had no legal duty to require the plaintiff to undertake <u>any</u> medical intervention much less purportedly requiring the plaintiff to get injections, submit tissue samples or wear a surgical mask or mask of any kind as a new condition of his employment.

**211.** The plaintiff was not acting under any authority of law or court order. Again, the defendant was under no legal duty to violate the law as alleged herein, and no authority or court order permitted the defendant to violate the law or violate the plaintiff's rights as alleged herein. The plaintiff never waived any of his rights at any time.

**212.** No employee or agent of the defendant is licensed, competent or authorized to give medical advice, such as requiring employees such as the defendant to get injections, wear a mask, or submit to temperature or tissue testing.

**213.** Additionally, neither the defendant nor any of its employees or agents are insured or indemnified to collect tissue samples or interpret vital statistics (nasal swabs and temperature readings which can lead to being quarantined without due process).

SA-42

**214.**  Defendant has no authority to require the plaintiff to act upon its medical advice (injections, masks); disclose his vital statistics (temperature); or submit to any medical examination by giving tissue samples (nasal testing) as a new condition of the plaintiff retaining his employment with the defendant.

**215.**  The defendant is not authorized to violate the rights of the plaintiff, nor is the defendant required to break the law, or operate beyond its charter as a new condition of the plaintiff's employment that was never considered at the time he was hired.

Plaintiff demands a jury trial.

**216. WHEREFORE** plaintiff demands judgment against the defendant for wrongful termination together with costs and attorney fees and other relief as this court deems appropriate.

**COUNT IV – LOST WAGES**

**217.**  Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**218.**  Plaintiff was wrongfully terminated on the date of November 22, 2021 and based upon his rate of compensation, the plaintiff is entitled to lost wages in the approximate amount of and based upon her yearly rate of compensation, the plaintiff is entitled to a minimum of lost wages in the approximate amount of one hundred ten thousand dollars ($110,000) not including additional benefits which may be calculated by the court, plus interest as calculated by the laws of the State of New York.

**219. WHEREFORE** plaintiff demands judgment against the defendant for lost wages in the amount of $110,000 as alleged herein, together with costs and attorney fees and other relief as this court deems appropriate.

SA-43

## COUNT V – BREACH OF CONTRACT

**220.** Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**221.** It was an employment contract that was commenced between the plaintiff and defendant in November of 2000 with an offer of employment and continued without interruption until plaintiff's employment was terminated as alleged herein.

**222.** The Plaintiff's job title was Physical Therapist and he was paid $110,000 per year.

**223.** In addition to the regular remuneration paid by the defendant to the plaintiff as alleged, the defendant provided the plaintiff with annual incentive bonus as an additional benefit under the employment agreement.

**224. WHEREFORE** plaintiff demands judgment against the defendant in the amount of no less than the amount of $110,00 plus costs and attorney fees and other relief as this court deems appropriate.

## COUNT VI – BREACH OF IMPLIED CONTRACT

**225.** Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**226.** It was an employment contract that was commenced between the plaintiff and defendant in November of 2000 with an offer of employment and continued without interruption until plaintiff's employment was terminated as alleged herein.

SA-44

**227.** The Plaintiff's job title was Physical Therapist and he was paid $110,00 per yearly.

**228.** In addition to the regular remuneration paid by the defendant to the plaintiff as alleged, the defendant provided the plaintiff with annual incentive bonus as an additional benefit under the employment agreement.

**229. WHEREFORE** plaintiff demands judgment against the defendant in the amount of no less than the amount of $110,000 plus costs and attorney fees and other relief as this court deems appropriate.

DATED this 8th day of December 2021.

Andrew Kosiba, Plaintiff

SA-45

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

F I L E D
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★    MAR 03 2022    ★

LONG ISLAND OFFICE

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK
225 Cadman Plaza East, Brooklyn, NY 11201

ANDREW KOSIBA

    PLAINTIFF

v.                      CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.

    DEFENDANT
                               /

### AMENDED COUNT I – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT

    This complaint is amended and the Defendant has not yet filed a responsive pleading to the original complaint as of this day.

Plaintiff, Andrew Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for discrimination on the basis of disability, and for prohibited actions taken on the basis of this disability under the "regarded as" prong; and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur*, and alleges the following:

- 1 -

## JURISDICTION AND VENUE

**1.**     This court has original and exclusive jurisdiction under Title I of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Discrimination"; as implemented by 29 CFR § 1630.2; §1630.4; §1630.5; §1630.13 and 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

**2.**     Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**3.**     The incidents and facts giving rise to this complaint have occurred within the last one hundred eighty days.  The plaintiff has commenced a complaint against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 7, 2021. The plaintiff has exhausted all administrative remedies and received a Right to Sue letter on February 17, 2022, a true and correct copy is attached in Exhibit A.

## PARTIES

**4.**     Plaintiff, Andrew Kosiba, resides in Suffolk County, New York at the address of 33 Neal Path; South Setauket and is a qualified individual with a disability within the meaning of the ADA.  The plaintiff is an employee of the defendant, which is a "covered entity" within the meaning of the Act.

**5.**     The defendant's principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York  11735.

## PLAIN STATEMENT

**6.** Defendant discriminated against the plaintiff based upon perceived disability.   When the plaintiff objected, the defendant sought to impose accommodations; including but not limited to: medical examinations, medical interventions including mask-wearing; without first conducting an individualized assessment to determine if he was a direct threat.  Defendant has used policies and procedures that harass, isolate, segregate, limit, classify, deny equal access and impose non-job-related medical exams and inquiries upon the plaintiff and this is prohibited under the ADA.

## STATEMENTS OF FACT

**7.**     The plaintiff is regarded as having a disability.

**8.**     The plaintiff is a qualified individual with a disability.

**9.**     The plaintiff is regarded as having a disability by the defendant and the defendant's policies are specifically implemented for the purpose of mitigating the disability which it regards the plaintiff as having.

**10.**     The plaintiff therefore has a disability under the protection of the ADA.

**11.**     The plaintiff was an employee of the defendant and was continuously employed by the defendant from November 2000 until the date of termination on November 22, 2021.

**12.**     In March of 2021, the defendant began demonstrating by its policies and practices that it regards the plaintiff as having a disability of an impaired immune system and an impaired respiratory system; and began responding to the plaintiff as if he had a contagious disease.

**13.**     Defendant has never conducted the required individualized assessment to determine whether or not the plaintiff is a direct threat.

- 3 -

ADA Title I Complaint

14.   The plaintiff duly noticed the defendant that he was claiming protection under the ADA because of being regarded as disabled.

15.   The plaintiff may proceed under the "regarded as" prong and this court has jurisdiction under the "regarded as" prong of the ADA.

16.   The complaint thereby satisfies the criteria for stating a *prima facie* cause of action for these reasons, along with the fact that the defendant has made a record of such disability as further alleged herein.

17.   The ADA also protects individuals such as the plaintiff for whom submitting to certain accommodations would create impairments.  The accommodations include, but are not limited to: submitting to repetitive, non-job-related medical examinations (nasal tissue testing, antigen testing; daily health inquiries); collection of vital statistics (body temperature); being segregated and isolated (including quarantine without due process); using medical devices for mitigation measures (masks); disclosing plaintiff's medical records and history for non-job-related matters ("vaccine" status reports); taking multiple injections of experimental gene therapy solutions under "emergency use authorization" without informed consent; and participating in clinical trials and epidemiological experiments as a condition of employment.

18.   Plaintiff re-alleges each statement from the Affidavit herein.

### COUNT I – ALLEGATIONS OF DEFENDANT'S VIOLATIONS OF TITLE I OF THE ADA, 42 U.S.C. §12101 *et sequitur*.

19.   Plaintiff incorporates each of the above statements of fact herein; the allegations contained in the following paragraphs and the plaintiff's affidavit in support of complaint which is also re-alleged and incorporated herein by reference.

- 4 -

ADA Title I Complaint

SA-49

**20.**    Title I of the ADA prohibits employment discrimination on the basis of disability in all aspects of employment, in 29 CFR § 1630 *et sequitur;* and particularly §1630.4; § 1630.5.

**21.**    In March of 2021, the defendant began regarding the plaintiff as having a disability of an impaired immune system and an impaired respiratory system; and began responding to the plaintiff as if he had a contagious disease.  (See Affidavit in Support of Complaint (hereafter "Affidavit"))

**22.**    The defendant expresses the attitude toward the plaintiff as if the plaintiff is a direct threat to others, yet has never conducted an individualized assessment or complied with any of the statutory individual assessment criteria1.(See Affidavit)

29 CFR § 1630.2(r):

> "Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a '<u>direct threat</u>' shall be based on an <u>individualized assessment</u> of the individual's present ability to safely perform the essential functions of the job. This assessment shall be <u>based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence</u>. In determining whether an individual would pose a direct threat, the factors to be considered include:
> (1) The duration of the risk;
> (2) The nature and severity of the potential harm;

---

[1] EEOC Technical Manual 2.2 (c) "...the Supreme Court has stated and the Congress has reiterated, "society's myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairments."  The legislative history of the ADA indicates that Congress intended this part of the definition to protect people from a range of discriminatory actions based on "myths, fears and stereotypes" about disability, which occur even when a person does not have a substantially limiting impairment."

ADA Title I Complaint

(3) The likelihood that the potential harm will occur; and
(4) The imminence of the potential harm."

**23.**   The defendant has made no meaningful efforts to remediate itself on the law, and has only referred to statements made on the CDC's website, but this clearly does not qualify as an individualized assessment.

**24.**   Plaintiff has given defendant conspicuous notice that plaintiff objects to discrimination and declines any of the accommodations (mitigation measures) on the basis of rights protected by the ADA because defendant's policies and practices demonstrate that the defendant regards him as having a disability, and that the defendant has made a record of such disability by mis-classifying the plaintiff as having an impairment.  (See Affidavit)

**Defendant Harassed, Isolated, Segregated and Denied Equal Access to Plaintiff.**

**25.**   The defendant's responses to the requests made by the plaintiff to cease the discrimination and harassment were in fact non-responsive, dismissive or harassing; a true and correct copy of each is included with Exhibit A.  (See Affidavit)

**26.**   Despite plaintiff's written notices, the defendant continued without cessation to harass the plaintiff based upon disability by sending him numerous communications coercing him to accept various accommodations or suffer adverse employment actions.   All written communications are attached as Exhibit A. (See Affidavit)

**27.**   Defendant imposed accommodations upon the plaintiff which included isolation and segregation such as demanding plaintiff remain 6 feet away from co-workers; refusing him access to the work space, the staff room, and rest

rooms; segregating plaintiff to a part of the work space; without due process. (See Affidavit)

**28.**    The defendant has failed to ensure the equal access or accessibility of the premises where the plaintiff is assigned to work.  The plaintiff has thereby been prevented from enjoying equal access and the benefits of employment enjoyed by other employees.

**Limiting, Segregating and Classifying Prohibited by 29 CFR § 1630.5.**

**29.**    Defendant's so-called "COVID-19" policies impose a disability upon the plaintiff by limiting and impeding him from performing his employment duties to such a degree that this adversely affects his employment opportunities or status on the basis of disability because the defendant will not permit plaintiff to do his job without first submitting to the defendant's accommodations ("mitigation measures").  (See Affidavit)

**30.**    Defendant classified the plaintiff as "unvaccinated"[2]; is widely sharing this classification of the plaintiff with other employees without any regard to confidentiality[3]; and encourages employees to harass the plaintiff with repetitive emails, intimidating interactions and threats of termination.  See Affidavit

**31.**    Defendant's policy states that those employees classified as "unvaccinated",  such as the plaintiff, are required to submit to weekly accommodations such as medical tests at their own expense, enhanced quarantine measures based upon "close contact" and continued masking. (See Affidavit)

---

[2] discrimination based upon physical condition

[3] prohibited by 29 CFR § 1630.13.

- 7 -

ADA Title I Complaint

**32.**    Defendant repetitively asked the plaintiff to disclose his medical history through a group text without any notice given regarding the data retention policy or who receives the data and for what purpose; however, defendant is clearly classifying employees by medical history; limiting or impeding the plaintiff's ability to perform his employment duties based upon his medical history; and threatening adverse employment actions against the plaintiff for refusing to disclose his medical history when the defendant has failed to give any conspicuous notice as to the manner in which such disclosures are necessary to the plaintiff's essential job function.  (See Affidavit)

**33.**    Defendant also falsely classified plaintiff as "a safety hazard" without assessment in a written safety violation warning and threatened to accuse him of "abandoning his job" while preventing him access to the job site despite plaintiff sending timely notices to the defendant that he is both fit for service and has complied with all requests for response. (See Affidavit)

**Defendant Imposed non-job-related medical exams and inquiries.**

**34.**    Title I prohibits the defendant from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; at 42 U.S.C. §12112(d)(4); 29 CFR §1630.13 (b)(c).

**35.**    An employer is entitled only to the information necessary to determine whether the employee can perform the essential functions of the job with or without reasonable accommodations and the defendant has failed to identify any set of facts that would qualify under this limitation.

§ 1630.13(b) Prohibited medical examinations and inquiries.

> (b) Examination or inquiry of employees. Except as permitted
> by § 1630.14, it is unlawful for a covered entity to require a

- 8 -

medical examination of an employee or to make inquiries as
to whether an employee is an individual with a disability or as
to the nature or severity of such disability.
(c) Examination of employees. A covered entity may require a
medical examination (and/or inquiry) of an employee that is
job-related and consistent with business necessity. A covered
entity may make inquiries into the ability of an employee to
perform job-related functions.

36.   Certain examinations are allowed as part of an employee health program
available to employees at the work site under CFR § 1630.14; however
defendant is not running a voluntary health program as the policy is not
presented as voluntary and defendant imposes adverse employment actions or
retaliates against, interferes with, coerces, intimidates, and threatens employees
within the meaning of Section 503 of the ADA, codified at 42 U.S.C. 12203 and
29 CFR Part 1630.14(c) for not complying with the policy.

37.   Defendant has never conspicuously disclosed or gave legally adequate
notice that complying with the COVID-19 mitigation measures
("accommodations") are an **essential function** of the job of Physical Therapist;
and the measures have never previously been an essential function of plaintiff's
job. 4 (See Exhibit C "Job Description")

38.   The plaintiff has already satisfied and met the criteria for his essential job
function based upon the usual factors such as education, experience and work
ethic.  Defendant has failed to give conspicuous notice as to the manner in which
these so-called "Covid-19" policies are related to the plaintiff's ability to perform
his essential employment duties.[5]

---

[4]  29 CFR 1630.2 definition "Essential Function": "(i) ….the reason the position exists is to perform
that function."

[5]  https://www.eeoc.gov/publications/ada-your-responsibilities-employer

ADA Title I Complaint

**39.** Plaintiff claimed his right not to provide any medical information that is not related to the performance of his job duties. (See Affidavit)

**Defendant offered mitigation measures as accommodations to the perceived disability and plaintiff chose not to accept.**

**40.** Defendant limited the accommodation measures[6], such as examinations; disclosures of medical records that were not job-related; experimental injections; medical interventions; equipment or products; to only those chosen by the defendant. Additionally, the employer failed to prove that there are no other accommodations available which do not require injections, medical devices and medical examinations.

**41.** In fact, the defendant is not required to provide any accommodation under the "regarded as" prong.

29 CFR Part § 1630.9

> (e) A covered entity... is not required to provide a reasonable accommodation to an individual who meets the definition of disability solely under the "regarded as" prong (§ 1630.2(g)(1)(iii)).

**42.** The defendant has failed or refused to comply with this law, even making the outrageous claim that the plaintiff can either submit to complying with the accommodations or have his employment terminated, regardless of the defendant's legal duties or the law. (See Affidavit)

---

[6] 29 CFR Part 1630.2(j)(5)(i)

- 10 -

ADA Title I Complaint

**43.**    Defendant's policy of imposing accommodations also violates the plaintiff rights to medical privacy and informed consent.[7]  (See Affidavit)

**44.**    If the plaintiff had previously made at least one request for reasonable modifications, plaintiff has since withdrawn such request.

**45.**    Additionally, the so-called "vaccines" that are being promoted as vaccines do not actually prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SarsCOV2" purported "diseases".

**46.**    Plaintiff requests that this court take judicial notice of Section 201(h) of the Food, Drug and Cosmetic Act and its Final Guidance titled, "Classification of Products as Drugs and Devices & Additional Product Classification Issues; Guidance for Industry and FDA Staff", published in September of 2017, in which the Food & Drug Administration **defines** wearing a mask for mitigation purposes as a medical device and the application of a medical device or contrivance.  A true and correct copy of this is included as Exhibit B.

**47.**    Plaintiff further requests judicial notice of the fact that the Food & Drug administration has never **approved** wearing such face masks, but only "authorized" them without any supporting medical or clinical data establishing any medical necessity or efficacy for wearing such contrivances.

**48.**    The plaintiff requests that the court take judicial notice of the official mortality rates of the State of New York and the United States for the years from

---

[7] Defendant and its policies failed to advise the plaintiff of the absolute risks and absolute benefits for accepting accommodations of taking experimental injections, masking and tissue- testing under "emergency use authorization" guidelines, for a "contagious disease" that the defendant regards the plaintiff as having as set forth in 21 USC §360bbb-3 *et seq.*

- 11 -

ADA Title I Complaint

2017, 2018, 2019 and 2020 in which the standard deviation is zero, the very definition of no verifiable "pandemic".

**49.** No laws have changed that would create either a new duty of care or a new insurable risk for the defendant; and no new laws have created any new legal duty or obligation for the defendant to violate the medical privacy rights of anyone.

**50.** Plaintiff demands a jury trial.

**51. WHEREFORE**, Plaintiff demands judgment against the defendant for compensatory damages and that the court declare that Defendant's discriminatory actions and/or violations as set forth in this Complaint violate Title I of the Americans with Disabilities Act under 42 U.S.C. §12101 and implemented under 29 CFR Part 1630 *et sequitur*;

**52.** And an order enjoining the defendant, along with its officers, agents, and employees, and all others in active concert or participation with them, from:

**53.** Engaging in discriminatory acts and/or omissions against the plaintiff because of (perceived) disability; and an order enjoining the defendant from implementing practices and policies in a manner that is inaccessible to individuals with disabilities, specifically the plaintiff, within the meaning of Title I of the ADA;

**54.** And ordering defendant to comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and,

**55.** Take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of the defendant's discriminatory conduct to the position that plaintiff would have been in, but for the Defendant's conduct, beginning with the plaintiff; and,

ADA Title I Complaint

**56.**   Take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

**57.**   Award monetary damages to the plaintiff, in an appropriate amount for injuries suffered as the result of Defendant's failure to comply with the requirements of Title I of the ADA, 42 U.S.C. §12101; and,

**58.**   Assess a civil penalty against the Defendant in an amount authorized by 42 U.S.C. §12101 to vindicate the public interest and make the plaintiff whole; and,

**59.**   Order such other relief as the interests of justice may require.

### AMENDED COUNT II – COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF UNDER THE AMERICANS WITH DISABILITIES ACT

Plaintiff,   Andrew Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for Retaliation, Coercion, Interference and Intimidation and for declaratory and injunctive relief under Title I of the Americans with Disabilities Act as implemented under 29 CFR Part 1630, *et sequitur*, and alleges the following:

### JURISDICTION AND VENUE

**1.**   This court has original and exclusive jurisdiction under Title I of the Americans with Disabilities Act of 1990 and the Americans with Disabilities Act Amendments Act of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Retaliation, Coercion, Threats and Interference"; as implemented by 29 CFR Part 1630.12, 14(b)(3), (c) & (d) as it pertains to adverse employment actions.

ADA Title I Complaint

**2.**    Venue is proper in the Eastern District of New York pursuant to 28 U.S.C. §1391(b)(2) because Plaintiff resides in this District and a substantial part of the events or omissions giving rise to the claims occurred in this District.

**3.**    The incidents and facts giving rise to this complaint have occurred within the last one hundred eighty days.  The plaintiff has commenced a complaint against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 7, 2021. The plaintiff has exhausted all administrative remedies and received a Right to Sue letter on February 17, 2022, a true and correct copy is attached in Exhibit A.

<div align="center">

**PARTIES**

</div>

**4.**    Plaintiff, Andrew Kosiba, resides in Suffolk County, New York at the address of 33 Neal Path; South Setauket and is a qualified individual with a disability within the meaning of the ADA.  The plaintiff is an employee of the defendant, which is a "covered entity" within the meaning of the Act.

**5.**    The defendant's principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York  11735.

<div align="center">

**PLAIN STATEMENT**

</div>

**6.**    Defendant discriminated against the plaintiff based upon perceived disability under the "regarded as" prong and the "record of" prong of the ADA. When the plaintiff objected and conspicuously requested the discrimination to end, the defendant unceasingly retaliated against the plaintiff by intimidating and coercing the plaintiff to accept accommodations and discrimination; interfering with his rights; and threatening adverse employment actions. Defendant created a "severe and pervasive" hostile work environment that ultimately led to the plaintiff's termination of employment by the defendant.

<div align="center">

- 14 -

ADA Title I Complaint

</div>

## STATEMENTS OF FACT

**7.** The plaintiff conspicuously gave notice to the defendant of the reasonable, good faith belief that he was being discriminated against and was claiming protection under the ADA because of being regarded as disabled.

**8.** In October 2021, the defendant began unceasingly retaliating against the plaintiff despite plaintiff's reasonable good faith belief that he was exercising protected opposition to discrimination and claiming rights protected under the ADA.

**9.** The plaintiff advised each of the managers and supervisors and personnel in the human resources office that the plaintiff was a qualified individual with a disability and was regarded as having a disability. The plaintiff also advised each of these employees on numerous occasions that the defendant's policies pertaining to the mask-wearing and vaccines and disclosing medical history and submitting to medical examinations and the collection of vital statistics demonstrated very abundantly that the defendant also regarded the plaintiff as having a disability.

**10.** The plaintiff demanded that the defendant provide a copy of the individualized assessment that it conducted in order to determine that he was a direct threat however, defendant ignored these requests and continued to demand that the plaintiff participate in its "health control measures" or accommodations such as mask-wearing and medical examinations.

**11.** Every time plaintiff objected to discriminatory communications, actions and imposed accommodations from the defendant; defendant ignored the plaintiff and continued the same conduct by retaliating against the plaintiff.

**12.**   Defendant took materially adverse actions to deter plaintiff from engaging in protected opposition whenever plaintiff claimed the protection of the ADA for being regarded as disabled.  Plaintiff exercised his right to refuse the defendant's offered accommodations and again asked to review the individualized assessment determining plaintiff was a "direct threat".  The defendant ignored the plaintiff and refused to communicate or answer any questions, and instead, advised the plaintiff to request an exemption from the policies for religious or medical reasons.

**13.**   The defendant also failed or refused to cite any legal authority for imposing these accommodations or health control measures, including but not limited to, identifying or describing any new legal duty of care as a result of these policies or any law, and refused or failed to describe or identify any insurable risk the defendant may have had to protect employees from any contagious disease that the plaintiff was regarded as having.

**14.**   After advising the plaintiff to request these exemptions, the defendant refused to provide a list of legal criteria upon which such exemptions were based and refused or failed to cite any legal duty from which the plaintiff would be requesting an exemption.

**15.**   Defendant's adverse actions were causally connected to plaintiff's good faith opposition to the discriminatory policy; and to the defendant regarding the plaintiff as disabled with having a contagious disease that impaired his ability to engage in one or more major life activities.

**16.**   Defendant's adverse actions were causally connected to plaintiff's good faith opposition to the discriminatory policy; to the plaintiff claiming the protection of the ADA without any need to request a medical or religious exemption; and to

- 16 -

ADA Title I Complaint

plaintiff's demand to review the individualized assessment upon which classifying plaintiff as a "direct threat" was based.

**17.**   The plaintiff may proceed under the "regarded as" prong and this court has jurisdiction under the "regarded as" prong of the ADA.

**18.**   The complaint thereby satisfies the criteria for stating a *prima facie* cause of action for these reasons, along with the fact that the defendant has made a record of such disability as further alleged herein and the plaintiff's supporting affidavit is also re-alleged and incorporated herein by reference and by paragraph number.

**19.**   The list of adverse employment actions taken by the defendant in retaliation against the plaintiff for not accepting its accommodations is extensive: defendant created false employment records stating that plaintiff was a safety hazard without assessment; while preventing him access to the job site; plaintiff was threatened with termination on several occasions and given deadlines for termination; plaintiff was refused access to job site; plaintiff was repeatedly coerced by management to undertake accommodations for a perceived, yet undiagnosed disability; defendant continued to harass plaintiff despite plaintiff claiming protected opposition status by filing an EEOC Charge; and defendant's ADA compliance officer refused to mitigate the retaliation or aid and encourage the plaintiff in enjoying rights protected under the ADA.

**20.**   Defendant took adverse employment actions against the plaintiff based upon perceiving the plaintiff as a direct threat and as having an impaired immune system, impaired respiratory system; which corroborates that defendant, in fact, regards the plaintiff as disabled.

**21.**   Plaintiff re-alleges each statement from the Affidavit herein.

- 17 -

## COUNT II ALLEGATIONS OF DEFENDANT'S VIOLATIONS
OF TITLE I OF THE ADA, 42 U.S.C. §12101 *et sequitur*.

**22.**   Plaintiff incorporates each of the above statements of fact herein; the allegations contained in the following paragraphs and the plaintiff's affidavit in support of complaint which is also re-alleged and incorporated herein by reference.

**23.**   The ADA also prohibits employers from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing under the ADA, Title 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c), to wit:

**Retaliation**

29 CFR § 1630.12 Retaliation and coercion.

> (a) Retaliation. It is unlawful to discriminate against any individual because that individual has opposed any act or practice made unlawful by this part or because that individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing to enforce any provision contained in this part.

**24.**   The plaintiff was threatened to be terminated because of his unmasked and unvaccinated condition and has successfully stated a violation of the act simply because he has been subjected to an action prohibited under the law because of perceived physical impairment. See Affidavit in Support of Complaint (hereafter "Affidavit").

**25.**   The impairment **experienced** by the plaintiff in connection with his respiratory and immune systems is neither transitory nor minor from the

- 18 -

defendant's point of view because the defendant has no end date when it will not regard this status as warranting termination.

**26.** Defendant threatened the plaintiff with retaliation by termination and subsequently terminated the plaintiff; even though it was aware of a pending EEOC investigation and plaintiff's protected opposition.

**27.** Nor can the defendant claim it was unaware of its own perception at the date of termination because the very basis for termination is the unvaccinated condition of the plaintiff and the attendant deficiencies associated with the plaintiff's respiratory and immune systems.

**28.** Defendant adopted a new discriminatory policy and discriminated against the plaintiff based on perceived disability; when plaintiff opposed the unlawful policy, defendant retaliated against the plaintiff by threatening to terminate his employment through the ruse of classifying plaintiff as a safety violation by making false employment records; and also by falsely claiming that plaintiff was not responsive to their non-job-related medical inquiries and exams; however, the evidence shows that plaintiff was threatened with termination because plaintiff was deemed a "direct threat" without an individualized assessment and because plaintiff was classified as "unvaccinated" and declined accommodations.  (See Affidavit)

**Coercion, Interference or Intimidation**

29 CFR § 1630.12

> (b) Coercion, interference or intimidation. It is unlawful to coerce, intimidate, threaten, harass or interfere with any individual in the exercise or enjoyment of, or because that individual aided or encouraged any other individual in the exercise of, any right granted or protected by this part.

- 19 -

ADA Title I Complaint

**29.**   Defendant effectively coerced the plaintiff by refusing to provide requested proof of an individualized assessment; refusing to provide a risk/benefit analysis as required for true informed consent; and refused to recognize the plaintiff's right to refuse medical treatment or participate in a clinical study; and refusing to provide requested proof of liability insurance, thus interfering with plaintiff's enjoyment of protected rights. (See Affidavit)

**30.**   Defendant coerced the plaintiff to submit to the accommodation measures, medical interventions and examinations and other health control measures, even though the defendant was duly advised by the plaintiff that the plaintiff was not subject to any health control measures by any court orders, and that the defendant was not empowered by any court order or other legal duty to impose such interventions, examinations or control measures upon the plaintiff[8]; (See Affidavit)

**31.**   Defendant allowed other employees to coerce, intimidate or verbally ridicule and abuse the plaintiff in violation of the defendant's duty of care. (See Affidavit)

**32.**   Defendant threatened the plaintiff with the termination of employment because of a perceived disability and as a result of classifying plaintiff as "unvaccinated". (See Affidavit)

**33.**   Defendant threatened the plaintiff with exclusion because of disability. (See Affidavit)

**34.**   Defendant's designated compliance agents interfered with plaintiff's rights under the ADA by refusing to aid and encourage plaintiff in the enjoyment of his rights under the ADA which is a duty of the defendant.  (See Affidavit)

---

[8]  See Texas Health and Safety Code 81.083 and Texas Public Health Emergencies Bench Book.

ADA Title I Complaint

**35.** Defendant's policies interfered with plaintiff's rights by failing to advise the plaintiff that no "vaccine" accommodations, which have been approved by the Food & Drug Administration, are commercially available to the plaintiff, or are yet in production.[9]

**36.** Additionally, the so-called "vaccines" that are being promoted as vaccines do not actually prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SarsCOV2" purported "diseases".

**37.** Defendant is interfering with the plaintiff's rights by obfuscation and by refusing to acknowledge rights protected under the ADA. [10]

The EEOC has offered guidance on interference and states:

"Examples of interference include: issuing a policy or requirement that purports to limit an employee's rights to invoke ADA protections (e.g., a fixed leave policy that states 'no exceptions will be made for any reason');"[11]

**38.** Defendant's notices to the plaintiff failed to include conspicuous notice as to the manner in which its accommodations ("Covid policies") are related to his essential job function, and do not mention plaintiff's right of refusal under EUA guidelines[12].  (See Affidavit)

**39.** Defendant also failed to give notice of plaintiff's right to refuse the defendant's accommodations under the ADA[13],  and failed to advise the plaintiff

---

[9] Comirnaty is not available in the US.

[10] 42 USC 12203(b) and 29 CFR 1630.12(b).

[11] https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues

[12] Title 21, Chapter 9 V, Part E §360bbb–3a. Emergency use of medical products.

[13] 29 CFR Part 1630.9 (d) & (e)

- 21 -

of his right to informed consent.  Defendant only offers "exemptions" based upon religious or medical reasons which can be refused by the defendant and defendant does not even disclose the criteria for such an exemption.   (See Affidavit)

**40.**   Defendant's policy and written notices interfered with plaintiff's ADA rights because they limited plaintiff's right to invoke ADA protections under the "regarded as" prong, including without limitation, the right to be free of discrimination and retaliation based upon disability, such as being terminated or segregated because of one's physical condition.

**41.**   Defendant engaged in adverse actions when plaintiff notified the defendant that the plaintiff was not waiving the right of refusal, the right of informed consent, and the right to an individualized assessment before being labeled a direct threat based upon his rights under the ADA. (See Affidavit)

**42.**   Defendant deceptively tried to persuade plaintiff that his only remedy to the illegal policy demands would be to ask for a medical or religious exemption from these discriminatory policies and practices, thereby creating a false record that is without legal merit and creates a substantial prejudice against the plaintiff to seek a remedy in court.

**Harm and Injury suffered by the plaintiff.**

**43.**   The injury suffered by the plaintiff is thereby concrete and particularized and it is actual and imminent.  The injury alleged in the complaint, including the pleading and exhibits, clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical.  The injury described therein is at least fairly traceable to the challenged action, conduct and policies of the defendant.

ADA Title I Complaint

**44.**   The harm (injury) already suffered by the plaintiff includes, but is not limited to, having to choose between waving medical privacy rights, and submitting to medical interventions and examinations without the benefits of informed consent, and being regarded as if he has a contagious disease without any individualized assessment according to any medical or scientific standards or having his employment terminated.

**45.**   Once violated, these rights cannot be recovered.  The medical privacy rights are the plaintiff's intangible property rights which are not required to be waived as a condition of employment and include the right to refuse to participate in any epidemiological experiments or clinical trials.

**46.**   Defendant's policies demonstrate soundly and convincingly, that its policies inflict future harm against the plaintiff who is regarded as having a disability or invisible disability and that the defendant fully intends to continue these policies and that the defendant fully intends to retaliate and continue retaliating against the plaintiff as alleged herein.

**47.**   It is important to note that none of the personnel in human resources that were involved in this matter ever once cited any legal authority that countermands the ADA.

**48.**   Furthermore, defendant never cited any legal authority or obligation that has created any new duty of care or insurable risk to impose the discriminatory policies.

**49.**   Furthermore, the defendant failed to identify any insurable risk for engaging in the administration of medical examinations, interventions or protecting anyone from what is being claimed as a "pandemic" or "public health danger".

- 23 -

ADA Title I Complaint

**50.**   Additionally, defendant fails to cite any insurable risk for the same or for those suffering any adverse health consequences as a result of complying with the accommodations administered by unlicensed, untrained, uninsured and un-equipped employees of the defendant.

**51.**   Even one's own licensed and insured physician requires informed consent as a condition of administering any medical examination or intervention upon the patient.   No laws have changed and the defendant is without any legal authority or obligation to engage in these practices, and especially engage in harassment, discrimination and retaliation in violation of federal law.

**52.**   As a result of Defendant's actions the plaintiff has experienced discrimination, segregation, isolation, retaliation, coercion, interference, loss of wages, termination and disruption in his career.

**53.**   Plaintiff demands a jury trial.

**54.**   **WHEREFORE**, Plaintiff demands judgment against the defendant for compensatory damages and that the court declare that Defendant's retaliatory, coercive, interfering and intimidating actions and/or violations as set forth in this Complaint violate Title I of the Americans with Disabilities Act under 42 U.S.C. §12101 and implemented under 29 CFR Part 1630 *et sequitur*;

**55.**   And an order enjoining the defendant, along with its officers, agents, and employees, and all others in active concert or participation with them, from:

**56.**   Engaging in retaliation, coercion, interference and intimidation and/or omissions against the plaintiff because of his disability; and an order enjoining the defendant from implementing practices and policies in a manner that is inaccessible to individuals with disabilities, specifically the plaintiff, within the meaning of Title I of the Americans with Disabilities Act (ADA);

- 24 -

ADA Title I Complaint

**57.** And ordering defendant to:

**58.** Comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and,

**59.** Take such affirmative steps as may be necessary to restore, as nearly as practicable, each identifiable victim of the defendant's discriminatory conduct to the position that he would have been in, but for the Defendant's conduct, beginning with the plaintiff; and,

**60.** Take such affirmative steps as may be necessary to prevent the recurrence of any retaliation, coercion, interference and intimidation and to eliminate, to the extent practicable, the effects of such conduct.

**61.** Award monetary damages to the plaintiff, in an appropriate amount for injuries suffered as the result of Defendant's failure to comply with the requirements of Title I of the ADA, 42 U.S.C. §12101; and,

**62.** Assess a civil penalty against the Defendant in an amount authorized by 42 U.S.C. §12101 to vindicate the public interest and make the plaintiff whole; and,

**63.** Order such other relief as the interests of justice may require.

## COUNT III – COMPLAINT FOR WRONGFUL TERMINATION
## OF EMPLOYMENT

The plaintiff, Andrew Kosiba, sues the defendant, CATHOLIC HEALTH SYSTEMS OF LONG ISLAND, INC., for wrongful termination of employment and alleges the following:

- 25 -

ADA Title I Complaint

## JURISDICTION AND VENUE

**1.**     The Eastern District Court has original jurisdiction over claims for wrongful termination for employment and related employment agreements.

**2.**     The plaintiff resides in Nassau County and his mailing address is 33 Neal Path; South Setauket, New York.

**3.**     The defendant is a resident in the state of New York, with its principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York 11735.

**4.**     The material facts for all times material to this complaint took place in Nassau County, New York.

## STATEMENTS OF FACT

**5.**     On the date of November 22, 2021, the plaintiff's employment was terminated without notice.

**6.**     The plaintiff advised the defendant on several occasions by documenting the harassment and coercion via plaintiff's confidential communications filed with the Human Resources.

**7.**     This documentation addressed the fact that defendant's actions were not legal and not binding upon the plaintiff and that the defendant had no duty to act under these new terms.     True and correct copies of these written communications are attached as Exhibit A.

**8.**     The defendant ignored the plaintiff, refused to do an intake, falsely declared plaintiff has "resigned" and terminated his employment for discriminatory reasons on November 22, 2021.  The communications exhibited with this complaint are included as Exhibit A.

- 26 -

ADA Title I Complaint

SA-71

**9.**     Defendant is not a licensed physician and not supervised under any licensed physician yet wants to impose a medical intervention upon the plaintiff as a condition for employment in violations of the plaintiff's right to informed consent and Americans with Disabilities Act.

**10.**     Defendant stated that while it may require a forced medical intervention without any medical qualification or licensing, the plaintiff is somehow required to get permission from a licensed physician in order to exercise his right to informed consent.  Why does the plaintiff need a licensed physician to exercise his right to informed consent and the defendant does not need any licensed physician to violate plaintiff's rights regarding medical interventions?

ADA Title I Complaint

## ALLEGATIONS

**11.**   Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**12.**   The plaintiff's employment was wrongfully terminated by the defendant for discriminatory reasons.

**13.**   Upon defendant's change in the employment conditions purportedly requiring the plaintiff to get EUA injections, wear a mask while working, and other mitigation measures, plaintiff was suddenly expected to waive his rights to informed consent on the unfounded presumption that the plaintiff had an impaired immune system, impaired respiratory system, and was a carrier of a contagious disease, all without having first made any individualized assessment as to whether or not the plaintiff was a direct threat to anyone.

**14.**   Beginning from the date the plaintiff was hired, plaintiff has been compensated for his labor and the services he has provided the defendant at regular intervals.  Plaintiff had a reasonable expectation to continue working for the defendant.  The defendant's termination of the plaintiff's employment was in violation of the employment contract and was made without notification or adequate notification to the plaintiff.

**15.**   The terms of the job description are alleged herein and include the written policies of the defendant, a true and correct copy of which is attached as Exhibit C.

**16.**   The conditions of plaintiff's employment with the defendant did not require the defendant to waive any of his rights.

**17.**   The conditions of the plaintiff's employment with the defendant did not require the plaintiff to accept the defendant's medical advice.

ADA Title I Complaint

**18.**    The conditions of the plaintiff's employment with the defendant did not include terms that allowed the defendant to engage in the unlicensed practice of medicine and the defendant is not insured or otherwise indemnified for practicing medicine.

**19.**    The conditions of the plaintiff's employment with the defendant did not include terms that made the defendant the plaintiff's physician or otherwise require the plaintiff to act upon medical advice given by the defendant.

**20.**    Plaintiff's employment was wrongfully terminated in retaliation for exercising his rights under the ADA.  Also, the plaintiff has certain intangible private property rights which include the right to care for his own health and choose his own physician and health care practices while also avoiding habits and practices that the plaintiff believes might ruin or risk his good health.

**21.**    The plaintiff also has the intangible private property right to make decisions that affect his health with informed consent; that is, plaintiff has a right to review all risk and benefit analyses and results from relevant clinical studies prior to making any decision to adopt new practices regarding his health.

**22.**    The defendant refused to comply with the law and violated the plaintiff's property rights, specifically those enumerated under the state's Patient's Bill of Rights and informed consent.

**23.**    Defendant is an employer and prohibited from firing or otherwise retaliating against employees, specifically the plaintiff, who report workplace safety violations or participate in investigations into such violations.

**24.**    New conditions of employment violated the Americans with Disabilities Act and involved the defendant's conduct which included imposing mitigation measures and retaliation in violation of the ADA.

ADA Title I Complaint

**25.** New conditions of employment violated the long-standing safety standards adopted by the Occupational Safety and Health Administration and involved the defendant's conduct which included imposing medical interventions in violation of the law prohibiting the unlicensed practice of medicine.

**26.** Plaintiff's employment was also wrongfully terminated because the plaintiff refused to accept a medical intervention sought to be imposed by the defendant where such medical intervention was not permitted to be imposed by law or to be imposed by the defendant and violated the plaintiff's right to informed consent.

**27.** As a direct and proximate result of the defendant's actions, the plaintiff's employment was wrongfully terminated by the defendant.

**28.** The defendant's actions were willful and negligent. After plaintiff's objections and attempts to re-mediate the defendant on the law and his rights, the defendant continued violating the law and violating the plaintiff's rights as alleged herein.

**29.** The defendant did not act under color of law or claim of lawful authority. The defendant had no legal duty to require the plaintiff to undertake any medical intervention much less purportedly requiring the plaintiff to get injections, submit tissue samples or wear a surgical mask or mask of any kind as a new condition of his employment.

**30.** The plaintiff was not acting under any authority of law or court order. Again, the defendant was under no legal duty to violate the law as alleged herein, and no authority or court order permitted the defendant to violate the law or violate the plaintiff's rights as alleged herein. The plaintiff never waived any of his rights at any time.

- 30 -

ADA Title I Complaint

**31.**   No employee or agent of the defendant is licensed, competent or authorized to give medical advice, such as requiring employees such as the defendant to get injections, wear a mask, or submit to temperature or tissue testing.

**32.**   Additionally, neither the defendant nor any of its employees or agents are insured or indemnified to collect tissue samples or interpret vital statistics (nasal swabs and temperature readings which can lead to being quarantined without due process).

**33.**   Defendant has no authority to require the plaintiff to act upon its medical advice (injections, masks); disclose his vital statistics (temperature); or submit to any medical examination by giving tissue samples (nasal testing) as a new condition of the plaintiff retaining his employment with the defendant.

**34.**   The defendant is not authorized to violate the rights of the plaintiff, nor is the defendant required to break the law, or operate beyond its charter as a new condition of the plaintiff's employment that was never considered at the time he was hired.

Plaintiff demands a jury trial.

**35.**   **WHEREFORE** plaintiff demands judgment against the defendant for wrongful termination together with costs and attorney fees and other relief as this court deems appropriate.

## COUNT IV – LOST WAGES

Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

ADA Title I Complaint

**1.**     Plaintiff was wrongfully terminated on the date of November 22, 2021 and based upon his rate of compensation, the plaintiff is entitled to lost wages in the approximate amount of and based upon her yearly rate of compensation, the plaintiff is entitled to a minimum of lost wages in the approximate amount of one hundred ten thousand dollars ($110,000) not including additional benefits which may be calculated by the court, plus interest as calculated by the laws of the State of New York.

**2.**     **WHEREFORE** plaintiff demands judgment against the defendant for lost wages in the amount of $110,000 as alleged herein, together with costs and attorney fees and other relief as this court deems appropriate.

## COUNT V – BREACH OF CONTRACT

**1.**     Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**2.**     It was an employment contract that was commenced between the plaintiff and defendant in November of 2000 with an offer of employment and continued without interruption until plaintiff's employment was terminated as alleged herein.

**3.**     The Plaintiff's job title was Physical Therapist and he was paid approximately $110,000 per year.

**4.**     In addition to the regular remuneration paid by the defendant to the plaintiff as alleged, the defendant provided the plaintiff with annual incentive bonus as an additional benefit under the employment agreement.

ADA Title I Complaint

**5.** **WHEREFORE** plaintiff demands judgment against the defendant in the amount of no less than the amount of $110,000 plus costs and attorney fees and other relief as this court deems appropriate.

## COUNT VI – BREACH OF IMPLIED CONTRACT

**1.** Plaintiff re-alleges the foregoing and incorporates each fact herein and further alleges as follows,

**2.** It was an employment contract that was commenced between the plaintiff and defendant in November of 2000 with an offer of employment and continued without interruption until plaintiff's employment was terminated as alleged herein.

**3.** The Plaintiff's job title was Physical Therapist and he was paid approximately $110,000 per yearly.

**4.** In addition to the regular remuneration paid by the defendant to the plaintiff as alleged, the defendant provided the plaintiff with annual incentive bonus as an additional benefit under the employment agreement.

**5.** **WHEREFORE** plaintiff demands judgment against the defendant in the amount of no less than the amount of $110,000 plus costs and attorney fees and other relief as this court deems appropriate.

DATED this 2nd day of March, 2022.

_Andrew Kosiba_
Andrew Kosiba, Plaintiff

- 33 -

ADA Title I Complaint

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### 225 Cadman Plaza East, Brooklyn, NY 11201

ANDREW KOSIBA

    PLAINTIFF

v.                       CASE NO. <u>2:21-cv-06416-GRB-ARL</u>

CATHOLIC HEALTH SYSTEMS OF

LONG ISLAND, INC.

    DEFENDANT

_____/

### AFFIDAVIT IN SUPPORT OF COMPLAINT

STATE OF NEW YORK     )
                      )   Ss
COUNTY OF NASSAU     )

**1.**   I, Andrew Kosiba, do hereby solemnly affirm that the statements herein are true and correct in substance and in fact and that I have personal knowledge of each.

- 34 -

**2.**    I have been harassed at my job, discriminated and retaliated against based on disability for refusing to accept my employer's accommodations for regarding me as impaired in my immune system and impaired in my respiratory system.

**3.**    I am absent and without evidence of any information from any health officer identifying myself as having any communicable disease or having been exposed to any toxic substance.

**4.**    I am absent and without knowledge of any evidence or court order, obtained by any petition of the Department of Health or a public health officer, that was based upon any physician's affidavit in which I have been identified as having any communicable disease or having been exposed to any toxic substance.

**5.**    I am absent and without knowledge of any evidence of any court order determining that I am or have been a direct threat to anyone.

**6.**    I am absent and without knowledge of any evidence of any individualized assessment required by law that has determined that I am or have been a direct threat to anyone.

**7.**    I am absent and without knowledge of any evidence of any court order imposing any terms of isolation or quarantine or other measures upon myself.

**8.**    I have previously and timely disclosed and duly noticed the defendant of a prior existing disability, and that the assertions made in the complaint are true and correct to the best of my knowledge, information and belief.

**9.**    I have been working as a home physical therapist for approximately 20 years with Catholic Health. I have never had an issue with management and have been an exemplary employee and I feel I am an asset to the company.

- 35 -

**SA-80**

**10.** When Covid started, there were certain mitigation measures that were instituted like PPE wearing, daily temperature checks, mask wearing, PCR tests which I did in the beginning because no one knew what was happening and I thought it was for my protection as well. As I researched and as time went on and the "numbers" went down these measures didn't go away and I began to research actual scientific data. I started to disagree with the measures we were mandated and saw that more and more we were following political rules for some reason and not science.

**11.** Catholic Health requested me to take EUA injections as a job requirement (new condition) in early September.  I wanted to opt out of this new policy requirement. I was given a declination form in early September 2021 which only had medical or religious exemptions listed, it did not have an option for refusal based upon informed consent or any other rights protected under the ADA.

**12.** I felt coerced and intimidated by the company to get the EUA injections. The company was also classifying me as unvaccinated keeping track of my injection status which felt threatening as I thought they were going to fire me for claiming my rights. I felt very threatened.  Despite filing a declination form I continued to receive many emails about where and when I could get the shot.

**13.** On March 15, 2021, I was in a GoToMeeting which was run by Dr. Kranz. Dr. Kranz stated that our agency had a 62% compliance with the jab and she said, "That's not enough people, that's not nearly enough!"

**14.** Most recently during our last in office meeting, I came into the office and noticed many people not wearing masks. I began to take my mask off, but was told to keep my mask on because I was unvaccinated. I was singled out, and this made me feel angry and stressed. I was being segregated and they were

- 36 -

SA-81

openly classifying me as unvaccinated and disclosing my medical information to everyone in the room. I felt like a second-class worker.

**15.**   I have been told by Christine Bracco in HR that I must have an EUA injection by October 7 or I will be fired.  My declination is no longer honored and my employer does not acknowledge any right to refuse under the ADA.  I am feeling severe anxiety and stress about this.  I am having heart palpitations. Night after night I awake at 4 o'clock in the morning and cannot fall back asleep because of these measures.

**16.**   On August 16, 2021, I was not feeling well and spiked a fever. I called out sick and under duress because of all the hype of the virus I took a home PCR test which was positive. When I called the agency, I was told that because I tested positive for Covid they were going to notify all patients I came in contact with for 3 previous days. I was furious. I thought, "How can they share my health information like that?".  It made me extremely anxious. They said they would not name me. This was not good enough!  Due to the nature of my job I sometimes am the only clinician visiting the patient and I was even told by the nurse at work (Christina Nelson) that I should be ready that some people might "figure it out". I have an excellent rapport with my patients, and I felt that this was a betrayal. Ironically, 3 days later I tested negative with a PCR test.

**17.**   I received a memo dated September 1, 2021 from Anthony Pellicano, and Dr. Jason Golbin, titled "Covid-19 Vaccinations". A true and correct copy is included as part of Exhibit A.   This memo instructed me to undertake accommodations of getting tested bi-weekly and undertaking an injection process.

- 37 -

**18.** On September 27, 2021 I attempted to find a resolution with Christine Bracco, Director of HR, by sending a "Notice of Employment Discrimination and Retaliation Based Upon Disability", which asked her to address the my request for due process and concerns regarding discrimination based on a perceived disability.

**19.** On September 28, 2021, I arrived to the office for a meeting with Christine Bracco, Director of HR. Upon arrival I was forced to have a temperature check before going in. When I asked if this is necessary because I had already sent in a temp check to my supervisor that morning and was clear. I was told I must comply. After doing it I remarked that this is redundant and upon walking away I heard one of the ladies at the front desk say, "That's one of the ones who will be leaving". At the meeting Christine Bracco told me there was nothing else they could do and her hands were tied regarding my discrimination complaint.

**20.** On September 30, 2021 I was at a monthly meeting for my team and was informed that whoever was vaccinated will receive a sticker to wear on their badge so they will be identified as such. I was made to feel so excluded, intimidated and made me feel very anxious as to how far this would be taken.

**21.** On October 5, 2021 I filed a Charge of Discrimination and Harassment with the EEOC via email and certified mail but didn't get any response for months.

**22.** On October 16, 2021 I saw that a patient that was assigned to me had a "Vaccinated Staff Only" stipulation on their file. I was very disheartened and saddened to see that Catholic Health was following such a discriminatory policy. Not only is it revealing my health information when I have to decline such a case, it also discriminates against me in my professional capacity. Instead, I feel that

Catholic Health should educate the patient that they cannot discriminate on the basis of disability and that they cannot enforce such a policy. This would not be tolerated if a patient requested any other discriminatory request.

23.     On November 5, 2021 I received an email stating that I am to be required to have a bi-weekly COVID test as the agency is waiting on rulings from lawsuits regarding religious exemptions. I am very stressed about this as I have never been required to take a COVID test while I am healthy. I have not been informed of the efficacy of the PCR tests nor of the long-term effects of frequent testing. I want to be left to do my job as I have been doing for over twenty years, including the past two years during this "pandemic".

24.     On November 17, 2021, I received an email from Christine Bracco and Tony Pellicano, Chief HR Officer stating that if I don't receiver an injection by November 22, 2021, I will be placed on leave without pay for 2 weeks. I have had a vacation planned for weeks which happened to coincide with the November 22 date. After that time employees who still have not received the injection will be terminated.

25.     On November 28, 2021, after returning from vacation, I had received a letter from Christine Bracco Bracco, Director of Human Resources. The letter stated that I was being placed on "unpaid furlough" for 2 weeks at which point it would be assumed that if I didn't comply with "mandate", that it would be considered that I have resigned. This is outrageous as I had previously stated that I was healthy, ready and able to work. Just as it is a proven fact that "vaccinated" people can become sick from and transmit Covid-19, yet I and others who refuse the "vaccine" are the only ones in danger of being terminated. This is causing a severe amount of anxiety to me and my family.  I am having heart palpitations and nausea because of this latest policy.   I feel like I am

experiencing and being continually discriminated against.  All I want to do is return to my job without prejudice and do what I am more than capable of doing.

**26.**   On November 29, 2021, I responded to Christine's letter in an email (Exhibit A) explaining that I have no intention of resigning my position. Taking an experimental injection was never a condition of my employment and I am ready, able and willing to return to work.  I have made great efforts to timely notice my employer that I am fit for service and have complied with all requests for response.

**27.**   On December 1, 2021 I received a termination letter From Christine Bracco stating that "We simply are not permitted to allow unvaccinated employees in covered positions to continue to work even with appropriate PPE and subject to COVID-19 testing."

The documents included with Exhibit A are true and correct copies of the originals.

Andrew Kosiba, Affiant

STATE OF NEW YORK          )
                           )      Ss
COUNTY OF ~~NASSAU~~  Suss-lk )

Subscribed and sworn to before me a notary public this 3 day of March, 2022.

Signature of Notary                              [ls]

DARLENE M ROTH
Notary Public - State of New York
NO. 01RO4881014
Qualified in Suffolk County
My Commission Expires Dec 29, 2022

- 40 -

1
2
3
4
5
6
7
8
9
1
0
1
1
1
2
1
3
1
4
1
5
1
6
1
7
1
8
1

# EXHIBIT A

written communications

**SA-86**

EEOC Form 161-B (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| To: | Mr. Andrew Kosiba<br>33 Neal Path<br>South Setauket, NY 11720 | From: | New York District Office<br>33 Whitehall St ,5th Floor<br>New York , New York ,10004 |
|---|---|---|---|

| EEOC Charge No.<br>**520-2022-02493** | EEOC Representative<br>**D. Young,**<br>**Investigator** | Telephone No.<br>**(929) 506-5309** |
|---|---|---|

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice;** or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

> [ ] Less than 180 days have elapsed since the filing date. I certify that the Commission's processing of this charge will not be completed within 180 days from the filing date.

> [ ] The EEOC is terminating its processing of this charge.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

**Dolanda Young** Digitally signed by Dolanda Young
Date: 2022.02.17 06:41:37 -05'00'

For February 17, 2021

Enclosures(s)

**Judy Keenan,**
**New York District Director**

*(Date Mailed)*

cc:

SA-87



## Fw: Message on behalf of Alan Guerci, M.D.
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                    Thu, Apr 8, 2021 at 3:50 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Cudahy, Maryann
Sent: Friday, December 11, 2020 10:35 AM
To: Email Users - All
Subject: Message on behalf of Alan Guerci, M.D.

Dear Colleagues,

I know many of you have questions regarding a COVID vaccine. I am happy to inform you that the F.D.A.'s vaccine advisory panel, voted in favor of emergency authorization for people 16 and over. Although the F.D.A. does not have to follow the advice of its advisory panel, it usually does. Emergency Use Authorization (EUA) should follow by this weekend. Although the vaccines will not be widely available to the general public for many months, Pfizer and Moderna have produced enough doses for approximately 20 million people. These first doses will go to people in high-risk groups, including health care workers.

We expect to receive our first batch of vaccines the week of December 14th. CHS employees will be offered the vaccine based on risk of exposure to COVID-19. Top priority will be given to employees and physicians in our ICUs, emergency departments and dedicated COVID units, as well as long-term care, home care and hospice workers who regularly interact with patients and residents. We will make the vaccination more widely available as additional supplies are received. For more information, please refer to the attached FAQs and our COVID Vaccination Policy<http://chsit/assets/sys tem_wide_policies/COVID%20%20MERS%20SARS%20Co%20V%20Vaccination%20Policy.pdf>. **Patients will be treated following a separate protocol.**

While we are not making the vaccine mandatory at this time, we strongly urge all caregivers to be vaccinated. Please know the vaccine requires two doses. More information will be shared as the vaccine becomes more widely available. Meanwhile, we have prepared a comprehensive FAQs that we hope answers your questions. To address your concerns, we will be establishing a hotline in the near future so you can ask questions about the vaccine that are not addressed by the FAQs. Responses to your questions will be posted on the CHS intranet so that they are available to all employees.

Some of you may be apprehensive about receiving a COVID-19 vaccine. It is important to note that during Phase III trials, the vaccines showed better than 95% effectiveness with no serious adverse safety concerns. As health care providers, we have an obligation to lead the way for our patients, ourselves and our families, which is why I will be one of the first to be vaccinated. An effective vaccine will keep us safe and will be essential to putting this pandemic behind us.

SA-88

Maryann Cudahy

Assistant to Alan D. Guerci, M.D., President & CEO

Assistant to Salvatore F. Sodano, Chairman

Catholic Health Services of Long Island

992 North Village Avenue

Rockville Centre, NY 11570

(516) 705-3708

maryann.cudahy@chsli.org<mailto:maryann.cudahy@chsli.org>

[CHS_Logo_Revise_4C_Tagline cropped]

**SA-89**

## Fw: COVID Survival Tip #1
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                                    Thu, Apr 8, 2021 at 3:44 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Frawley, Mary
Sent: Tuesday, January 5, 2021 7:45 PM
To: Email Users - Catholic Home Care
Subject: COVID Survival Tip #1

Dear Staff,

The attached article is about disconnecting from the electronic world during COVID. We have had so many challenges during the past 9 months. This article reminds me that it is important to disconnect, go outside and get some fresh air and remember that we will survive COVID!!!

Take some time to read, think about disconnecting and spending some quality time with your family and GET VACCINATED!!!

Stay Safe,

Mary

Mary Frawley DNP, RN

Director of Patient Services

Catholic Home Care

110 BiCounty Blvd Ste 114

Farmingdale, NY 11735

Ph: 631-828-7408

Email: mary.frawley@chsli.org<mailto:mary.frawley@chsli.org>

SA-90

## Fw: Agency/COVID-19 Update – January 17, 2021

1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                    Thu, Apr 8, 2021 at 3:45 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Kranz, Kim
Sent: Sunday, January 17, 2021 10:08 AM
To: Email Users - Catholic Home Care; Email Users - Good Shepherd Hospice
Cc: Verzi, Dennis
Subject: Agency/COVID-19 Update – January 17, 2021

Message sent on behalf of Kim Kranz, President

As this week comes to a close, I'd like to reflect on our vaccination initiatives over the past several weeks and thank all of those involved for the work they have done to provide this much needed service to our employees. To date 455 of our employees have received the vaccination, this is only 50% of our employee base.  Dr. Kerrianne Page, CMO and myself continue to communicate the importance of vaccinating all. We highly recommend and encourage you to be vaccinated for the protection of yourself, your loved ones, our patients/families and your fellow employees. Please work with Chris Bracco, HR Partner, to schedule your 1st dose of the vaccine.

Dr. Page is available to discuss any questions or concerns you may have about receiving the vaccine.

As eligibility requirements for the COVID vaccine expand it will become more challenging for us to have supply.

Now is the time to work on scheduling an appointment.


In addition, I am excited to share the launch of the new system name of Catholic Health! Over the next few weeks, you will continue to see messaging relating to this new branding, as well as the launch of our new system logo on January 27. Following that release, there are a number of other branding changes that will continue to be mentioned throughout the system. Continue to visit our social media pages for the latest information on our new brand launch.


Below are some important highlights for all staff that I would like to share with you:


COVID


Our hospital(s) goal is to keep COVID volume at the appropriate levels so our system can continue to perform elective surgical procedures. We have been working with our hospitals closely to ensure patients are safely transferred to their homes.

SA-91

Currently we are caring for over 250 patients who are COVID positive or a person under investigation (PUI). I want to thank all our employees and volunteers who are keeping our staff safe by ensuring protective equipment is ordered, inventory is tracked & maintained, supplies are packaged and supplies are distributed, remarkable teamwork!!

COVID update calls with Dr. Page, our program Directors and myself will continue during the week of January 25th.

ACUTE HOSPITAL AT HOME PROGRAM

A new innovative model of patient care, the acute Hospital At Home program is scheduled to launch next week. This program has been approved by Center for Medicare and Medicaid Services (CMS) for all six hospitals. A multidisciplinary group of leaders have built a level of quality and safety to patients who qualify for the Catholic Health Hospital At Home program. This care allows for a select set of COVID-19 patients who would most benefit from the opportunity to continue their acute hospitalization at home. A strict inclusion criteria will be used and patients identified will receive their continued Remdesivir infusion therapy at home. Over 40 of our clinicians from Home Care are trained in this new model of care.

I would like to thank all of the clinicians involved in delivering this new model of care and level of service.

A special thank you to Dr. Page and Barbara Rowe for their unwavering leadership and support of launching and operationalizing this program.

In closing, I would like to share with you a prayer from Catholic Health Services:

Lord grant that our lives may amaze. Make us staunch advocates of the freedom you proclaimed in the synagogue in Nazareth and tirelessly work to bring your glad tidings to the poor.

Thank you for delivering our mission and ministry to serve our communities.

With gratitude,

Kim

SA-92

9/20/21, 8:47 AM                                      Gmail - Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

 Gmail                                                           **Andrew Kosiba <kosproducts@gmail.com>**

## Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

**Kosiba, Andrew <Andrew.Kosiba@chsli.org>**                                        Fri, Sep 3, 2021 at 5:32 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Dolan, Sarah
Sent: Thursday, September 2, 2021 1:46 PM
To: AllCHSLIEmailUsers
Subject: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

I write with an important update on the New York State COVID-19 vaccination mandate for covered healthcare workers and the accompanying Catholic Health policy, which is required by the New York State mandate.  On August 26, 2021, New York State issued regulations requiring COVID-19 vaccinations for all covered healthcare workers in the state.  These regulations eliminated the availability of religious exemptions for covered healthcare workers.  The New York State Department of Health cited public health reasons for the elimination of religious exemptions and noted that New York State has existing vaccination requirements for healthcare workers, such as for measles, which are not subject to religious exemptions.

As a health care institution in New York State, Catholic Health is required to follow Department of Health mandates. Therefore, Catholic Health entities will not be able to consider requests for religious exemptions and will only be able to consider requests for medical exemptions based on pre-existing conditions. All covered healthcare workers who do not receive an approved medical exemption will have to receive at least one dose of the COVID-19 vaccination by the State deadlines of September 27, 2021 (for hospital and nursing home staff) and October 7, 2021 (for staff of home health, hospice and diagnostic and treatment centers).

A copy of Catholic Health's revised COVID-19 Vaccination Policy, which is in compliance with regulations, is attached and includes the Catholic Health form for requesting medical exemptions. The form is also posted on the Catholic Health intranet. Please note that all requests for medical exemptions must be submitted by Monday, September 20th so we have enough time to review the request and ensure employees are eligible to report to work on the applicable deadline.

Thank you for your attention to this important matter.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

## Fw: New York State COVID Vaccine Mandate

1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                                    Wed, Sep 8, 2021 at 8:01 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Bracco, Christine
Sent: Wednesday, September 8, 2021 4:36 PM
To: Bracco, Christine
Subject: New York State COVID Vaccine Mandate

I am reaching out to you as a follow up to the recently announced New York State vaccination mandate for Healthcare employees, which will take effect for Home Care and Hospice on October 7th.

For over six years now I have been a proud team member of Catholic Health Home Care and Good Shepherd Hospice and I am inspired and humbled on a daily basis by the incredible work you all do on behalf of our patients and family members. Having had the opportunity to speak individually with many of you, I know this announcement has been distressing and I wanted to reach out to each of you to offer my support as we navigate through this new requirement.

At this time, my records indicate you have not received a COVID vaccination. If that information is not up to date or if you have a scheduled vaccination, please let me know as soon as possible.

If you are considering not being vaccinated, please let me know by the end of this week, 9/10/2021, so I can work towards assisting you with options and/or next steps.

Thank you for all you do!

Chris

Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

SA-94

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY 11735

9/20/21, 8:46 AM                          Gmail - Fw: Hospice & Home Care Agency Update

M Gmail                                                    Andrew Kosiba <kosproducts@gmail.com>

## Fw: Hospice & Home Care Agency Update

Kosiba, Andrew <Andrew.Kosiba@chsli.org>                         Fri, Sep 10, 2021 at 7:30 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Kranz, Kim
Sent: Friday, September 10, 2021 1:58 PM
To: Email Users - Catholic Home Care; Email Users - Good Shepherd Hospice
Subject: Hospice & Home Care Agency Update

GSH/CHC Team Members,

Please allow this to serve as an agency update which includes:

- We will Never Forget

- Current Status – Census & COVID cases

- Recruitment

- Vaccination Plan

- Patient Experience

This Saturday, September 11th  in remembrance of 9/11 we will have our Chaplains present in our Farmingdale Office, Port Jefferson and Rockville Centre IPUs to provide our staff with prayer and remembrance for the 20th anniversary of this tragic event.

Current Status – Census & COVID cases (we continue to track and trace daily)

CHC

9/7/2021

9/8/2021

9/9/2021

9/10/2021

Total Census

SA-96

9/20/21, 8:46 AM                                    Gmail - Fw: Hospice & Home Care Agency Update

2653

2614

2598

2584

Patient PUI

12

10

11

16

Patient Positive

26

25

27

35

Staff in Quarantine

1

1

1

2

Staff Test Positive

3

1

Gmail - Fw: Hospice & Home Care Agency Update



1

2

Hospice

9/7/2021

9/8/2021

9/9/2021

9/10/2021

Total Census

376

372

371

379

Patient PUI

4

4

4

3

Patient Positive

1

1

1

SA-98

9/20/21, 8:46 AM                                   Gmail - Fw: Hospice & Home Care Agency Update

4

Staff in Quarantine

1

2

2

2

Staff Test Positive

1

1

1

1

- Please do not come to work if you are sick or experiencing any COVID symptoms.

- COVID testing for non-symptomatic employees is occurring in our Farmingdale office Monday's and Wednesday's 8:00am – 1:00pm

**Recruitment**

I am happy to announce we have over 30 new employees starting in our September 13th orientation. This includes clinical and support team members in both Hospice & Home Care. A very special thank you to all our Managers and Recruitment Team, Human Resources and Education Team for your positive efforts in making this a possibility.  We will have another Open House in September along with daily on-site interviewing for walk-ins.  Our October orientation already includes clinicians for both programs.

**Vaccination Plan**

- Approximately 80% of our staff have been vaccinated.

- If vaccination is received proof of vaccination must be brought to Human Resources.

- CH Policy on Employee Vaccination issued 09.02.2021, please follow and notify Chris Bracco of any questions.

- Requirement by New York State for all staff to be vaccinated with at least one shot by October 7, 2021.

- Operations is working on a Flex & Sustain Plan identifying the impact that non-vaccinated staff will have on each department operations. This will require daily monitoring for needed alterations.

**Patient Experience**

- We have seen incremental positive results with our overall patient experience scores and have opportunity for improvement to reach our CH goal. Our managers will continue to provide Appreciative Coaching training. We have shared with our management team our most recent scores for July.

Focus on our I-CARE golden key behaviors Every Patient….Every Time makes every encounter a Positive Experience for Our Patients.

THANK YOU for being our Heroes.

Please be careful and safe. I am available if you have any questions.

With gratitude,

Kim

SA-100

9/20/21, 8:46 AM                                    Gmail - Fw: Hospice & Home Care Agency Update

Kim Kranz

President

Catholic Health

Home Care and Good Shepherd Hospice

110 Bi-County Blvd. Ste. 114

Farmingdale, NY 11735

T  (631) 828-7410

F  (631) 828-7494

Kim.kranz@chsli.org


[cid:image001.png@01D7A64B.DEBE7220][cid:image002.png@01D7A64B.DEBE7220]


Vaccination


2 attachments

**Catholic Health**
Home Care

**image001.png**
6K

**Catholic Health**
Good Shepherd Hospice

**image002.png**
8K

.

9/20/21, 8:44 AM                                   Gmail - Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

 Gmail                                              **Andrew Kosiba <kosproducts@gmail.com>**

## Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

**Kosiba, Andrew <Andrew.Kosiba@chsli.org>**                              Thu, Sep 16, 2021 at 7:08 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Dolan, Sarah
Sent: Thursday, September 16, 2021 2:38 PM
To: AllCHSLIEmailUsers
Subject: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

Dear colleague,

On September 14, 2021 an upstate federal court granted a temporary restraining order (TRO) prohibiting the State "from
enforcing any requirement that employers deny religious exemptions from COVID-19 vaccination." This TRO will go into
effect on September 27, 2021. Please note the court ruling does not suspend the NYS COVID-19 vaccination mandate,
however it temporarily prohibits New York State from blocking employers from considering religious exemptions. The
mandate remains in effect in all other respects. The issue of the availability of religious accommodations is now on appeal
to the U.S. Court of Appeals, which has been asked to rule on the State's position on religious exemptions on an
expedited basis. A decision from this Court will have binding effect on all health systems in the State, including Catholic
Health and its entities.

We continue to receive requests for religious accommodations and will evaluate these once we receive further direction
from the courts and regulatory guidance. These requests should be submitted to your local Human Resources
department so we can keep accurate track of all that are received. In the meantime we continue to move forward with our
plans based on the NYS COVID-19 vaccination mandate. This includes reminding employees about the mandate
deadline, providing educational resources and providing ready access to appointments to receive the vaccination.

We will continue to monitor and keep you informed on the status of these legal proceedings and will comply with all
applicable judicial orders and regulatory directives. Please know that we will not take any adverse employment actions
against an unvaccinated employee seeking a religious exemption from the vaccination mandate while we await further
legal and regulatory direction.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

9/25/21, 8:16 AM                                    Gmail - Fw: NY State COVID Vaccination Mandate

M Gmail                                             Andrew Kosiba <kosproducts@gmail.com>

## Fw: NY State COVID Vaccination Mandate
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                    Fri, Sep 24, 2021 at 6:47 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Bracco, Christine
Sent: Friday, September 24, 2021 9:07 AM
To: Bracco, Christine
Cc: Verrengia, Michael
Subject: NY State COVID Vaccination Mandate

I hope this email finds you well.

As a follow up to the email distributed by Catholic Health yesterday afternoon, I wanted to reach out to you again with regards to the New York State COVID Mandate.

The New York State COVID Vaccination Mandate for Home Care and Hospice will be effective on October 7th.  While an upstate New York federal judge has issued a temporary restraining order prohibiting consideration of religious exemptions, all other vaccine mandates remain in effect.  In order to continue working on and after October 7th, employees will need to provide one of the following:

1)   Evidence of at least the first dose of vaccination.  If you have already received your first dose or are fully vaccinated, please send a copy of your NY State COVID card to Jennifer Temple, Employee Health Nurse, as quickly as possible.

2)   CH approval for a Medical Exemption.  Medical Exemption Applications were due on September 20, 2021,so if you are still planning to apply for a Medical Exemption please do so immediately.  Medical Exemption applications must be submitted using the CH Medical Exemption Form.

3)   Religious Exemption; Employees with a Religious Exemption will be permitted to continue working pending CH Committee review and the outcome of the temporary suspension.  Religious exemptions should be submitted by today, 9/24, at noon.

Employees who do not meet one of the above criteria will be furloughed, without pay, beginning on October 7th. Employees may only be furloughed for up to 2 weeks, during which time health insurance benefits for you and all covered dependents will be maintained.

Tony Pellicano, our Chief HR Officer, said it best – "we hope we can continue to all work together to ensure that we meet our promise to the patients we serve".

SA-103

9/25/21, 8:16 AM                                        Gmail - Fw: NY State COVID Vaccination Mandate

Please let me know if I can answer any questions or assist you in anyway.


All the best,

Chris




Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-104

Christine Bracco, Human Resources
Catholic Health
christine.bracco@chsli.org

October 7th, 2021.

RE: Your email on September 24th, 2021.

You (Catholic Health) admit that you do not regard Andrew Kosiba (Andrew) as having any contagious disease, yet you purport to require him to disclose his medical history and submit to medical interventions (accommodations such as mask wearing and vaccines)[1]. This violates 29 CFR Part 1630.9(d) and 21 U.S.C. 360bbb-3. You are not exempted from complying with the law under 29 U.S.C. §654.

There are no vaccines during a period of emergency use authorization.

No vaccines have been approved by the FDA and no vaccines are currently in production for the so-called "Coronavirus" or any of its purported derivatives. Your statement that a vaccine has been approved by the FDA is false.

Any medical interventions during an emergency use authorization period are by definition, clinical trials and no one is required to participate in clinical trials for any reason, and certainly not as a condition for employment. 21 CFR Part 50.20.

You state that you have a legal obligation yet failed to cite any legal duty. (What law?). You thereby admit that you have no duty of care or insurable risk to protect employees or anyone from any contagious disease.

You admit that you have no new legal duty of care to protect anyone from any contagious disease. Workman's compensation does not cover contagious diseases. Let me explain the reason for this. First of all, the risk cannot be calculated under any actuarial scheme and secondly, it is statistically impossible to establish the proximate cause of who infected whom.

You provide no supporting facts of any contagious disease but this is not relevant because whether or not there is a contagious disease, or any "pandemic" as you falsely claim, you still have no new legal duty of care, and Andrew Kosiba has no legal duty to disclose his medical records to you. Likewise, he has no legal duty to submit to any of your accommodations (mask wearing, vaccines, or whatever). This is a matter of law, 29 CFR Par. 1630.9(d). **Read the law; and yes, it does apply to Catholic Health.**

You fail to cite any law that exempts you from this actual legal duty, and you fail to cite any law that exempts you from complying with the requirement to conduct an individualized assessment to determine whether Andrew Kosiba is a direct threat to anyone. Commentary and news reports do not satisfy the legal criteria for an individualized assessment.

Please be advised that claiming there is a pandemic is not a legal defense for disability discrimination and retaliation claims. While not relevant, it should be noted that the standard deviation in the mortality rate for the years 2017, 2018, 2019 and 2020 is zero, unchanged. This is the very definition of no pandemic. Moreover, no public health officer, including the CDC, has

---

[1]The FDA defines wearing a mask when intended for health purposes as a medical device. Section 201(h) Food, Drug & Cosmetic Act.

any record of any contagious disease culture or specimen for "Covid-19" or "SarsCov-2" or anything similar, it doesn't exist.

Speaking in pertinent legal terms again, Title I of the ADA prohibits employment discrimination based on disability. Among other things, Title I prohibits employers (you) from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c).

Your requests for Andrew's medical records are not part of any job-related employee health program.

You fail to allege any facts that would constitute an undue burden for Andrew's refusal to accept your accommodations.

You fail to allege any fact that would establish any fundamental alteration in the manner in which your business operates. Your policies themselves have created a fundamental alteration in the way your business operates.

You fail to allege facts that the disability you are in fact regarding Andrew as having is transitory and minor.

Your policies have created a disability for Andrew.

29 CFR Sections 1630.2(r):

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk,

(2) The nature and severity of the potential harm,

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm."

Your policies have nothing to do with anyone's safety, in fact, your policies violate the safety of your employees and violate your actual duty of care toward those employees. Safety requirements must be based on actual risks (not "guidelines" published on a website) and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

Since you are not regarding Andrew Kosiba as having any contagious disease and you have no diagnosis or records of the same, you will immediately cease and desist from your illegal conduct of discrimination based upon such a disability and retaliation against Andrew and allow him to do his job without unnecessary interruption. Unless you can show you have conducted an individualized assessment of Andrew and determined that he is a direct threat, by the criteria set forth in the actual law, you will cease and desist from any further communication, harassment, discrimination, intimidation, or retaliation against Andrew.

SA-106

# Re: NYS Vaccination Mandate

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To: Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>

CC: ak764@protonmail.com <ak764@protonmail.com>

Date: Thursday, November 18th, 2021 at 9:14 AM

Hello Christine.

This is my response to Tony Pellicano's email which you forwarded regarding the newest
illegal "policy" Catholic Health Services has set forth. Please note that his first point
in regards to "all employees in positions such that if they were infected with Covid-19,
they could potentially expose other personnel, patients or residents to the disease" also
applies to those who were injected or deemed "vaccinated" and yet they are not being
fired. Therefore your policy is illegal and discriminatory. I would hope that for the sake
of the agency, you would all rethink this policy and return to work as usual without
"mandates" which are not law and discriminatory.

Thank you for your attention and please file this again in my confidential file.

Sincerely,

Andrew Kosiba

From: Bracco, Christine
Sent: Wednesday, November 17, 2021 12:33 PM
To: Bracco, Christine
Subject: NYS Vaccination Mandate

I am forwarding an update on the status of the NYS Vaccination Mandate from our Chief HR
Officer, Tony Pellicano. I am available all week if you have questions or need any
assistance so please don't hesitate to contact me at 631-828-7603. Chris

--------------------------------------------------------------------------------
--------------------------------------------------------------------------------
-----------------------------------------

This is to provide an important update on the status of the NYS COVID-19 vaccination
mandate, following my most recent communication on September 23, 2021. There have been
some recent, significant developments so it is very important that you review the
following information carefully.

SA-107

As we know, on October 16, 2021, after encountering litigation arising from the New York State Department of Health (DOH), we permitted employees seeking religious exemptions to continue to work subject to PPE and testing requirements.  On November 4 and 12, 2021, the U.S. Court of Appeals for the Second Circuit upheld the state mandate without a religious exemption as constitutional and vacated the temporary injunctions that had been issued against the mandate. This means that the Court of Appeals has permitted the DOH to proceed with the mandate without "religious exemptions".

In a letter dated November 15, 2021, the DOH has advised that individuals employed in positions where, if they were infected with COVID-19, they could potentially expose other "covered personnel, patients, or residents to the disease" must receive the first dose of the vaccination by Monday November 22, 2021 in order to be permitted to remain in their positions.  The only exceptions allowed are those with religious accommodation requests who also have approved medical exemptions or who can perform their jobs in a way where they will not come into contact with patients, residents or co-workers.  We expect there will be few if any positions that satisfy this criteria.

In light of this development, please be advised of the following:

•       All employees in "positions such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease" must have the first dose of the COVID-19 vaccination by Monday, November 22, 2021.  This includes all individuals working in hospitals, nursing homes, home care and hospice who have in-person interaction with co-workers, patients or residents as part of their job responsibilities.

•       Employees who do not receive the first dose of the vaccination by Monday, November 22, 2021 will be placed on a two week unpaid leave.  After that time employees who still have not received the first dose will be terminated and receive their accrued unused vacation time in accordance with our normal policies.  However, we will maintain health and welfare benefits until the end of the year. Employees who are terminated due to this action and are fully vaccinated within six months of termination will be eligible to return to work in an available position for which they qualify with no loss of seniority.

•       During this time, Catholic Health will consider on an individualized basis whether there are reasonable accommodations available, which might permit employees who have applied for an exemption to the vaccine due to their sincerely held religious beliefs to continue working remotely such that there would be no in-person contact with co-workers, patients or residents.  We must advise, however, that most if not all of the positions held by those who have applied for religious accommodations require in-person work in covered facilities such that co-workers, patients or residences could be exposed to COVID-19 should the employee become infected.

•       As a result, we strongly encourage our employees who have not yet been vaccinated to consider receiving the first dose of the vaccine by Monday, November 22,

SA-108

Case 2:21-cv-06145-GRB-ARL Document 14 Filed 08/03/22 Page 64 of 130 PageID #: 918

by Friday, November 19th if you intend to receive the vaccination so that work schedules can be planned accordingly.

As we have stated in earlier communications, as a healthcare system operating in the state of New York we are required to follow the directives issued by the NYS DOH and by the courts.  We appreciate your patience and understanding as we continue to navigate through this difficult time. In the final analysis, we owe it to our patients to provide the safest environment possible. We greatly appreciate that 93% of our employees have chosen to take the vaccine and hope that we can continue to all work together to ensure that we meet our promise to the patients we serve.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

[cid:image002.png@01D7DBAF.266FF470]

**12.69 KB** 🖉 2

image002.png (5.59 KB)        ☰ N of Timely Response (2).odt (7.10 KB)

 **Catholic Health**

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew

This will confirm that you have been placed on an unpaid furlough due to your failure to meet the requirements of the NYS mandate for receiving the COVID-19 vaccination. According to the mandate, employees are required to have evidence of at least the first dose of vaccination in order to continue working as of November 22, 2021. In accordance with our previous letter dated November 16th, you will be placed on an unpaid leave for a period of two weeks ending on Monday, December 6th. If you fail to comply with the vaccination requirement by that date, you will be considered to have resigned and your employment will be terminated. In this case your health benefits will be continued through the end of the month and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley in order to be eligible for COBRA benefits.  In the event you return to work during the period of the unpaid leave the contributions will be deducted from your next paycheck.

If you decide to get the vaccination and return into an available position with six months of termination you will be eligible for re-employment with no loss of seniority and resume health care coverage on the first of the month following the date of return.

We regret having to take this action and hope that you will reconsider your decision to receive the vaccination and return to Catholic Health. Please direct any questions relating this matter to Christine Bracco at 631-828-7603.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

Christine Bracco, Human Resources
Catholic Health

christine.bracco@chsli.org

## CONFIDENTIAL COMMUNICATION
### 29 CFR §1630.14(c)(1)

September 20th, 2021.

RE    Employment discrimination & retaliation

Hello Christine,

This is a confidential communication that I am requesting be included into my personnel file and I want this and subsequent communications to be kept confidential within human resources. I am documenting acts of retaliation and harassment of which I have been subjected to on the job. I also want to speak confidentially to the Catholic Health designated employee or representative for matters involving Title I of the Americans with Disabilities Act and grievances.

Please explain why Catholic Health and its employees are discriminating against me based upon a disability you are regarding me as having? I am invoking my rights under the Americans with Disabilities Act as a qualified individual with a disability.

I am being regarded as having a contagious disease without any individualized assessment and continually being asked for my medical records and to submit to medical examinations and interventions (accommodation or mitigation measures) without any informed consent. It has been extremely difficult to perform my employment duties because of these interruptions and harassment.

Regarding the mitigation measures including but not limited to mask-wearing, vaccines, social distancing, hand-washing and submitting to medical examinations such as the collection of vital statistics (body temperature) or tissue samples (diagnostic testing), I am not required to accept these or any mitigation measures under Title I of the ADA, 29 CFR Part 1630.9(d). If you have some legal authority that overrides this, please provide me with a legal citation.

Title I of the ADA prohibits employers from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c)

My questions are:

1. Why do you regard me as having a disability and what records have you made of this?

**2. What physician, what medical records, and what complaint made by a physician to a health officer, and "orders of isolation and quarantine" do you rely upon**

SA-111

for diagnosing me as having a contagious disease?  **Please include all, evidence, court records and records from the individualized assessment used in making this determination or diagnosis as required under Title I of the Americans with Disabilities Act.**[1]

3.  Please identify the statute and regulation imposing your legal duty of care to protect me and others from any contagious disease and the commissioner's pertinent "hazard assessments".

4.  Please provide a copy of documentary evidence from the departments of health or labor establishing the existence of a disease that has been isolated by modern scientific standards and documentary evidence proving that such disease is airborne and contagious.

5.  Please identify your insurable risk with a copy of your insurance binder showing that you are insured for protecting employees from a contagious disease, and any adverse health consequences they may suffer as a result of your mitigation measures.

6.  Regarding the mitigation measures, **a)**  why have you refused to include notice that this is under an emergency use authorization, and disclose the risks and benefits of the product, and also advise me of my right to either accept or refuse the product,[2] and **b)**  which of these mitigation measures has the proven efficacy to prevent transmission or infection of the contagious disease for which you regard me as having?

7.  How are your requests for my medical information and submitting to medical examinations and interventions necessary for the performance of my employment duties?

8.  Why are you able to diagnose me with a deadly disease and impose restrictions and medical interventions without my informed consent, without any physician's oversight or judicial approval, yet I am required to obtain written permission from my physician to exercise my rights to informed consent and medical privacy?  We can stipulate that I have never waived any of my rights to medical privacy which includes the right of informed consent as a condition for employment.

Please identify the designated employee responsible for resolving matters concerning the Americans with Disabilities Act and grievances.  On the other hand, if you refuse to answer these questions, I will consider the matter closed and we can set it aside and continue with our business without further interruption.

Be advised that if my employment is conditioned upon submitting to your mitigation measures, this constitutes discrimination based upon disability, a violation of state and federal law, and retaliation under the ADA, for which I would have a claim for employment discrimination based upon disability.

Sincerely,

Andrew Kosiba

Please be advised that this communication and all related communications are confidential and must not be disclosed as per the Americans with Disabilities Act explained below.

---

1   29 CFR 1630.2 et seq.
2   21 USC 360bbb-3

SA-112

### Post Script Memorandum of Law

Title I of the ADA, 42 U.S.C. § 12111, et seq., and its implementing regulation, 29 C.F.R. Part 1630, permits covered employers, such as Catholic Health, to make inquiries into the ability of an employee to perform job-related functions and make inquiries into the nature and severity of the employee's disability, so long as the examination is job-related and consistent with business necessity. 42 U.S.C. §§ 12112(d)(4)(A)–(B); 29 C.F.R. § 1630.14(c). See also Darby v. Childvine, Inc, 964 F.3d 440 (2020)

Information obtained as a result of such an examination or inquiry regarding the medical condition or history of any employee must be treated as a confidential medical record. 42 U.S.C. §§ 12112(d)(4) (C), (d)(3)(B); 29 C.F.R. § 1630.14(c)(1).

Confidential medical information may be disclosed in three instances: (1) to inform supervisors or managers regarding necessary restrictions on the work of the employee and necessary accommodations, (2) to medical personnel when emergency treatment is required, and (3) to government officials investigating compliance with this regulation. 42 U.S.C. §§ 12112(d)(4)(C), (d)(3) (B); 29 C.F.R. § 1630.14(c)(1). None of these exceptions apply with regard to my employment with Catholic Health.

SA-113

**Addendum**

# DEMAND FOR RETRACTION

White House, Department of Justice

and Fox News, CNN, MSN, MSNBC

The White House and Department of Justice, via Jen Psaki, made a false and misleading statement in the White House press briefing dated July 6th, 2021.[3]

Demand is made the White House and Department of Justice and all news agencies to retract its false statement:

**"Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization."**

and the same demand for retraction of the false and misleading title from the article published by Fox News dba Fox TV Digital Team, CNN, MSN, MSNBC and all news agencies that published the following statement in any way:

**"Federal law doesn't prohibit COVID-19 vaccine mandates"**

and all commentary supporting this statement, and correct this false statement with the complete opinion which the Department of justice failed to include, which states:

"Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization."[4]

**"We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies.** See, e.g., Equal Employment Opportunity Commission, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA)."[5]

Demand is made upon the White House, Department of Justice and all news media agencies to retract its false and misleading statements and publish a correction by disclosing its complete and accurate opinion and to correct this in the same manner in which the false and misleading statement was first made (not on the back page of some newspaper).

These false and misleading statements create a danger and public health hazard by encouraging private businesses and government agencies to violate the law. This is the way the government can push its agenda and avoid being challenged, by distributing a policy to literally millions of locations instead of adopting an actual law, it can mislead millions of people into making the wrong conclusions, an din many cases, result in the death or permanent injury of many thousands or millions of people.

---

3   https://rumble.com/embed/vhso17/?pub=mt1mb
4   21 USC §360bbb-3
5   https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mand-vax.pdf

SA-114

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

David L. Reinman, ADR Coordinator
New York District Office EEOC
33 Whitehall Street, 5th Floor
New York, NY 10004
david.reinman@eeoc.gov

CRTIU Supervisor
New York District Office EEOC
33 Whitehall Street, 5th Floor
New York, NY 10004

Christine Bracco, Human Resources
Catholic Health
110 Bi-County Blvd
Farmingdale, NY 11735
christine.bracco@chsli.org

## For New York District Office EEOC
## Charge of Discrimination and Request for Mediation

Re: Catholic Health
110 Bi-County Blvd
Farmingdale, NY 11735

### STATEMENT IN SUPPORT OF COMPLAINT

I am making this complaint against my employer for its discrimination against me based upon disability.  The EEOC has the authority and legal duty to investigate this complaint.

My employer regards me as having a disability.
My employer has made a record of such disability.

My employer has failed to conduct any individualized assessment to determine if I am a direct threat to anyone.  My employer has failed to engage in any interactive process with me concerning disability rights or resolutions.

Witness List:

Elizabeth Nallan-Potter    Elizabeth.Nallan-Potter@chsli.org    631-828-7400

Christine Bracco    Christine.Bracco@chsli.org    631-828-7400

Kim Kranz    Kim.Kranz@chsli.org    631-828-7400

- 1 -

Tony Pellicano   Tony.Pellicano@chsli.org   631-828-7400

Mary Frawley   Mary.Frawley@chsli.org   631-828-7400

I have asked to speak confidentially with my employer's designated employee or representative that is responsible for resolving matters involving the Americans with Disabilities Act and grievances thereunder, but my employer refuses to provide me access to such a person.

Instead, my employer has offered various accommodation measures, including, but not limited to mask-wearing, staying six feet away from others, frequent hand-washing, collection, use and storage of my vital statistics, histological samples and biometric data and biometric identifiers without adequate or proper notice, adequate disclosures, adequate data retention security or my informed consent, working in isolation, video-graphic and audio-graphic communications in lieu of face to face communications, working behind clear shielding, and injections of certain types of suspensions which are being called "vaccinations" yet do not prevent infection or transmission of any contagious disease and in fact create more disabilities by altering the normal function of my immune system and other cellular functions. My employer has not merely "offered" such accommodation measures, but threatened me with penalties including those described herein for refusing such accommodations in violation of 29 CFR Part 1630.9(d).

I have thereby informed my employer that I am a qualified individual with a disability that substantially limits my ability to engage in one or more major life activities.

My employer asked me to describe my disability and discuss it with certain employees, even though such disability does not adversely affect my ability to perform the duties of my employment and has done so without any offer or attempt to make such disclosures in confidence or privately.

I have requested information regarding the risks and benefits of my employers accommodation measures and in response, my employer has retaliated against me by humiliating me in front of others, by reprimanding me and has threatened or intimidated or coerced me with the threat of suspension of my pay, reduced hours or pay or the termination of my employment for refusing such accommodation measures instead of providing me with the information I requested so that I could make an informed decision.

I have exercised my right to refuse such accommodation measures and proposed instead that I be permitted to perform my employment duties without harassment, retaliation, coercion, or intimidation as a result of my exercise of such rights, and my employer has prevented and interfered with this occurring.

I have not requested reasonable modifications but only that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation.

- 2 -

SA-116

My employer has instead retaliated against me for exercising my rights under the Americans with Disabilities Act by threatening me with disciplinary measures and penalties for refusing such accommodation measures, including but not limited to suspension or reduction of pay, limiting my access to the premises where I work, segregation, isolation, termination of employment, exclusion from programs or services that would permit me to improve my employment skills or become eligible for advancement, and denied me the possibility for promotion even when I was eligible or would become eligible.

Each day my employer permits and encourages other employees, including my supervisor and managers to harass and intimidate me and ask me for medical, health and other personal information that does not pertain to, or is not necessary for, the performance of my employment duties.

I am thereby being denied equal access to the same programs, activities, benefits, jobs or other opportunities for which I am otherwise qualified, while other employees are not. I am being segregated, excluded and relegated to lesser services by my employer based solely upon disability.

My employer has written and adopted policies that exacerbate my disabilities and create disabilities while also encouraging others to retaliate against me for exercising my rights under the Americans with Disabilities Act.

My employer has failed or refused to fulfill its duty to aid and encourage me in the exercise of my rights which are protected under the Americans with Disabilities Act.

My employer has demonstrated by the actions of its employees and by its own written policies that it intends to continue such violations and failures to comply with the law and violation my rights.

## REQUEST FOR MEDIATION

By filing this Charge, I am formally requesting a mediation hearing to resolve these issues. I request that my Charge be entered manually and a hearing be scheduled. I request the CRTIU Supervisor to enter my Charge into the EEOC system personally as I do not find the online portal acceptable or accessible for entering my Charge. I request a written response from the CRTIU Supervisor confirming that my Charge has been filed within 14 business days of receipt of this Notice.

_____
Andrew Kosiba

Enclosure Copies:

    1.) Notice of Employment Discrimination & Harassment Based on Disability

- 3 -

10/2/21, 8:41 AM                                          Inbox | ak764@protonmail.com | ProtonMail

# Fwd: Harrassment

From:  Andrew Kosiba <kosproducts@gmail.com>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Saturday, October 2nd, 2021 at 6:50 AM



---------- Forwarded message ---------
From: **Kosiba, Andrew** <Andrew.Kosiba@chsli.org>
Date: Fri, Oct 1, 2021, 8:27 AM
Subject: Harrassment
To: Bracco, Christine <Christine.Bracco@chsli.org>
Cc: ak764@optonline.net <ak764@optonline.net>


Hi Christine,

Thank you for your response. I was not asking for a medical exemption. I am claiming my rights under the ADA since I am being regarded as having an infectious disease and I am asking to be left alone to do my job as I have done faithfully for the last 20 plus years. I want the harassment and discrimination to stop.

By law my employer is required to have an ADA representative. Since you are saying it is you that handles ADA then I want to add 2 incidents to my confidential file.

On Tuesday when entering the building I was told I must take a temperature reading. When I stated "But I already had one and submitted it to my supervisor" and asked "is it still necessary?" I was told yes it is. When I displayed my frustration at this policy, I took the temp reading. As I walked away from the counter I heard "That's one of the ones that will be leaving".

On Thursday I came into the office for a team meeting. During the meeting we were told that if you are vaccinated, they have a sticker to be placed on your badge in order to display the fact that you were vaccinated.

Please enter these incidents into my file. Any further harassment or coercion will be directed to you.

Thank you for your attention.

Sincerely,

Andrew Kosiba

SA-118

10/19/21, 10:06 AM                                         Gmail - Confidential file

M Gmail                                    Andrew Kosiba <kosproducts@gmail.com>

## Confidential file
2 messages

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                   Mon, Oct 18, 2021 at 6:15 PM
To: "Bracco, Christine" <Christine.Bracco@chsli.org>
Cc: "ak764@optonline.net" <ak764@optonline.net>

Hello Christine,

I wanted to reach out to you so you can add this complaint to my confidential file. I found out that Catholic Health is allowing patients to demand "vaccinated staff only". This is an extremely offensive and discriminatory policy to allow this to happen in the face of a disability. No one should be subjected to this.

It makes me disheartened and sad to find this out. I would hope that the agency would take a stand against this and educate people that this is a discriminatory policy that you cannot abide by.

Thank you for your attention to this matter.

Andrew Kosiba

**Bracco, Christine** <Christine.Bracco@chsli.org>             Tue, Oct 19, 2021 at 7:59 AM
To: "Kosiba, Andrew" <Andrew.Kosiba@chsli.org>
Cc: "ak764@optonline.net" <ak764@optonline.net>

Good Morning, Andrew.

I will add this to your file.

Take care,

Chris

[Quoted text hidden]

11/5/21, 5:39 PM                                                (4) Inbox | ak764@protonmail.com | ProtonMail

# Fw: UPDATE - New York State COVID-19 Mandate

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date: Wednesday, November 3rd, 2021 at 5:13 PM

```
From: Bracco, Christine
Sent: Wednesday, November 3, 2021 3:35 PM
To: Bracco, Christine
Cc: Verrengia, Michael; Temple, Jennifer; Russo, Adriana L; Kranz, Kim; Alfred, Iyabode
(Yabo); Frawley, Mary; Wilson, Christine K. [CHC]; Joachim, Pamela; Sullivan, Roger;
Mckeever, Maribeth; O'Connor, Carolynn; Winchester, Dionne; Maddock, Kathryn; Donahue,
Margaret (Peggy); Silipo, Samantha; Cucci, Patricia; D'Anna, Susan; Koppelman, Syndee;
Mirabella, Christine; Savarese, Peter; Schilling, Ann; Lyons-McCreary, Nicole; Sam-
Matthews, Suzette; Duggan, Thomas; Farr, Robin A; Wagner, Beth; Nallan-Potter, Elizabeth;
Nelson, Christina; Madonia, Ramona; Prisco, Suzanne; Tapley, Jacqueline; Magnani, Lucas;
Rowe, Barbara; Page, Kerrianne
Subject: UPDATE - New York State COVID-19 Mandate


I write to you with respect to your pending request for a religious exemption from the New
York State COVID-19 vaccine mandate for healthcare workers.  As you no doubt are aware, on
Friday October 29, 2021, the U.S. Court of Appeals for the 2nd Circuit vacated a lower
court preliminary injunction which had blocked New York State from preventing employers
from considering requests for religious exemptions from the mandate.  In so doing, the
Court of Appeals has permitted the New York State COVID-19 vaccine mandate for healthcare
workers to proceed without the availability of religious exemptions.


The U.S. Court of Appeals has promised a more detailed opinion, and we have learned that
the litigants challenging the vaccine mandate have sought relief from the U.S. Supreme
Court.  We await further direction in the legal proceedings but must share that the U.S.
Supreme Court recently permitted a similar vaccine mandate in the State of Maine to
proceed without the availability of religious exemptions.


As we await further direction from the courts, which we expect in the very near term, you
will be permitted to continue to work, subject to existing PPE and testing requirements.


Catholic Health Home Care and Good Shepherd Hospice currently perform COVID testing every
Monday and Wednesday, between 8am and 1pm, in Farmingdale.  Please reach out to Jennifer
Temple, Employee Health Nurse, to schedule your bi-weekly COVID test, beginning the week
of 11/8/2021.
```

SA-120

11/5/21, 5:39 PM                              (4) Inbox | ak764@protonmail.com | ProtonMail

Thanks,

Chris


Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-121

11/8/21, 5:07 PM                                      (6) Inbox | ak764@protonmail.com | ProtonMail

## Fw: COVID testing requirement

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:     ak764@protonmail.com <ak764@protonmail.com>

Date: Friday, November 5th, 2021 at 5:13 PM

```
From: Temple, Jennifer
Sent: Friday, November 5, 2021 11:20 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID testing requirement

Good Morning,

As per previous emails from Human Resources, bi-weekly COVID testing will be required by
CH for any employee who is not COVID vaccinated effective week of 11/7/2021, and every
other week thereafter. COVID swabbing is performed in Employee Health in Farmingdale on
Mondays and Wednesdays between the hours of 8am and 1 pm. You may get tested here or
choose to be tested elsewhere. However, if you are tested elsewhere, it is your
responsibility to promptly  provide me with the results every other week. The test must be
PCR, as rapid tests are not acceptable.  If you'd like to be tested here in Farmingdale ,
bi-weekly, you will choose either Monday or Wednesday , and that will be your regular
testing day. Please reach out to me via email or practice unite   to schedule your day
ASAP. If you are already coming to me for testing, please continue to come as usual . If
you are being tested elsewhere, or plan to begin testing elsewhere, please let me know
where you are being tested . If  you have already communicated with me in regards to your
testing plans, please disregard this email. As always, feel free to contact me with any
questions or concerns.

Thank you,

Jennifer


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610
```

SA-122

11/5/21, 5:38 PM                                          (4) Inbox | ak764@protonmail.com | ProtonMail

## Fw: COVID testing requirement

From:  Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:   ak764@protonmail.com <ak764@protonmail.com>

Date:  Friday, November 5th, 2021 at 5:13 PM

---

```
From: Temple, Jennifer
Sent: Friday, November 5, 2021 11:20 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID testing requirement

Good Morning,

As per previous emails from Human Resources, bi-weekly COVID testing will be required by
CH for any employee who is not COVID vaccinated effective week of 11/7/2021, and every
other week thereafter. COVID swabbing is performed in Employee Health in Farmingdale on
Mondays and Wednesdays between the hours of 8am and 1 pm. You may get tested here or
choose to be tested elsewhere. However, if you are tested elsewhere, it is your
responsibility to promptly  provide me with the results every other week. The test must be
PCR, as rapid tests are not acceptable.  If you'd like to be tested here in Farmingdale ,
bi-weekly, you will choose either Monday or Wednesday , and that will be your regular
testing day. Please reach out to me via email or practice unite   to schedule your day
ASAP. If you are already coming to me for testing, please continue to come as usual . If
you are being tested elsewhere, or plan to begin testing elsewhere, please let me know
where you are being tested . If  you have already communicated with me in regards to your
testing plans, please disregard this email. As always, feel free to contact me with any
questions or concerns.

Thank you,

Jennifer


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610
```

SA-123

11/11/21, 10:09 PM                    (5) Inbox | ak764@protonmail.com | ProtonMail

# Fw: COVID Testing

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:   ak764@protonmail.com <ak764@protonmail.com>

Date: Tuesday, November 9th, 2021 at 5:25 PM

```
From: Temple, Jennifer
Sent: Tuesday, November 9, 2021 8:58 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID Testing


Good Morning ,

As you are aware, effective 11/8/2021, bi-weekly covid swabbing is required for anyone who
has a medical or religious exemption . You are receiving this email because you have not
provided me  information on when and where you will be tested . Testing is available in
Farmingdale EHS Mondays and Wednesdays 8a-1pm . if you'd like to begin testing here
tomorrow, please let me know ASAP. Otherwise please let me know your testing plans. If you
are going to be tested outside of here, it is your responsibility to provide me with the
bi-weekly results promptly.

Thank you,


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care



T  (631)828-7613

F  (631) 828-7610

Jennifer.temple@chsli.org


[cid:image001.png@01D7D547.0DDADB00][cid:image005.png@01D7143E.5A5DBEE0]
```

11/11/21, 10:10 PM                          (5) Inbox | ak764@protonmail.com | ProtonMail

Subject: Re: COVID Testing

Good morning Jennifer.

I am aware of the testing that Catholic Health has implemented. I have already spoken with HR regarding these matters ie. mandates, vaccination, testing. These policies are discriminatory. I also feel that they are retaliatory towards those individuals who did not comply. I know there is a list of non-compliant employees. I know that those employees are being treated differently and this is against the law, ie. ADA, Civil Rights Act.

I have logged a complaint with HR. I have also logged a complaint with EEOC as I am regarded as having a disability. This is harassment at this point and I want it to stop.

As you may or may not know, under Emergency Use Authorization (EUA), Informed Consent must be given. I have inquired as to the long term effects of using PCR tests, efficacy, what is done with my personal medical information, how it is stored and have not been able to obtain an answer. Even if these questions are answered, this is a discriminatory policy and I do not consent.

It is also against the law to retaliate against anyone who does not consent to these measures under the EUA.

As I have told HR, I am not asking for any accommodations. I simply wish to be left to perform the job I was hired for over twenty years ago without interruption, a job I take seriously and have done faithfully. If I am ill I will stay home and if need be I will seek medical attention at that point.

I also ask Christine Bracco to add this email correspondence and response to my confidential file as another example of on the job harassment.

Thank you for your attention to this matter.

Sincerely,

Andrew Kosiba

11/11/21, 10:10 PM                                    (5) Inbox | ak764@protonmail.com | ProtonMail

From: Temple, Jennifer
Sent: Tuesday, November 9, 2021 8:58:18 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID Testing


Good Morning ,

As you are aware, effective 11/8/2021, bi-weekly covid swabbing is required for anyone who
has a medical or religious exemption . You are receiving this email because you have not
provided me  information on when and where you will be tested . Testing is available in
Farmingdale EHS Mondays and Wednesdays 8a-1pm . if you'd like to begin testing here
tomorrow, please let me know ASAP. Otherwise please let me know your testing plans. If you
are going to be tested outside of here, it is your responsibility to provide me with the
bi-weekly results promptly.

Thank you,


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610

Jennifer.temple@chsli.org<mailto:Jennifer.temple@chsli.org>


[cid:image001.png@01D7D652.82BAEDF0][cid:image005.png@01D7143E.5A5DBEE0]


**606.51 KB** 🔗 3

   🏔 image001.png (6.06 KB)                    🏔 image002.png (7.27 KB)

   🔲 COVID-19 Vaccinations Final 9121.pdf (593.18 KB)

SA-126

11/11/21, 10:10 PM                              (5) Inbox | ak764@protonmail.com | ProtonMail

# Fw: COVID Testing

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:  ak764@protonmail.com <ak764@protonmail.com>

Date: Thursday, November 11th, 2021 at 7:53 AM

From: Bracco, Christine
Sent: Wednesday, November 10, 2021 4:59 PM
To: Kosiba, Andrew; Temple, Jennifer
Subject: RE: COVID Testing

Hi Andrew,

In accordance with the Catholic Health Policy, COVID-19 Vaccinations effective September
27, 2021, employees not vaccinated must adhere to bi-weekly COVID-19 testing. Attached is
a copy of the policy for your review.

As an employee with a pending request for an accommodation which remains under review, you
will be required to have negative COVID-19 test results on a bi-weekly basis in order to
continue reporting to work.  COVID testing may be conducted in the Employee Health
department or you may choose an outside testing site that is more convenient for you as
long as the test results are submitted within five (5) days of the test date.

Please work with Jen to ensure the testing is completed within the time frame specified.

Thank you for your cooperation.

Take care,

Chris

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, November 10, 2021 4:01 PM
To: Temple, Jennifer <Jennifer.Temple@chsli.org>
Cc: Bracco, Christine <Christine.Bracco@chsli.org>

 Catholic Health

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew

This will confirm that you have been placed on an unpaid furlough due to your failure to meet the requirements of the NYS mandate for receiving the COVID-19 vaccination. According to the mandate, employees are required to have evidence of at least the first dose of vaccination in order to continue working as of November 22, 2021. In accordance with our previous letter dated November 16th, you will be placed on an unpaid leave for a period of two weeks ending on Monday, December 6th. If you fail to comply with the vaccination requirement by that date, you will be considered to have resigned and your employment will be terminated. In this case your health benefits will be continued through the end of the month and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley In order to be eligible for COBRA benefits.  In the event you return to work during the period of the unpaid leave the contributions will be deducted from your next paycheck.

If you decide to get the vaccination and return into an available position with six months of termination you will be eligible for re-employment with no loss of seniority and resume health care coverage on the first of the month following the date of return.

We regret having to take this action and hope that you will reconsider your decision to receive the vaccination and return to Catholic Health. Please direct any questions relating this matter to Christine Bracco at 631-828-7603.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

SA-128

12/15/21, 4:03 PM (8) Inbox | ak764@protonmail.com | ProtonMail

## Fw: NYS Vaccination Mandate

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To: ak764@protonmail.com <ak764@protonmail.com>

Date: Wednesday, November 17th, 2021 at 1:43 PM

```
From: Bracco, Christine
Sent: Wednesday, November 17, 2021 12:33 PM
To: Bracco, Christine
Subject: NYS Vaccination Mandate


I am forwarding an update on the status of the NYS Vaccination Mandate from our Chief HR
Officer, Tony Pellicano.  I am available all week if you have questions or need any
assistance so please don't hesitate to contact me at 631-828-7603.  Chris

------------------------------------------------------------------------------------
------------------------------------------------------------------------------------
---------------------------------------


This is to provide an important update on the status of the NYS COVID-19 vaccination
mandate, following my most recent communication on September 23, 2021.  There have been
some recent, significant developments so it is very important that you review the
following information carefully.


As you know, while we awaited further direction from the courts and the NYS Department of
Health (DOH), we permitted employees seeking religious exemptions to continue to work
subject to PPE and testing requirements.   On November 4 and 12, 2021, the U.S. Court of
Appeals for the Second Circuit upheld the state mandate without a religious exemption as
constitutional and vacated the temporary injunctions that had been issued against the
mandate. This means that the Court of Appeals has permitted the DOH to proceed with the
mandate without "religious exemptions".


In a letter dated November 15, 2021, the DOH has advised that individuals employed in
positions where, if they were infected with COVID-19, they could potentially expose other
"covered personnel, patients, or residents to the disease" must receive the first dose of
the vaccination by Monday November 22, 2021 in order to be permitted to remain in their
positions.  The only exceptions allowed are those with religious accommodation requests
who also have approved medical exemptions or who can perform their jobs in a way where
they will not come into contact with patients, residents or co-workers.   We expect there
will be few if any positions that satisfy this criteria.
```

**SA-129**

In light of this development, please be advised of the following:

• All employees in "positions such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease" must have the first dose of the COVID-19 vaccination by Monday, November 22, 2021. This includes all individuals working in hospitals, nursing homes, home care and hospice who have in-person interaction with co-workers, patients or residents as part of their job responsibilities.

• Employees who do not receive the first dose of the vaccination by Monday, November 22, 2021 will be placed on a two week unpaid leave. After that time employees who still have not received the first dose will be terminated and receive their accrued unused vacation time in accordance with our normal policies. However, we will maintain health and welfare benefits until the end of the year. Employees who are terminated due to this action and are fully vaccinated within six months of termination will be eligible to return to work in an available position for which they qualify with no loss of seniority.

• During this time, Catholic Health will consider on an individualized basis whether there are reasonable accommodations available, which might permit employees who have applied for an exemption to the vaccine due to their sincerely held religious beliefs to continue working remotely such that there would be no in-person contact with co-workers, patients or residents. We must advise, however, that most if not all of the positions held by those who have applied for religious accommodations require in-person work in covered facilities such that co-workers, patients or residences could be exposed to COVID-19 should the employee become infected.

• As a result, we strongly encourage our employees who have not yet been vaccinated to consider receiving the first dose of the vaccine by Monday, November 22, 2021 in order to ensure their continued employment. We ask that you notify your manager by Friday, November 19th if you intend to receive the vaccination so that work schedules can be planned accordingly.

As we have stated in earlier communications, as a healthcare system operating in the state of New York we are required to follow the directives issued by the NYS DOH and by the courts. We appreciate your patience and understanding as we continue to navigate through this difficult time. In the final analysis, we owe it to our patients to provide the safest environment possible. We greatly appreciate that 93% of our employees have chosen to take the vaccine and hope that we can continue to all work together to ensure that we meet our promise to the patients we serve.

Tony Pellicano

SA-130

12/15/21, 4:03 PM                                          (9) Inbox | ak764@protonmail.com | ProtonMail

Chief HR Officer


(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>



[cid:image002.png@01D7DBAF.266FF470]



**5.59 KB** 📎 1

    📷 image002.png (5.59 KB)

SA-131

11/29/21, 2:19 PM                                         (1) Sent | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
       Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Monday, November 29th, 2021 at 8:08 AM

Hello Christine.

I am writing this email after I was on a scheduled vacation for the past week. This is in response to the letter I received about my being placed on "unpaid leave" due to not receiving the shot.

I want to be very clear. I have no intention of resigning my position as physical therapist. This was never made as a condition of my employment that I was hired for, to be involuntarily injected with a shot under experimental use authorization. I have the right to refuse ANY experimental procedures which this falls under.

I am ready, able and willing to return to work. You have no evidence that proves that I am a threat to anyone's health over anyone else that is employed by Catholic Health, including your "vaccinated" staff. According to the CDC and the WHO, those individuals can be infected and spread the illness called Covid-19. Yet, I, and others like me who know their rights, are being disciplined and under threat to being fired.

If it is your intention to fire me, I will need a letter stating that I am fired for this reason and signed by you.

I feel this is an outrageous stance that Catholic Health and you have taken. Saying that your "hands are tied" is not an excuse. Instead of fighting the unlawfulness of these "mandates" with your legal team, you have chosen to discipline your faithful employees. No one should have to face this kind of tyranny.

Sincerely,

Andrew Kosiba, PT, DPT

SA-132

11/30/21, 9:50 AM                                     (9) Inbox | ak764@protonmail.com | ProtonMail

# Return to work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:   Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
      Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:   ak764@protonmail.com <ak764@protonmail.com>

Date: Tuesday, November 30th, 2021 at 9:47 AM


Hello Christine,


Today is Tuesday, 11/30/2021. I wanted to send this email to emphasize that I am healthy
and I am ready, willing and able to return to work.


Regards,


Andrew Kosiba

Care as we would be subject to, among other things, enforcement actions, penalties and even the potential loss of our ability to continue operations.

We regret to inform you of this decision. We hope that you will consider receiving the COVID-19 vaccination during your unpaid leave of absence period so that you can continue in employment with us and return to work. Please feel free to contact me with any questions.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Health Home Care/Good Shepherd Hospice

SA-134

12/1/21, 10:01 AM                              (9) Inbox | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:   Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
      Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:   ak764@protonmail.com <ak764@protonmail.com>

Date: Wednesday, December 1st, 2021 at 9:56 AM


Hello Christine.


As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare
workers and has deemed the "mandate" put forth by the Biden administration to be
unconstitutional nationwide.


Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I
am ready, willing and able to work. I am no more of a threat to anyone's health than
anyone else who is currently working.


Sincerely,


Andrew Kosiba, PT, DPT

SA-135

12/2/21, 8:50 AM                                  (9) Inbox | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:   Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
      Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:   ak764@protonmail.com <ak764@protonmail.com>

Date: Thursday, December 2nd, 2021 at 8:46 AM


Hello Christine.


Today is 12/2/2021. I wanted to again state that I am healthy, willing, ready and able to work.


Regards,


Andrew Kosiba, PT, DPT

12/3/21, 8:53 AM                                      (11) Inbox | ak764@protonmail.com | ProtonMail

# Fw: Work

From:  Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Friday, December 3rd, 2021 at 8:29 AM

_____

From: Bracco, Christine
Sent: Thursday, December 2, 2021 10:05 AM
To: Kosiba, Andrew; Nallan-Potter, Elizabeth
Subject: RE: Work

Hi Andrew,


This is in response to your inquiry about the recent court decision in Louisiana, where a
federal district judge issued a temporary injunction against the implementation of the
vaccine mandate for healthcare workers issued by the Centers for Medicare and Medicaid
Services (CMS).  That ruling only applies to the CMS vaccine mandate and was premised on a
determination that CMS, as an administrative agency, lacked the authority to issue a
vaccine mandate.  It has nothing at all to do with the New York State vaccine mandate for
healthcare workers which was upheld by the U.S. Court of Appeals for the 2nd Circuit,
which is the highest federal court with jurisdiction over New York (apart from the U.S.
Supreme Court).  The New York State vaccine mandate for healthcare workers remains in
effect and we continue to be subject to it as a health care entity regulated by the NYS
Department of Health.


Chris



From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, December 1, 2021 9:57 AM
To: Bracco, Christine <Christine.Bracco@chsli.org>; Nallan-Potter, Elizabeth
<Elizabeth.Nallan-Potter@chsli.org>
Cc: ak764@protonmail.com
Subject: Work


Hello Christine.

SA-137

12/3/21, 8:53 AM                    (11) Inbox | ak764@protonmail.com | ProtonMail

As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare workers and has deemed the "mandate" put forth by the Biden administration to be unconstitutional nationwide.


Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I am ready, willing and able to work. I am no more of a threat to anyone's health than anyone else who is currently working.


Sincerely,


Andrew Kosiba, PT, DPT

SA-138

12/3/21, 8:57 AM                                    (10) Inbox | ak764@protonmail.com | ProtonMail

# Fw: Work

From:  Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Friday, December 3rd, 2021 at 8:41 AM

From: Kosiba, Andrew
Sent: Friday, December 3, 2021 8:41 AM
To: Bracco, Christine; Nallan-Potter, Elizabeth
Subject: Re: Work

Hello Christine,


The judge who ruled in the case in Louisiana ruled that the mandate is unconstitutional.
If it is unconstitutional then that means across the board against the constitution. I
feel that Catholic Health is entering into dangerous territory under the color of law.
Also, the behavior of Catholic Health and it's employees is unlawful against the ADA and
Civil Rights Act which was my point from the beginning. Many healthcare entities in many
states are backing away from the mandates already. I really feel that Catholic Health
should also reconsider.


I also reiterate that today is 12/3/2021 and I am healthy, able, willing and ready to
work. Your excuse that I would be a danger to anyone I treat as a patient any more than
any "vaccinated" employee is erroneous and false as per the studies that show that
"vaccinated" people can also get infected and spread the "virus".


Sincerely,


Andrew Kosiba, PT, DPT


From: Bracco, Christine
Sent: Thursday, December 2, 2021 10:05 AM
To: Kosiba, Andrew; Nallan-Potter, Elizabeth
Subject: RE: Work


Hi Andrew,


This is in response to your inquiry about the recent court decision in Louisiana, where a

federal district judge issued a temporary injunction against the implementation of the vaccine mandate for healthcare workers issued by the Centers for Medicare and Medicaid Services (CMS).  That ruling only applies to the CMS vaccine mandate and was premised on a determination that CMS, as an administrative agency, lacked the authority to issue a vaccine mandate.  It has nothing at all to do with the New York State vaccine mandate for healthcare workers which was upheld by the U.S. Court of Appeals for the 2nd Circuit, which is the highest federal court with jurisdiction over New York (apart from the U.S. Supreme Court).  The New York State vaccine mandate for healthcare workers remains in effect and we continue to be subject to it as a health care entity regulated by the NYS Department of Health.


Chris



From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, December 1, 2021 9:57 AM
To: Bracco, Christine <Christine.Bracco@chsli.org>; Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>
Cc: ak764@protonmail.com
Subject: Work


Hello Christine.


As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare workers and has deemed the "mandate" put forth by the Biden administration to be unconstitutional nationwide.


Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I am ready, willing and able to work. I am no more of a threat to anyone's health than anyone else who is currently working.


Sincerely,


Andrew Kosiba, PT, DPT

12/3/21, 9:02 AM                               (9) Inbox | ak764@protonmail.com | ProtonMail

# Re: Religious Exemption

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>
To:     Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
CC:    ak764@protonmail.com <ak764@protonmail.com>
Date:  Friday, December 3rd, 2021 at 8:50 AM


Hello Christine,


In response to this email, I want to reiterate that I pose no more danger to any of my
patients than any "vaccinated" employee as per the science. They can become infected and
they can spread the infection as you assume that I would.


I am also reiterating that I am not resigning my position and if you intend to fire me
over this then I want a signed letter stating this.


Sincerely,


Andrew Kosiba, PT, DPT


_____
From: Bracco, Christine
Sent: Thursday, December 2, 2021 9:10 AM
To: Kosiba, Andrew
Subject: Religious Exemption


Hi Andrew,


I write with respect to your request for a religious exemption from the NYS Covid-19
vaccine mandate for healthcare workers.  As we previously communicated, the NYS Department
of Health (DOH) and the U.S Court of Appeals for the Second Circuit have directed that
religious exemptions from the vaccine mandate are not available.


While religious exemptions from the NYS vaccine mandate are not available, the DOH and the
Court of Appeals have authorized religious accommodations in very limited circumstances.
In particular, the DOH and the U.S. Court of Appeals have stated that unvaccinated
employees may continue to work for "covered entities" such as Catholic Health Home Care
only where they can perform their jobs in a way where if they were to contract COVID-19,
they could not potentially expose covered personnel, patients or residents to COVID-19.
In other words, the position must be one in which an unvaccinated employee will not come
into contact with patients, residents or co-workers of Catholic Health Home Care. We
simply are not permitted to allow unvaccinated employees in covered positions to continue

**SA-141**

12/3/21, 9:02 AM                                      (9) Inbox | ak764@protonmail.com | ProtonMail

to work even with appropriate PPE and subject to COVID-19 testing.

We have carefully considered your religious accommodation request in accordance with these judicial and regulatory directives. We have assumed for purposes of this review only that your accommodation request is premised on a sincerely held religious belief. Having made that assumption, we must next determine whether you are able to perform your work in a manner where you will not come into contact with patients, such as through remote work, so that if you were to contract COVID-19, you could not potentially expose patients, co-workers or residents to COVID-19.

As you know, your position as Physical Therapist requires that you work in-person in patient homes and that you have frequent, direct contact with patients. Having you perform your work duties in an isolated or remote manner simply is not feasible and would pose an undue hardship for Catholic Home Care as it carries out its important health care work. Similarly, as a regulated health care entity, we must follow the directives of the DOH and the U.S. Court of Appeals. Not following those directives would pose an undue hardship for Catholic Health Home Care as we would be subject to, among other things, enforcement actions, penalties and even the potential loss of our ability to continue operations.

We regret to inform you of this decision. We hope that you will consider receiving the COVID-19 vaccination during your unpaid leave of absence period so that you can continue in employment with us and return to work. Please feel free to contact me with any questions.

Chris

Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY 11735

SA-142

12/3/21, 9:02 AM                    (9) Inbox | ak764@protonmail.com | ProtonMail

SA-143



# Catholic Home Care

**Catholic Health Services**
At the heart of health

December 7, 2021

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew:

As of Monday December 6, 2021, you have not notified us of your vaccination status being in compliance with the New York State Department of Health mandate requiring covered healthcare facility employees in New York receive the first dose of the COVID 19 vaccination. You have been previously notified that given the nature of your work responsibilities we are unable to grant your requested religious accommodation. Further, the two week unpaid furlough that began in late November ended Monday, December 6, 2021.

I regret to inform you that your employment with Catholic Health Home Care is being terminated, effective immediately. If you prefer to have this action recorded as a resignation, please submit a letter of resignation to the Human Resources department. In either case, you will continue to receive health benefits through the end of December and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley.

If you have been vaccinated, please contact me immediately so any discrepancy in our records can be resolved. Also, if you decide to get vaccinated in the future please contact me to discuss possible return to work options.

Please make arrangements to return all Catholic Health Home Care property, including your company-issued laptop, with your Manager.

On behalf of Catholic Health Home Care, we wish you the best in your future professional endeavors. Please contact me at (631) 828-7603 if you have any questions or need assistance.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Health Home Care/Good Shepherd Hospice

110 Bi-County Blvd, Suite 114 • Farmingdale, NY 11735
Direct: 631-828-7400 • Fax: 631-828-7475

SA-144

 

December 8, 2021

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew:

Your employment with Catholic Health will end on **12/6/2021.** If you are enrolled in the Benefits of Caring Program, your medical, prescription, dental, and vision coverage (if enrolled) will remain active through the end of the month of your employment termination date, and all other benefits will terminate on your last day of employment.

**Continuation of Coverage: Medical, Prescription, and/or Dental Coverage**
If you (and your dependents, if applicable), are enrolled in medical/prescription and/or dental coverage, you will be eligible to continue this coverage for yourself and/or your dependents. You will receive a separate packet in the mail to your home address from Baker Tilly regarding your continuation of coverage, which includes information including cost and the duration of your continuation eligibility.

You have a limited number of days to elect continuation coverage, so if you do not receive the packet within two weeks from your separation date, please contact **MyHR at 516-705-6947** or email chsbenefits@chsli.org.

As a reminder, you may only continue medical (including prescription) and/or dental coverage through continuation of coverage only if you are currently enrolled. If you have any questions related to your continuation of coverage, please contact Baker Tilly at 1-800-307-0230.

Listed below is the contact information, for questions related to ID cards, network providers, claims, etc.
- Medical (Empire BlueCross BlueShield): 1-800-496-6132, www.empireblue.com
- Prescription (OptumRX): 1-844-642-9089 http://www.optumrx.com
- Dental (Cigna): 1-800-244-6224, www.cigna.com

**Vision Coverage**
If enrolled, your vision coverage through the Blue View Vision Plus Plan will continue through the end of the month of your employment termination date.  For questions, visit www.empireblue.com or call 1-866-723-0515.

**Life Insurance and Disability Coverage**
Life Insurance, Short-Term Disability, and Long-Term Disability coverage will end on your last day of employment.

You may be eligible to convert your group life insurance to an individual policy, and will receive a packet in the mail to your home address from Prudential with more information.  Please contact Prudential at 1-877-889-2070 for questions related to conversion of coverage.

**Health Care Flexible Spending and Dependent Care Flexible Spending Accounts**
Your Health Care and/or Dependent Care Flexible Spending Account will terminate on your last day of employment.

You have until December 31st of the year your employment ends to submit eligible expenses to Baker Tilly for reimbursement.  In order to be eligible for reimbursement, the expense must be incurred prior to the termination date.

Please contact Baker Tilly at 1-800-307-0230 (Prompt 9), or online at www.myflexdollars.com for information related to the Health Care and/or Dependent Care Flexible Spending Accounts.

**Transit Flexible Spending Account**
If you have a transit pass/voucher, you can continue to use the remaining balance.  Please do not send your current pass/voucher back to WageWorks/Conexis.
If you have a commuter parking election with a balance on the account and you did not use Wire Commuter to purchase your parking pass/voucher, you can file a claim by submitting receipts to WageWorks/Conexis.  Please note that you must submit the claim to WageWorks/Conexis no later than March 31st of the following year, but not to exceed 180 days from the date on the receipt.
If you need a parking claim form or have any questions, please contact WageWorks/Conexis at 1-866-599-3061.

**Pension Plan**
Please contact the Diocese of Rockville Centre Pension Department at 516-678-5800 X 259 or email hr@drvc.org.

**403(b) Plan**
Your contributions will conclude with your last paycheck as an active employee.  Please contact your 403(b) Plan provider for details:

Mutual of America: 516-937-9177   TransAmerica: 631-495-0318
HANYS: 1-800-433-9832   Fidelity: 1-800-343-0860

**Critical Illness Insurance, Accident Insurance, Hospital Indemnity Insurance**
Please contact MetLife for Accident Insurance and Hospital Indemnity Insurance information at 1-800-438-6388.

**Legal Plan:** 1-800-821-6400 Identity Theft Protection Plan: 1-800-789-2720

**529 College Savings Plan**
Please contact the vendor directly to discuss options by calling 1-800-420-8580, or visit www.ny529atwork.com.

**Work/Life Assistance Plan**
The Work/Life Assistance Plan through Corporate Counseling Associates (CCA) is an available resource for you even after your employment ends.  Please contact CCA by calling 1-800-833-8707 or visit www.myccaonline.com (Company Code: CHS) for more information.

Very truly yours,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

SA-146

## JOB DESCRIPTION

**Department/Service:**     Patient Services

*Title:*     ***PHYSICAL THERAPIST***

**Reports to:**     Supervisor of Physical Therapy

**Work Area:**     Branch Office (Nassau, Suffolk, Brooklyn)

**Position Summary:**

Assesses, plans, provides and develops with the patient/client or responsible caregiver a home health plan of care for Physical Therapy, and identifies problems which warrant the placement of other disciplines and services provided by the Agency. Coordinates and evaluates the plan of care with all other disciplines providing care through the Agency, the Supervisor of Patient Services as warranted, other organizations and physicians for an assigned caseload.

Instructs patient/client or responsible caregiver in the projected care plan and expected outcomes. Provides written instructions appropriately as reinforcement of teaching and directions. Conferences with Supervisor of Patient Services or designated nurse coordinator regarding patient status, progress and discharge plan. Documents Physical Therapy skilled services in accord with Agency standards and expectations of third party payors. Obtains physician orders appropriately.

**Qualifications:**

**Education:**

1.     Graduate of a Physical Therapy curriculum approved by the Council on Medical Education of the American Medical Association and the American Physical Therapy Association.

2.     Current registration to practice Physical Therapy in New York State.

**Experience/Skills:**

1.     Possesses a minimum of 1 year of satisfactory experience in a home care setting, preferably in a CHHA.

2.     Knowledgeable regarding Federal, State, regulations and JCAHO standards as they apply to physical therapy services in a CHHA.

3.     Demonstrates a commitment to continuing professional growth and development.

4.     Good communication and teaching skills; verbal and written.

5.     Ability to relate and work well with patients/caregivers and Agency personnel.

6.     Ability to prioritize activities.

SA-147

7. Exercises good clinical judgments in planning and implementing physician orders.

8. Demonstrates ability to analyze clinical audits and apply this to appropriate problem-solve and plan interventions.

9. Is a licensed driver with an automobile that is appropriately insured and is in good working order.

## Responsibilities:

1. Represents the Agency's mission, philosophy and objectives through compassionately and competently providing Physical Therapy services.

2. Demonstrates an understanding and respect for patient rights and responsibilities.

3. Understands and applies Agency policy and procedures appropriately in the admission, treatment and discharge of patients.

4. Completes work assignment and documentation within allotted time.

5. Establishes clear, measurable goals and plan of care for the patient/client.

6. Communicates initial visit findings and the need for additional services appropriately.

7. Demonstrates ability to identify need for other disciplines in developing patient/client care plans.

8. Provides home health aide supervision according to Agency policies and procedures.

9. Records accurate information for billing, payroll and data entry.

10. Knowledgeable in Agency protocols and procedures applied to the coordination of managed care patients, benefits management for commercial insurance.

11. Projects schedule for a caseload.

12. Maximizes conferencing as a functional means through which a caseload will be coordinated, supervisory guidance will be provided and professional development will be fostered.

13. Participates in the quality improvement process and practices of the Agency to improve the quality of patient care, organizational functions, and to resolve identified problems.

14. Takes responsibility for personal professional development.

15. Performs other related duties assigned.

**Functional Abilities:**
(Including, but not limited to)

1.  Must be able to hear and speak in a manner understood by most persons.

2.  Must be able to read 12 point or larger type.

3.  May lift, carry, push/pull maximum up to 50 lbs.

4.  Must be able to stoop and bend; must be able to lift and transfer patients.

5.  Must be able to travel to prospective patients' residences.

_____          _____5/19/00_____
Employee Signature                                      Date

Job-pt 2/98

3

Case 2:21-cv-06416-GRB-ARL   Document 14   Filed 03/03/22   Page 105 of 120 PageID #: 259

# EXHIBIT B

Guidance for Industry and FDA

SA-150

Case 2:21-cv-06416-GRB-ARL   Document 14   Filed 03/03/22   Page 106 of 120 PageID #: 260

# Classification of Products as Drugs and Devices & Additional Product Classification Issues:
# Guidance for Industry and FDA Staff

## *FINAL GUIDANCE*

*Additional copies are available from:*
*Office of Combination Products*
*Food and Drug Administration*
*WO32, Hub/Mail Room #5129*
*10903 New Hampshire Avenue*
*Silver Spring, MD 20993*
*(Tel) 301-796-8930*
*(Fax) 301-847-8619*
*http://www.fda.gov/CombinationProducts/default.htm.*

For questions regarding this document contact the Office of Combination Products at 301-796-8930 or combination@fda.gov.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Combination Products**
**Office of Special Medical Programs**
**Office of the Commissioner**

**September 2017**

*Contains Nonbinding Recommendations*

## Table of Contents

I.    INTRODUCTION ..................................................................................................2

II.    WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT? ...........................................................................3

III.    WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE? .....................................................................4

    A.    STATUTORY DEFINITIONS ...................................................................................5

        1.    *Drug* ................................................................................................5

        2.    *Device* ..............................................................................................5

    B.    CERTAIN KEY PROVISIONS OF THE DEFINITION OF DEVICE ................................5

        1.    *"Similar or related article" in the definition of device* ...................6

        2.    *"Primary intended purposes" in the definition of device* ...............6

        3.    *"Chemical action" in the definition of device* ...............................7

        4.    *"Within or on the body" in the definition of device* ........................7

        5.    *Illustrative Examples* .......................................................................8

    C.    HOW IS A PRODUCT CLASSIFIED IF IT MEETS THE DEFINITION FOR DRUG (OR FOR BOTH DRUG AND DEVICE) AND ALSO MEETS THE DEFINITION FOR BIOLOGICAL PRODUCT? .......................10

IV.    ADDITIONAL INFORMATION ........................................................................11

FREQUENTLY ASKED QUESTIONS .....................................................................12

1

*Contains Nonbinding Recommendations*

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff[1]

This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page of this guidance.

## I.    INTRODUCTION[1]

FDA regularly receives questions from medical product sponsors concerning the classification of their products.[2] We believe that efficient, effective regulation is facilitated by providing guidance on issues frequently raised in relation to Requests for Designation (RFDs) and other classification activities. In addition, providing as much clarity and predictability as possible with respect to product classifications should enable informed planning for product development. Accordingly, we have prepared this guidance to make the Agency's current thinking concerning certain product classification issues more readily and widely available.

While issues have arisen relating to whether a product should be classified as a drug, device, biological product, or combination product, most of these issues have related to whether a product should be classified as either a drug or a device.[3] Accordingly, this guidance focuses particularly on cases in which a product[4] may be classified as a drug or device.[5] This guidance also addresses additional issues relating to product classification, including how to obtain classification determinations from FDA for medical products.

This guidance is organized into two substantive sections.

---

[1] This guidance has been prepared by the Office of Combination Products in consultation with the Center for Biologics Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Drug Evaluation and Research.

[2] Please note that "classification" as used in this guidance refers to a product's designation as a drug, device, biological product, or combination product. This is distinct from the use of the term "classification" in reference to the class (Class I, II, or III) of a device as described in section 513(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

[3] This guidance addresses the definitions for the terms drug, device, and biological product in section III. The term "combination product" is defined in 21 CFR 3.2(e). For further information regarding the definition for the term combination product and the regulation of combination products, please visit the webpage for the Office of Combination Products at www.fda.gov/CombinationProducts/default.htm.

[4] The guidance's discussion of the classification of products is also relevant to classification of the constituent parts of a combination product.

[5] This guidance focuses on classification of products for human use. Distinct considerations may apply in determining how to classify a product intended for use in animals.

2

*Contains Nonbinding Recommendations*

Section II offers guidance on the RFD process for obtaining a formal determination of a product's classification.

Section III presents general concepts regarding FDA's decision-making process for classification determinations and addresses issues that may arise in determining whether products should be classified as drugs or devices.[6]

The Agency recommends that sponsors contact the Office of Combination Products (OCP) to confirm the classification of any products they may wish to market if the appropriate classification is unclear or in dispute. Section IV provides contact information for OCP and responses to frequently asked questions.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities. Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited. The use of the word "should" in Agency guidances means that something is suggested or recommended, but not required.

## II. WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?

If the classification of a product as a drug, device, biological product, or combination product is unclear or in dispute, a sponsor can submit an RFD to OCP in accordance with Part 3 of Title 21 of the Code of Federal Regulations (21 CFR Part 3) to obtain a formal classification determination for the product, as provided for under section 563 of the FD&C Act (21 USC 360bbb-2). Any RFD determined to be incomplete will be returned to the sponsor with a request for the missing information.[7]  21 CFR 3.8(a). Once OCP determines the RFD is complete for filing, the Agency reviews the RFD.

The sponsor recommends a classification in the RFD, and should explain the basis for the recommendation. While the sponsor should justify why it believes the product meets the recommended classification, we generally consider both the information provided in the RFD and other information available to the Agency at that time in making our designation.

Generally, OCP will respond to the sponsor in writing within sixty days of the RFD filing, identifying the classification of the product as a drug, device, biological product, or

---

[6] This section generally focuses on approaches for determining whether a product should be classified as a drug or a device, based on application of the statutory definitions for these terms under sections 201(g) and 201(h) of the FD&C Act (21 USC 321(g) and (h)), respectively. Please note that this document does not focus on the classification of products as biological products regulated under section 351(i) of the Public Health Service Act (PHS Act) (42 USC 262(i)). It also does not address under what circumstances certain human cells, tissues, or cellular or tissue-based products (HCT/Ps), as defined in 21 CFR Part 1271, are regulated solely under section 361 of the PHS Act. For guidance concerning HCT/Ps, please visit http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/.
[7] See 21 CFR 3.7 for content requirements for RFDs.

3

*Contains Nonbinding Recommendations*

combination product. If the Agency does not provide a written response within sixty days, the sponsor's recommendation respecting the classification of the product is considered to be the final determination. 21 USC 360bbb-2(b) and (c).

RFD determinations pertain only to the product as described in the designation letter, including its proposed use(s) or indication(s) for use. The Agency may modify a determination made under section 563 regarding the classification of a product or the component of FDA that will regulate the product either with the written consent of the sponsor or for public health reasons based on scientific evidence. 21 USC 360bbb-2(b) and (c).[8]

A new determination may be appropriate if there is a change in, for example, a proposed indication for use or in a component of the product, or if the sponsor or Agency becomes aware of additional information that reveals that the means by which the product achieves its primary intended purposes differ from what was originally described in the RFD. For example, if a sponsor wished to change the indication for a product and that new indication would be achieved through a different mechanism than the original indication, a different classification for the new indication might be appropriate.

Please contact OCP if you have questions regarding whether to submit an RFD, what information to provide, or issues to address in an RFD to ensure its completeness and clarity.[9]

## III. WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?

FDA's determination of whether to classify a product as a drug or device is based on statutory definitions, as set forth in sections 201(g) and 201(h) of the FD&C Act, respectively. We apply these definitions to products, relying on the scientific data that are available to FDA at the time of the classification determination concerning the product for its proposed use(s)/indication(s).[10]

---

[8] The sponsor may request reconsideration of the decision if its classification recommendation is not adopted by the Agency. See 21 CFR 3.8, 10.75. If the sponsor develops or becomes aware of new information that may affect the product's classification, the sponsor may also submit a new RFD seeking a new determination.

[9] More detailed information on the RFD process is provided in OCP's guidance *How to Write a Request for Designation (RFD)*, available at http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm. A pre-RFD process is available if a sponsor wishes to obtain a preliminary, non-binding classification determination or to engage in preliminary classification discussions with the Agency before filing a formal RFD. The RFD and pre-RFD processes are also available to sponsors to clarify the Center assignment for medical products, though this issue is beyond the scope of this guidance. More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf.

[10] If a product type has been classified by regulation, FDA would generally classify the product (including as a constituent part of a combination product) in accordance with the regulation, if the product (or constituent part) falls within the scope of that regulation. If the Agency concludes that it may be appropriate to propose changing a classification established by regulation, FDA would initiate notice and comment rulemaking to do so.[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

4

*Contains Nonbinding Recommendations*

Medical product classification determinations often focus substantially on whether a product that meets the definition of drug also meets the statutory definition of device. This section presents the drug and device definitions and discusses how the Agency addresses certain issues that arise when determining whether a product should be classified as a drug or device.

**A.      Statutory Definitions**

      **1.      Drug**

Section 201(g) of the FD&C Act (21 USC 321(g)) provides that the term "drug" means:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C). . . .

      **2.      Device**

Section 201(h) of the FD&C Act (21 USC 321(h)) provides that the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--
> (1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

**B.      Certain key provisions of the definition of device**

Conceptually, all FDA-regulated medical products meet the definition of "drug" under section 201(g) of the FD&C Act, due to the broader scope of the drug definition. For a medical product also to meet the more restrictive device definition under section 201(h) of the FD&C Act, it must (i) be "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article," and (ii) "*not* achieve its primary intended purposes through *chemical action* within or on the body of man or other animals" and (iii) "*not* [be] dependent upon being *metabolized* for the achievement of its primary intended purposes" (emphasis added).

5

SA-156

*Contains Nonbinding Recommendations*

The sponsor presumably has the most complete information relevant to how its proposed product achieves its primary intended purpose(s). Sponsors seeking a classification determination should present all available data and other information potentially relevant to that determination (without regard to whether the data or information supports the sponsor's preferred outcome). For example, for a sponsor seeking to classify its proposed product as a device, those data should demonstrate that its product meets the definition of a device.

At the classification stage, sponsors would not be expected to have gathered sufficient data to demonstrate that their proposed product meets the applicable marketing authorization standard (e.g., data demonstrating effectiveness). Therefore, the focus of FDA's classification analysis is on how the product would be expected to achieve its primary intended purposes, assuming it is capable of achieving its primary intended purposes at all. FDA will use its best scientific judgment to evaluate all available information relevant to the classification determination, including information submitted by the sponsor or available in the literature.

The following discussion presents the Agency's current thinking on certain issues that arise with respect to the statutory definition of device.

1. **"Similar or related article" in the definition of device**

The first clause of the device definition provides that the term "means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or *other similar or related article . . .*" (emphasis added). The issue of whether a product may be considered a "similar or related article" under this clause can arise, for example, with regard to products in liquid, semi-liquid, gel, gas, or powder form. In some cases, such products are appropriately considered "similar or related articles," and may be classified as devices, so long as they also satisfy the remainder of the device definition under section 201(h) of the FD&C Act, including the chemical action exclusion discussed in section III.B.3 below. This could be the case, for example, for gels or powders put on the skin as a barrier, gases used as space fillers, or liquids used to clean either surgical instruments or contact lenses.

2. **"Primary intended purposes" in the definition of device**

Most often, in determining whether a product meets the device definition, questions arise concerning the exclusionary clause of the definition, which provides that a device is a product "which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals . . . ."[11] A product that has chemical action could be a device if it does not achieve its primary intended purposes through that chemical action.

---

[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

*Contains Nonbinding Recommendations*

For example, if the primary intended purpose of a hip joint replacement implant is to restore movement, and the implant also elicits a foreign body response through chemical action, that response would not be considered a primary intended purpose of the implant. Accordingly, such an implant could be classified as a device despite the chemical action, because such action does not achieve the product's primary intended purpose. Similarly, if the primary intended purpose of an absorbable suture is to rejoin tissue, and the suture is also designed to be resorbed by the body through a combination of chemical action and metabolic activities, such resorption would not be considered a primary intended purpose of the product. Accordingly, such an absorbable suture could be classified as a device despite the chemical action and metabolic activity, because such action or activity does not achieve the product's primary intended purpose.

### 3.   "Chemical action" in the definition of device

FDA frequently receives questions from product sponsors concerning the Agency's interpretation of the term "chemical action." This term must be read in the context of the statutory definition of "device" as a whole. The determination of whether a product meets the device definition does not depend solely on whether the product exhibits "chemical action." In particular, as explained in section III.B.2 and 4, a product that exhibits chemical action will still meet the device definition if the product "does not achieve its primary intended purposes through" that chemical action "within or on the body," and otherwise satisfies the device definition.

Under the Agency's interpretation of the device definition, a product exhibits "chemical action" if it interacts at the molecular level with bodily components (e.g., cells or tissues) to mediate (including promoting or inhibiting) a bodily response, or with foreign entities (e.g., organisms or chemicals) so as to alter that entity's interaction with the body.[12] We note that this type of interaction is consistent with the term "pharmacological action" as that term is generally understood in the medical field. Accordingly, we have used "pharmacological action" as a short-hand throughout the rest of this guidance for ease of explication and recognition. The examples presented in section III.B.5 offer illustration of FDA's interpretation of chemical action.

### 4.   "Within or on the body" in the definition of device

Because a device "does not achieve its primary intended purposes through chemical action *within or on the body* of man or other animals" (emphasis added), a product can be a device even if it achieves its primary intended purposes through chemical action, so long as the chemical action does not occur "within or on the body" (and the product meets the other elements of the definition of device under section 201(h)).

Whether chemical action is occurring "within or on the body" is generally a straightforward matter. If the chemical action is occurring inside the body or on the surface of the body, it is within or on the body. For example, the chemical action of an orally ingested pill

---

[12] For purposes of this interpretation, an interaction at the molecular level occurs through either chemical reaction (i.e., formation or breaking of covalent or ionic bonds), intermolecular forces (e.g., electrostatic interactions), or both. The mere exchange of non-chemical energy (e.g., electromagnetic or thermal energy) between a product and the body would not constitute "chemical action."

SA-158

*Contains Nonbinding Recommendations*

or tablet of a decongestant would be "within the body," and the chemical action of a spray or cream for treatment of dermatitis when applied to the skin would be "on the body." Similarly, it is generally a straightforward matter to determine that chemical action is not occurring within or on the body. For example, the chemical action of an antimicrobial agent used to clean a surgical instrument before that instrument is used is not occurring within or on the body.

However, the Agency has on occasion considered some situations in which it may be less clear whether chemical action is occurring within or on the body. For example, we have determined that chemical action occurring solely within an extracorporeal device, specifically a kidney hemodialysis machine, is not occurring within or on the body. Similarly, we have determined that the chemical action of a transport solution to preserve a donor organ for transplantation while in an organ transport container is not occurring within or on the body.

## 5.   Illustrative Examples

The following examples further illustrate the application of some of the key provisions of the device definition discussed above. Table 1 contains some examples of medical products that achieve their primary intended purposes through chemical action within or on the body. Table 2 contains some examples of medical products that do not achieve their primary intended purposes through chemical action within or on the body.

**Table 1:   Examples of Medical Products that Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
|---|---|
| Aspirin | Aspirin is used for pain relief. Acetylsalicyclic acid (aspirin) contains an acetyl group that has the ability to covalently bind to a serine residue of a cyclooxygenase enzyme (COX-1 or COX-2). This is considered pharmacological action because it inactivates the enzyme and thereby inhibits the synthesis of prostaglandin and thromboxanes, which suppresses the body's inflammatory response for pain relief. |
| Beta Blockers | Beta blockers are used to reduce blood pressure. Cells contain beta receptors that can be stimulated by neurotransmitters such as adrenaline/epinephrine. Beta blockers, like propranolol, bind beta receptors (b1 and b2) and exhibit pharmacological action by inhibiting the activation of the signaling cascade. This blockage causes cardiac cells to reduce the strength of cardiac contractions and heart rate. |
| Magnesium Sulfate | Magnesium sulfate is used as replacement therapy for magnesium deficiency. It acts as a catalyst in enzymatic reactions (a molecular-level interaction). While the chemical or atomic structure of magnesium sulfate is not altered, its participation in enzymatic reactions is considered a pharmacological action because it impacts various cellular and molecular processes. |

8

*Contains Nonbinding Recommendations*

| Polymyxin B Sulfate | Polymyxin B sulfate is an antibiotic that is used to treat bacterial infection. It is composed of a cationic protein surfactant that has fatty acid functional groups. Polymyxin B sulfate acts through intermolecular forces, by binding to components of the bacterial membrane (i.e., the membrane of the foreign entity) and by association/fusion of the fatty acid portion of the molecule with the lipid bilayer via hydrophobic interactions.  This binding is a pharmacological action because it disrupts the integrity of the bacterial membrane, which causes organism death, thereby treating the bacterial infection. |
| --- | --- |
| Hydroxocobalamin | Hydroxocobalamin is used as an antidote to cyanide poisoning. The cobalt moiety of hydroxocobalamin exhibits pharmacological action because it chemically reacts with cyanide, a toxic chemical agent, to form cyanocobalamin, a non-toxic compound, and the ability of hydroxocobalamin to interact with cyanide facilitates the removal of the toxic agent in order to inhibit the toxic effects of cyanide on the body. |

**Table 2:   Examples of Medical Products That Do Not Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
| --- | --- |
| Abdominal Adhesion Barrier | Inert, biodegradable synthetic polymers can be used to reduce post-operative adhesions with tissues and organs within the abdominal cavity. An implanted physical barrier sheet composed of such polymers would act to reduce adhesion through physical separation of tissue and not through pharmacological action on the surrounding tissue. |
| Polymethylmethacrylate (PMMA) | PMMA is an acrylate polymer that is used as a temporary bone spacer. PMMA is built from methyl methacrylate monomer units, which undergo free radical polymerization in the presence of an initiator compound. The molecules that are part of the polymerization process interact with each other to create a solid mass to fill a bone void physically. The process does not require an interaction between the PMMA and the bone at the molecular level and, therefore is not considered chemical action within or on the body. |
| Topical Surgical Adhesive | Cyanoacrylate is an acrylic resin that is used to approximate skin tissue as an adjunct to a wound closure product. The resin undergoes anionic polymerization in the presence of water. The chemical reaction that occurs between the resin and ions in the water allows it to form into long polymer chains. This type of adhesive can bond to a cut/incision, creating a physically-intact film to aid in keeping skin edges together.  While the product binds to tissue, it does not exhibit pharmacological action because that binding does not mediate a bodily response. |

*Contains Nonbinding Recommendations*

| Gold Nanoparticles | Nanoparticles composed of gold can be used to treat cancer. When gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue. The heat transfer, as opposed to a binding interaction with the nanoparticle, causes the cancer cells to die. Therefore, this effect is not achieved through chemical action. |
|---|---|
| Cryosurgery for Wart Removal | Cryogen (liquid gas), such as nitrogen or dimethyl ether, is used to treat common and plantar warts. The liquid gas is extremely cold and freezes the wart, resulting in damage to the topmost layer of cells. A physiological effect (i.e., cell death) results from heat transfer, not from a binding interaction with the gas. Therefore, the freezing is not considered chemical action. |
| Dental Amalgam | A resin that fills a cavity in a tooth as part of the treatment of dental caries may bind to the tooth via covalent bonding, or rely in part on intermolecular forces to change from liquid or paste to solid form. However, this binding and/or state change does not mediate a bodily response, but rather produces a solid mass, to fill the cavity. Therefore, it would not be considered chemical action. |
| Respirator Mask with Antimicrobial Filter | An antimicrobial product impregnated into a filter on a respirator mask to kill microbes that the user might otherwise inhale would exhibit pharmacological action. However, while the mask is in contact with the user's face, the filter is not. So, the chemical action occurring on the filter is not occurring within or on the body. |

### C. How is a product classified if it meets the definition for drug (or for both drug and device) and also meets the definition for biological product?

As explained in section III.B, products that meet the device definition in 201(h) of the FD&C Act also meet the drug definition in 201(g) of the FD&C Act. In addition, products that meet the drug definition, or both the drug and device definitions, may also meet the definition of biological product under section 351(i) of the PHS Act (42 USC 262(i)).

Section 351(i) provides that:

The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide),[13] or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

---

[13] For guidance on FDA's interpretation of the category "protein (except any chemically synthesized polypeptide)" see *Biosimilars: Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009*, at Q.II.1 (April 2015), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM444661.pdf.

10

SA-161

*Contains Nonbinding Recommendations*

Products that meet the drug definition and that also meet the definition of biological product are classified as biological products, and are generally subject to licensure under the PHS Act.[14]  Products that meet the definitions for drug, device, and biological product may also be classified as biological products.  If you have questions regarding whether a product meets the definition of biological product or how this might affect its classification, please contact OCP.

## IV.    ADDITIONAL INFORMATION

For further information on the classification of products as devices, drugs, biological products, or combination products, please refer to the Frequently Asked Questions on the next page, OCP's webpage at https://www.fda.gov/CombinationProducts/default.htm or contact OCP at:

> Office of Combination Product
> Food and Drug Administration
> WO32, Hub/Mail Room #5129
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993
>
> (Tel) 301-796-8930
> (Fax) 301301-847-8619
> combination@fda.gov

---

[14] Certain biological products have been historically approved under the FD&C Act and may continue to be subject to approval under the FD&C Act until March 23, 2020.  See Section 7002(e) of the Biological Price Competition and Innovation Act of 2009; see also FDA, *Implementation of the "Deemed to be a License" Provision of the Biologics Price Competition and Innovation Act of 2009, available at* https://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-gen/documents/document/ucm490264.pdf.

11

*Contains Nonbinding Recommendations*

## FREQUENTLY ASKED QUESTIONS

1. Can a product be classified as a device if it exhibits "chemical action"?

   Yes, if the product does not achieve its primary intended purposes through chemical action within or on the body and otherwise meets the definition of a device. However, products that meet the device definition may be regulated as drugs or biological products in some cases. See question 2.

2. If a product meets the definition for drug at 21 USC 321(g) and for device at 21 USC 321(h), how is it classified?

   Generally, the product would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 USC 321(ii)).

3. Can the proposed use or indication of a product affect its classification?

   Yes. Two products with exactly the same composition can be classified differently based on their primary intended purposes. For example, if a vaginal product is intended solely to facilitate ease and comfort during sexual intercourse and it achieves this through lubrication that decreases friction (via mechanical/physical action) and not through chemical action, it is classified as a device. However, the same product can be classified as a drug if it is intended, for instance, to alter pH, control odor, or prevent infection, and does so through chemical action as discussed in III.B.3 above.

4. What should you do if, after reviewing this guidance, you are unsure of how your product is classified?

   You should contact the Office of Combination Products (Combination@FDA.GOV) for feedback. OCP will provide you feedback, including on whether a pre-RFD or an RFD may be appropriate and what information you should provide.

5. Where can you find additional information about product classification?

   Additional information on classification is posted on OCP's webpage at:(https://www.fda.gov/CombinationProducts/AboutCombinationProducts/ucm101496.htm)

   For additional information on how to submit an RFD, see *How to Write a Request for Designation (RFD)* (http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm).

   More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf .

12

# Exhibit C

Job Description

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
100 Federal Plaza, Central Islip, NY 11722

ANDREW KOSIBA

    PLAINTIFF

v.                          CASE NO. <u>21-CV-06416 (GRB)(ARL)</u>

CATHOLIC HEALTH SYSTEMS OF

LONG ISLAND, INC.

    DEFENDANT

_____/

### CERTIFICATE OF SERVICE

    I, Andrew Kosiba, hereby certify that a true and correct copy of the foregoing was duly served upon the Defendant's attorney Roy W. Breitenbach at the address of 333 EARLE OVINGTON BLVD, SUITE 901; UNIONDALE, NEW YORK 11553 via first class mail on this 2nd day of March, 2022.

By: *Andrew Kosiba*

- 44 -
ADA Title I Complaint

SA-165

1

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
631-495-9968
ak764@protonmail.com

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   MAY 18 2022   ★

LONG ISLAND OFFICE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
100 Federal Plaza, Central Islip, New York 11722-9014

ANDREW KOSIBA
    PLAINTIFF

v.

CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.
    DEFENDANT

_____/

**REQUEST FOR LEAVE TO AMEND**

    Plaintiff requests for leave to amend the complaint. Plaintiff believes that he can better state a claim by consolidating some of the counts.

    This request is made in good faith and not intended solely for purposes of delay or harassment or to unnecessarily increase the costs of litigation.  The complaint is meritorious. The plaintiff sincerely believes that neither party will suffer any substantial prejudice and that the amendment is in the furtherance of the interests of justice.

DATED this 17 day of May 2022.

Andrew Kosiba, Plaintiff

- 1 -
*Amended Complaint*-- Andrew Kosiba

1  Andrew Kosiba
   Plaintiff *in Propria Persona*
2  33 Neal Path
   South Setauket, NY 11720
3  631-495-9968
   ak764@protonmail.com
4

5

6

7

8          **UNITED STATES DISTRICT COURT**
           **EASTERN DISTRICT OF NEW YORK**
9          100 Federal Plaza, Central Islip, New York 11722-9014

10  ANDREW KOSIBA
11         PLAINTIFF

12  v.                          CASE NO.  2:21-cv-06416-GRB-ARL

13  CATHOLIC HEALTH SYSTEMS OF
14  LONG ISLAND, INC.
           DEFENDANT
15  _____/

16                    **CERTIFICATE OF SERVICE**

17      I, Andrew Kosiba, hereby certify that a true and correct copy of the foregoing was duly

18  served upon the defendant's attorney, Roy W. Breitenbach, the address of 333 EARLE

19  OVINGTON BLVD, SUITE 901 UNIONDALE, NEW YORK 11553, via first class mail on this

20  ___ day of May, 2022.

21  By: ___

22

23

24

25

26

27

28

                          - 2 -
                *Amended Complaint-- Andrew Kosiba*

1  Andrew Kosiba
   Plaintiff *in Propria Persona*
2  33 Neal Path
   South Setauket, NY 11720
3  631-495-9968
   ak764@protonmail.com
4
5              **UNITED STATES DISTRICT COURT**
               **EASTERN DISTRICT OF NEW YORK**
6              100 Federal Plaza, Central Islip, New York 11722-9014

7  ANDREW KOSIBA
        PLAINTIFF
8
9  v.                                    CASE NO.  2:21-cv-06416-GRB-ARL

10 CATHOLIC HEALTH SYSTEMS OF
   LONG ISLAND, INC.
11       DEFENDANT
                                     /
12

13        **SECOND AMENDED COMPLAINT & DEMAND FOR JURY TRIAL**

14        This Second Amended Complaint is following the request for leave to amend. The

15 clerk is denying equal access to the court by interfering and frustrating my access to justice

16 and to the court because I am not being represented by an attorney.

17        Plaintiff, Andrew Kosiba ("plaintiff"), files this Second Amended Complaint against

18 Defendant, CATHOLIC HEALTH SYSTEMS OFLONG ISLAND, INC. ("defendant") and

19 states as follows:

20                           **INTRODUCTION**

21 **1.**     This is a claim by plaintiff Andrew Kosiba against his former employer for the violation

22 of the Americans with Disabilities Act and Amendments Act ("ADA and ADA-AA"), 42 U.S.C.

23 § 12101, et seq., for discrimination and retaliation on the basis of disability, and for

24 prohibited actions taken on the basis of this disability under the "regarded as" prong; and for

25 declaratory and injunctive relief under Title I of the Americans with Disabilities Act as

26 implemented under 29 CFR Part 1630, *et sequitur*.

27 **2.**     Accordingly, plaintiff brings this action pursuant to the ADA and ADA-AA to recover all

28 available relief in law, including but not limited to: (i) a judgment from this Court that

                                   - 1 -

                          *Amended Complaint-- Andrew Kosiba*

defendant's actions were unlawful; (ii) back pay; (iii) compensatory damages in whatever amount she is found to be entitled; (iv) reinstatement, or in the alternative front pay in the event reinstatement is not practical; (v) an equal amount as liquidated damages, other monetary damages; (vi) an award of costs and reasonable court fees; and (vii) punitive damages to the extent available; (viii) pre-judgment and post-judgment interest; and (ix) a jury trial on all issues so triable.

## JURISDICTION AND VENUE

3.     This court has original and exclusive jurisdiction over plaintiff's claims pursuant to 28 U.S.C. §1331, in that the matters in controversy are brought pursuant to Title I of the Americans with Disabilities Act of 1990 and the ADA and ADA-AA of 2008; 42 U.S.C. §12101 and 42 U.S.C. §12112(a), (b) and (d)(4) as it pertains to "Discrimination"; as implemented by 29 CFR Part 1630.14(b)(3), (c) & (d) as it pertains to adverse employment actions, employers and medical examinations and interventions.

4.     Venue is proper in this judicial district under 28 U.S.C. §1391 because defendant does business in this judicial district and the acts complained of took place in this judicial district.

5.     Plaintiff timely filed a charge of Discrimination against the defendant with the Equal Opportunity Employment Commission (EEOC) on or about the date of October 7, 2021.

6.     On or about February 17, 2022, the EEOC issued plaintiff a Dismissal and Notice of Right to Sue against defendant with regards to this matter. A copy of the Right to Sue letter is attached as Exhibit A.

7.     Plaintiff has exhausted the administrative remedies available to him.

8.     Plaintiff files his complaint within 90 days of the EEOC's issuance of the notice of right to sue.

## PARTIES

- 2 -

*Amended Complaint-- Andrew Kosiba*

SA-169

**9.**    Plaintiff, Andrew Kosiba, resides in Suffolk County, New York at the address of 33 Neal Path; South Setauket and is a qualified individual with a disability within the meaning of the ADA and ADA-AA.

**10.**    Plaintiff was an employee of the defendant, which is a "covered entity" within the meaning of the ADA and ADA-AA.

**11.**    Defendant's principal place of business is located at 110 Bi-County Blvd; Farmingdale, New York 11735.

**12.**    At all times material to this action, Plaintiff was an "employee" of defendant within the meaning of the ADA and ADA-AA.

**13.**    At all times relevant, defendant was an "employer" as defined by 42 U.S.C. 12111(5).

**14.**    From approximately November of 2000, until his termination on November 22, 2021, plaintiff was employed as a Physical Therapist.

**15.**    At all times material to this action, plaintiff was perceived as having a disability as defined by 42 U.S.C. §12102 (1) (2) and (3) and was subjected to adverse actions prohibited under this chapter because of perceived physical impairments whether or not these perceived impairments limited or were perceived to limit major life activities.

**16.**    Specifically, plaintiff was perceived as disabled with a contagious disease; was mis-classified as having an impaired immune system and an impaired respiratory system by Defendant; and was not allowed to work because of defendant's discriminatory perceptions, policies and procedures.

**17.**    At all times material to this action, plaintiff was, and is, a "qualified individual" under the ADA and ADA-AA as a person who met the legitimate skill, experience, education, or other requirements of the employment position that plaintiff held, and who can/could perform the "essential functions" of the position plaintiff held with or without reasonable accommodation.

**18.**    Additionally, defendant is not eligible for any exemption under the ADA and ADA-AA, and, indeed, did not seek or obtain an exemption.

- 3 -

*Amended Complaint-- Andrew Kosiba*

**19.** At all times material to this action, defendant is/was an employer covered by the ADA and ADA-AA in that it employs more than 15 employees.

**20.** At all times material to this action, plaintiff was an employee entitled to be free from discrimination on the basis of a perceived disability under the ADA and ADA-AA.

<u>**PLAIN STATEMENT**</u>

**21.** Defendant discriminated against plaintiff based upon perceived disability. When plaintiff objected, the defendant continued to impose accommodations; including but not limited to: medical examinations, medical interventions including mask-wearing; without first conducting an individualized assessment to determine if he was a direct threat. Defendant has used policies and procedures that harass, isolate, segregate, limit, classify, deny equal access and impose non-job-related medical exams and inquiries upon plaintiff. Defendant also retaliated against plaintiff by interfering with his rights, imposing punitive measures including isolation and medical examinations, withholding his pay, and ultimately terminating his employment, which is prohibited under the ADA and ADA-AA.

<u>**STATEMENTS OF FACT**</u>

**22.** The Americans with Disabilities Act Amendments Act ("ADA and ADA-AA"), 42 U.S.C. § 12101, et. seq., as amended is a remedial statute aimed at addressing and providing remedy in response to Congress's findings that discrimination against individuals with physical or mental disabilities persist in critical areas like employment, and our nation's goals with respect to individuals with disabilities is to assure equality of opportunity and participation. 42 U.S.C. § 12101(a)(1)-(8). The ADA and ADA-AA is meant to protect qualified employees, like plaintiff, from discrimination, harassment and retaliation in the workplace on account of a real or perceived mental or physical disability. 42 U.S.C. § 12112.

**23.** Plaintiff advised defendant that he was being regarded as disabled by the defendant and that the defendant was making a record of this disability by mis-classifying him as substantially limited with impaired immune and respiratory systems affecting his ability to perform major life activities in the workplace including working, communicating with others, performing manual tasks, talking, and breathing without the use of mitigation measures.

- 4 -

*Amended Complaint-- Andrew Kosiba*

**24.** Plaintiff on many occasions duly noticed defendant of his good faith opposition to discriminatory policies and procedures.

**25.** Under the ADA and ADA-AA an employer may not require an individual with disability to accept accommodations which such qualified individual chooses not to accept. 29 CFR 1630.9 (d). This is especially pertinent when accommodations are imposed for a perceived and unproven disability.

**26.** Under the ADA and ADA-AA an employer is required to conduct an individual assessment to determine whether an employee poses a 'direct threat' before it can impose any measures upon the employee. 29 CFR §1630.2 (r)

**27.** Under the ADA and ADA-AA it is considered discrimination on the basis of disability if the employer limits, segregates, or classifies an employee in a way that adversely affects such employee because of the disability. 42 USC § 12112

**28.** Under the ADA and ADA-AA an employer who discharges, disciplines, or discriminates against an employee in the manner described in subsection (a) is considered to have violated 29 CFR §1630.4 (a)

**29.** Under the ADA and ADA-AA employers are prohibited from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing. 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c) and shall be subject to the enforcement provisions relevant to such violations set forth in sections 42 U.S. Code § 12117,  42 U.S. Code § 12133 and 42 U.S. Code § 12188.

**30.** Under the ADA and ADA-AA employers are prohibited from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; 42 U.S.C. §12112(d)(4); 29 CFR §1630.13 (b).

**31.** Under the ADA and ADA-AA, employers are prohibited from sharing non-job-related medical classification without any regard to confidentiality;  29 CFR §1630.14 (c)

- 5 -

*Amended Complaint-- Andrew Kosiba*

**32.**    Plaintiff may proceed under the "regarded as" prong and the "record of" prong and this court has jurisdiction under the "regarded as" prong of the ADA and ADA-AA.

## **GENERAL ALLEGATIONS**

**33.**    At all times material to this action, defendant failed to comply with its duty under the ADA and ADA-AA once plaintiff validly notified defendant of plaintiff being regarded as disabled and misclassified as substantially limited and requested equal access under the ADA and ADA-AA.

**34.**    Defendant discriminated and retaliated against plaintiff for making a complaint that he was being regarded as disabled, thus asserting his entitlement to equal access under the ADA and ADA-AA.

**35.**    Defendant's policies and procedures are specifically implemented for the purpose of mitigating the disability which it regards plaintiff as having.

**36.**    Plaintiff requested the defendant to provide a copy of the individualized assessment[1] that it conducted to determine that plaintiff was a direct threat; however, defendant ignored the requirement and continued to demand that plaintiff participate in its "health control measures" or accommodations such as mask-wearing, medical examinations, inquiries and treatments under Emergency Use Authorization ("EUA").

**37.**    Rather than providing equal access or proving any exemption to the ADA and ADA-AA, defendant embarked on a series of adverse employment actions against plaintiff which were designed to deter plaintiff's good faith opposition to the policies and procedures.

**38.**    Defendant's policy and procedures limited plaintiff's right to invoke ADA and ADA-AA protections by refusing to recognize that plaintiff could claim a reason under Federal law for refusing to comply with the policy and procedures.  Instead, defendant insisted that plaintiff

---

1 EEOC Technical Manual 2.2 (c)  "...the Supreme Court has stated and the Congress has reiterated, "society's myths and fears about disability and disease are as handicapping as are the physical limitations that flow from actual impairments."  The legislative history of the ADA indicates that Congress intended this part of the definition to protect people from a range of discriminatory actions based on "myths, fears and stereotypes" about disability, which occur even when a person does not have a substantially limiting impairment."

- 6 -

*Amended Complaint-- Andrew Kosiba*

could only claim a "medical" or "religious" exemption, which is interference with plaintiff's rights under the ADA and ADA-AA.

**39.** Defendant also engaged in adverse employment actions when plaintiff claimed the right of informed consent and the right to refuse to take part in clinical trials and noticed defendant that all the imposed mitigation measures fall under an EUA period.

**40.** Defendant's violation of the ADA and ADA-AA was not in good faith and was willful, and plaintiff sustained damages as a result of defendant's conduct including past and future earnings, lost opportunities and benefits, liquidated damages, emotional distress, and reasonable attorneys' fees and or costs.

**41.** Plaintiff re-alleges each statement from the affidavit herein.

## **COUNT I**
### **DISCRIMINATION UNDER THE ADA and ADA-AA FOR PERCEIVED DISABILITY**

**42.** Plaintiff incorporates each of the above statements of fact herein; the allegations contained in the paragraphs 1 through 41 and the plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**43.** Title I of the ADA prohibits employment discrimination on the basis of disability in all aspects of employment, in 29 CFR § 1630 *et sequitur;* and particularly §1630.4; § 1630.5.

**44.** Plaintiff is a qualified individual under the ADA and ADA-AA.

**45.** In March of 2021, defendant began regarding plaintiff as having the disability of a contagious disease and made a record of such disability by mis-classifying plaintiff as being substantially limited with an impaired immune system and an impaired respiratory system; and began requiring plaintiff to use mitigation measures to perform several major life activities in the workplace.

**46.** The defendant has made no meaningful efforts to remediate itself on the law, and has only referred to statements made on the CDC's website, but this clearly does not qualify as an individualized assessment.

- 7 -

*Amended Complaint-- Andrew Kosiba*

**47.**   Despite having knowledge of plaintiff claiming protected status under the ADA and ADA-AA, defendant continued to limit, segregate, classify plaintiff due to its perception of plaintiff as a person with a disability within the meaning of the ADA and ADA-AA.

**48.**   Defendant's responses to the requests made by plaintiff to cease the discrimination and harassment were in fact non-responsive, dismissive or harassing; a true and correct copy of each written communication is included with Exhibit A.

**49.**   Despite plaintiff's written notices, defendant continued without cessation to harass the plaintiff based upon disability by sending plaintiff numerous communications coercing plaintiff to accept various accommodations or suffer adverse employment actions.   All written communications are attached as Exhibit A.

**50.**   Defendant imposed accommodations upon the plaintiff which included isolation and segregation such as demanding plaintiff remain 6 feet away from co-workers; refusing him access to the work space; subjected him to medical examinations and medical interventions; placing plaintiff on unpaid administrative leave all without due process.

**51.**   Defendant has failed to ensure the equal access or accessibility of the premises where plaintiff is assigned to work.  The plaintiff has thereby been prevented from enjoying equal access and the benefits of employment enjoyed by other employees.

**52.**   Defendant's "COVID-19 policies and procedures" classified plaintiff in such a way that plaintiff's employment opportunities were adversely affected and limited because defendant would not permit plaintiff to do his job without first submitting to defendant's accommodations ("mitigation measures").[2]

**53.**   Defendant classified plaintiff as "unvaccinated"[3]; widely shared this classification of the plaintiff with other employees without any regard to confidentiality[4]; and encourages employees to harass plaintiff with repetitive emails, intimidating interactions and threats of termination.

---

2 prohibited by 29 CFR § 1630.5

3 discrimination based upon physical condition

4 prohibited by 29 CFR § 1630.13.

- 8 -

*Amended Complaint-- Andrew Kosiba*

SA-175

**54.**    An employer is entitled only to the information necessary to determine whether the employee can perform the essential functions of the job with or without reasonable accommodations and defendant has failed to identify any set of facts that would qualify under this limitation.

**55.**    Defendant has never conspicuously disclosed or gave legally adequate notice that complying with the COVID-19 mitigation measures ("accommodations") are an **essential function** of the job of Physical Therapist; and the measures have never previously been an essential function of plaintiff's job. [5]

**56.**    Plaintiff claimed his right not to provide any medical information that is not related to the performance of his job duties.

**57.**    Defendant limited the accommodation measures[6], such as examinations; disclosures of medical records that were not job-related; experimental injections; medical interventions; equipment or products; to only those chosen by defendant. Additionally, defendant failed to prove that there are no other accommodations available which do not require injections, medical devices and medical examinations.

**58.**    If plaintiff had previously made at least one request for reasonable modifications, plaintiff has since withdrawn such request.

**59.**    Additionally, the so-called "vaccines" that are being promoted as vaccines do not actually prevent transmission or infection of any contagious disease, specifically regarding the so-called "COVID-19" or "SarsCOV2" purported "diseases".

**60.**    The ADA and ADA-AA also protects individuals such as plaintiff for whom submitting to certain accommodation measures would create impairments. The accommodations include, but are not limited to, taking experimental injections under Emergency Use Authorization (EUA) which are being promoted as "vaccines" but which are not legally vaccines; submitting to repetitive, non-job-related medical examinations (nasal tissue testing, temperature checks); being placed under isolation, segregation and quarantine

---

[5]  29 CFR 1630.2 definition "Essential Function": "(i) ….the reason the position exists is to perform that function."
[6]  29 CFR Part 1630.2(j)(5)(i)

- 9 -

*Amended Complaint*-- Andrew Kosiba

SA-176

without due process; using medical devices for mitigation measures[7] (masks); disclosing plaintiff's medical records and history for non-job-related matters and participating in clinical trials and epidemiological experiments as a condition of employment.

**61.**    Plaintiff requests that this court take judicial notice of Section 201(h) of the Food, Drug and Cosmetic Act and its Final Guidance titled, "Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff", published in September of 2017, in which the Food & Drug Administration **defines** wearing a mask for mitigation purposes as a medical device and the application of a medical device or contrivance.  A true and correct copy of this is included as Exhibit B.

**62.**    Plaintiff further requests judicial notice of the fact that the Food & Drug administration has never **approved** wearing such face masks, but only "authorized" them without any supporting medical or clinical data establishing any medical necessity or efficacy for wearing such contrivances.

**63.**    Plaintiff requests that the court take judicial notice of the official mortality rates of the State of New York and the United States for the years from 2017, 2018, 2019 and 2020 in which the standard deviation is zero, the very definition of no verifiable "pandemic".

**64.**    Plaintiff has been damaged by defendant's violation of the ADA and ADA-AA and has suffered damages, which include past and future earnings, lost opportunities and benefits, and emotional distress.

**65.**    The conduct of defendant and its agents and employees proximately, directly, and foreseeably, injured plaintiff, including but not limited to, emotional pain and suffering, humiliation, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses.

**66.**    The conduct of defendant was so willful and wanton and in such reckless disregard of the statutory rights of plaintiff so as to entitle him to an award of punitive damages against defendant, to deter it, and others, from such conduct in the future.

**67.**    As a result of defendant's actions plaintiff has experienced discrimination, segregation, isolation.

7  Section 201(h) Food, Drug & Cosmetic Act

- 10 -

*Amended Complaint-- Andrew Kosiba*

SA-177

**68.**    Plaintiff is entitled to any and all relief permitted under the ADA and ADA-AA, 42 U.S.C. § 12117(a), including equitable relief.

**69.**    **WHEREFORE**, Plaintiff respectfully requests entry of:

a.    judgment in his favor and against defendant for violation of the anti-discrimination provisions of the ADA and ADA-AA;

b.    ordering defendant to comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and

c.    ordering defendant to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct and to eliminate, to the extent practicable, the effects of such conduct.

d.    judgment in his favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.    judgment in his favor and against defendant for his reasonable attorney fees, costs and litigation expenses;

f.    judgment in his favor and against defendant for punitive damages; and

g.    an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**70.**    Plaintiff demands a jury trial.

## COUNT II
### INTERFERENCE/RETALIATION UNDER THE ADA and ADA-AA

**71.**    The ADA and ADA-AA also prohibits employers from retaliating against individuals who oppose discriminatory activities or who make charges, testify, assist, or participate in any manner in an investigation, proceeding or hearing under the ADA, Title 42 U.S.C. § 12203 and 29 CFR Parts 1630.12(a) and (b) and Parts 1630.13(b), (c), (d) and Part 1630.14(c).

- 11 -

*Amended Complaint-- Andrew Kosiba*

SA-178

**72.** Plaintiff incorporates the above statements of fact and the allegations contained in the paragraphs 1 through 41 herein and plaintiff's supporting affidavit which is also re-alleged and incorporated herein by reference.

**73.** In August of 2021, defendant began unceasingly to retaliate against plaintiff despite plaintiff's reasonable good faith belief that he was exercising protected opposition to discrimination and claiming rights protected under the ADA and ADA-AA.

**74.** The plaintiff was threatened to be terminated because of his unvaccinated condition and has successfully stated a violation of the Act simply because he has been subjected to an action prohibited under the law because of perceived physical impairment.

**75.** Defendant continued to threaten the plaintiff with suspension, dismissal, and termination even after it was aware of a pending EEOC investigation and plaintiff's protected opposition status.

**76.** Defendant coerced plaintiff to submit to the accommodation measures, medical interventions and examinations and other health control measures, even though defendant was duly advised by plaintiff that he was not subject to any health control measures by any court order, and that the defendant was not empowered by any court order or other legal duty to impose such interventions, examinations or control measures upon plaintiff. [8]

**77.** Defendant threatened plaintiff with the termination of employment then terminated his employment because of a perceived disability and as a result of classifying plaintiff as "unvaccinated".

**78.** Defendant's notices to plaintiff failed to include conspicuous notice as to the manner in which its accommodations ("Covid policies and procedures") are related to the performance of plaintiff's essential job functions, and also did not mention plaintiff's right of refusal under EUA guidelines[9].

---

[8]  See New York Public Health Emergencies Bench Book

[9]  Title 21, Chapter 9 V, Part E §360bbb–3a. Emergency use of medical products.

- 12 -

*Amended Complaint-- Andrew Kosiba*

**79.**   Despite having knowledge of plaintiff claiming protected status under the ADA and ADA-AA, defendant terminated plaintiff's employment due to plaintiff's opposition to discriminatory policies and procedures.

**80.**   Defendant also failed to give notice of plaintiff's right to refuse defendant's accommodations under the ADA and ADA-AA[10],  and failed to advise plaintiff of his right to informed consent.

**81.**   At all times material to this action, defendant interfered with the exercise of plaintiff's rights under the ADA and ADA-AA.

**82.**   As a result of defendant's intentional, willful and unlawful acts by retaliating against plaintiff and interfering with plaintiff's rights under the ADA and ADA-AA, plaintiff has suffered injury and damages.

**83.**   The injury suffered by plaintiff is thereby concrete and particularized and it is actual and imminent.  The injury alleged in the complaint, including the pleading and exhibits, clearly sets forth a set of facts that actually occurred and are not conjectural or hypothetical. The injury described therein is at least fairly traceable to the challenged action, conduct and policies of defendant.

**84.**   The harm (injury) already suffered by plaintiff includes, but is not limited to, having to choose between waiving rights to: medical privacy, informed consent, refusal to take part in clinical trials, and be free of discrimination and retaliation OR having plaintiff's employment terminated.   Once violated, these rights cannot be recovered.

**85.**   Defendant's policies and procedures demonstrate soundly and convincingly that it intends to inflict future harm against plaintiff based upon perceived disability; it fully intends to continue these policies and it fully intends to continue retaliating against plaintiff as alleged herein.

**86.**   As a result of defendant's actions the plaintiff has experienced retaliation, coercion, interference, termination and disruption in plaintiff's career.

---

10 29 CFR Part 1630.9 (d) & (e)

- 13 -

*Amended Complaint-- Andrew Kosiba*

**87.**   Defendant's efforts were to terminate plaintiff, rather than to provide equal access, per defendant's duty, and were not objectively or subjectively in good faith, therefore plaintiff is entitled to liquidated damages or other monetary damages, including punitive damages to the extent available.

**88.**   **WHEREFORE**, Plaintiff respectfully requests entry of:

a.   ordering defendant to comply with the requirements of Title I of the Americans with Disabilities Act, 42 U.S.C. §12101; and,

b.   take such affirmative steps as may be necessary to prevent the recurrence of any retaliation, coercion, interference and intimidation and to eliminate, to the extent practicable, the effects of such conduct.

c.   reinstatement, or, in the alternative, front pay in the event reinstatement is not practical;

d.   judgment in his favor and against defendant for actual and compensatory damages, including lost earnings, front pay, and/or all actual monetary losses suffered as a result of defendant's conduct;

e.   judgment in his favor and against defendant for his reasonable court fees and litigation expenses;

f.   judgment in his favor and against defendant for punitive damages; and

g.   Assess a civil penalty against the defendant in an amount authorized by 42 U.S.C. §12101 to vindicate the public interest and make the plaintiff whole; and

h.   an order granting such other and further relief as this Court deems just and equitable under the circumstances of this case.

**89.**   Plaintiff demands a jury trial.

DATED this  17  day of May 2022.

Andrew Kosiba, Plaintiff

- 14 -

*Amended Complaint*-- Andrew Kosiba

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
631-495-9968
ak764@protonmail.com

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
100 Federal Plaza, Central Islip, New York 11722-9014

ANDREW KOSIBA

    PLAINTIFF

v.                            CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.

    DEFENDANT

——————————————/

### AFFIDAVIT IN SUPPORT OF COMPLAINT

STATE OF NEW YORK   )
                    )ss
COUNTY OF NASSAU    )

**1.**    I, Andrew Kosiba, do hereby solemnly affirm that the statements herein are true and correct in substance and in fact and that I have personal knowledge of each.

**2.**    I have been harassed at my job, discriminated and retaliated against based on disability for refusing to accept my employer's accommodations for regarding me as impaired in my immune system and impaired in my respiratory system.

**3.**    I am absent and without evidence of any information from any health officer identifying myself as having any communicable disease or having been exposed to any toxic substance.

**4.**    I am absent and without knowledge of any evidence or court order, obtained by any petition of the Department of Health or a public health officer, that was based upon any

physician's affidavit in which I have been identified as having any communicable disease or having been exposed to any toxic substance.

**5.** I am absent and without knowledge of any evidence of any court order determining that I am or have been a direct threat to anyone.

**6.** I am absent and without knowledge of any evidence of any individualized assessment required by law that has determined that I am or have been a direct threat to anyone.

**7.** I am absent and without knowledge of any evidence of any court order imposing any terms of isolation or quarantine or other measures upon myself.

**8.** I have previously and timely disclosed and duly noticed the defendant of a prior existing disability, and that the assertions made in the complaint are true and correct to the best of my knowledge, information and belief.

**9.** I have been regarded as having a disability and I have a disability which precludes me from wearing a face covering for medical reasons and for reasons of self-care, breathing, and communication. I have been diagnosed with conditions that contra-indicate wearing a mask or limiting my oxygen or re-breathing my expelled bacteria. I understand that I have the right to make my own health choices and that no law has been suspended regarding my right to Informed Consent during this time and I have not been diagnosed with an infectious disease.

**10.** I have been working as a home physical therapist for approximately 20 years with Catholic Health. I have never had an issue with management and have been an exemplary employee and I feel I am an asset to the company.

**11.** Since approximately March of 2021, there were certain mitigation measures that were instituted like PPE wearing, daily temperature checks, mask wearing, PCR tests which I did in the beginning because no one knew what was happening and I thought it was for my protection as well. As I researched and as time went on and the "numbers" went down these measures didn't go away and I began to research actual scientific data. I started to disagree with the measures we were mandated and saw that more and more we were following political rules for some reason and not science.

**12.** Catholic Health requested me to take EUA injections as a job requirement (new condition) in early September. This is when I learned that my employer classified me as "unvaccinated". I wanted to opt out of this new policy requirement. I was given a declination

patients, and I felt that this was a betrayal. Ironically, 3 days later I tested negative with a PCR test.

**17.** On September 24, 2021, I had been told by Christine Bracco in HR that I must have an EUA injection by October 7, 2021 or I will be fired. My declination is no longer honored and my employer does not acknowledge any right to refuse under the ADA. I am feeling severe anxiety and stress about this. I am having heart palpitations. Night after night I awake at 4 o'clock in the morning and cannot fall back asleep because of these measures.

form in early September 2021 which only had medical or religious exemptions listed, but did not list what the criteria were for such exemption.  It also did not have an option for refusal based upon informed consent or any other rights protected under the ADA.

**13.**    I felt coerced and intimidated by the company to get the EUA injections.  The company was also classifying me as unvaccinated keeping track of my injection status which felt threatening as I thought they were going to fire me for claiming my rights. I felt very threatened. Despite filing a declination form I continued to receive many emails about where and when I could get the shot.

**14.**    On March 15, 2021, I was in a GoToMeeting which was run by Dr. Kranz. Dr. Kranz stated that our agency had a 62% compliance with the jab and she said, "That's not enough people, that's not nearly enough!"

**15.**    In late spring, 2021, during our last in office meeting, I came into the office and noticed many people not wearing masks. I began to take my mask off, but was told the unvaccinated need to continue to wear masks. This made me feel angry and stressed. We were being segregated and they were openly classifying me as unvaccinated and disclosing my medical information to everyone in the room. I felt like a second-class worker.

**16.**    On August 16, 2021, I was not feeling well and spiked a fever. I called out sick and under duress because of all the hype of the virus I took a home PCR test which was positive. When I called the agency, I was told that because I tested positive for Covid they were going to notify all patients I came in contact with for 3 previous days. I was furious. I thought, "How can they share my health information like that?".  It made me extremely anxious. They said they would not name me. This was not good enough! Due to the nature of my job I sometimes am the only clinician visiting the patient and I was even told by the nurse at work (Christina Nelson) that I should be ready that some people might "figure it out". I have an excellent rapport with my patients, and I felt that this was a betrayal.  Ironically, 3 days later I tested negative with a PCR test.

**17.**    On September 24, 2021, I had been told by Christine Bracco in HR that I must have an EUA injection by October 7, 2021 or I will be fired.  My declination is no longer honored and my employer does not acknowledge any right to refuse under the ADA.  I am feeling severe anxiety and stress about this.  I am having heart palpitations. Night after night I awake at 4 o'clock in the morning and cannot fall back asleep because of these measures.

**18.**    On September 27, 2021 I attempted to find a resolution with Christine Bracco, Director of HR, by sending a "Notice of Employment Discrimination and Retaliation Based Upon Disability", which asked her to address the my request for due process and concerns regarding discrimination based on a perceived disability.  I asked my employer to reveal when it had conspicuously disclosed that complying with a "COVID-19 vaccine" requirement, testing requirement, or masking requirement was an essential function of my job.

**19.**    On September 28, 2021, I arrived to the office for a meeting with Christine Bracco, Director of HR. Upon arrival I was forced to have a temperature check before going in. When I asked if this is necessary because I had already sent in a temp check to my supervisor that morning and was clear. I was told I must comply. After doing it I remarked that this is redundant and upon walking away I heard one of the ladies at the front desk say, "That's one of the ones who will be leaving". At the meeting Christine Bracco told me there was nothing else they could do and her hands were tied regarding my discrimination complaint.  My "Notice of Employment Discrimination and Retaliation Based Upon Disability" was never addressed and my questions were not answered.

**20.**    On September 30, 2021 I was at a monthly meeting for my team and was informed that whoever was vaccinated will receive a sticker to wear on their badge so they will be identified as such. I was made to feel so excluded, intimidated and made me feel very anxious as to how far this would be taken.

**21.**    On October 5, 2021 I filed a Charge of Discrimination and Harassment with the EEOC via email and certified mail but didn't get any response for months.

**22.**    On October 16, 2021 I saw that a patient that was assigned to me had a "Vaccinated Staff Only" stipulation on their file. I was very disheartened and saddened to see that Catholic Health was following such a discriminatory policy. Not only is it revealing my health information when I have to decline such a case, it also discriminates against me in my professional capacity. Instead, I feel that Catholic Health should educate the patient that they cannot discriminate on the basis of disability and that they cannot enforce such a policy. This would not be tolerated if a patient requested any other discriminatory request.

**23.**    On November 5th I received an email stating that I am to be required to have a bi-weekly COVID test as the agency is waiting on rulings from lawsuits regarding religious exemptions. I am very stressed about this as I have never been required to take a COVID test while I am

healthy. I have not been informed of the efficacy of the PCR tests nor of the long-term effects of frequent testing. I want to be left to do my job as I have been doing for over twenty years, including the past two years during this "pandemic". This shows me that my employer is making a record of the disability by misclassifying me as having such a significant impairment that it will not allow me to work without using mitigation measures.

**24.**     On November 17, 2021, I received an email from Christine Bracco and Tony Pellicano, Chief HR Officer stating that if I don't receiver an injection by November 22, 2021, I will be placed on leave without pay for 2 weeks. I have had a vacation planned for weeks which happened to coincide with the November 22 date. After that time employees who still have not received the injection will be terminated.

**25.**     On November 28, 2021, after returning from vacation, I had received a letter from Christine Bracco Bracco, Director of Human Resources. The letter stated that I was being placed on "unpaid furlough" for 2 weeks at which point it would be assumed that if I didn't comply with "mandate", that it would be considered that I have resigned. This is outrageous as I had previously stated that I was healthy, ready and able to work. Just as it is a proven fact that "vaccinated" people can become sick from and transmit Covid-19, yet I and others who refuse the "vaccine" are the only ones in danger of being terminated. This is causing a severe amount of anxiety to me and my family.  I am having heart palpitations and nausea because of this latest policy.   I feel like I am experiencing and being continually discriminated against.  All I want to do is return to my job without prejudice and do what I am more than capable of doing.

**26.**     On November 29, 2021, I responded to Christine's letter in an email (Exhibit A) explaining that I have no intention of resigning my position. Taking an experimental injection was never a condition of my employment and I am ready, able and willing to return to work. I have made great efforts to timely notice my employer that I am fit for service and have complied with all requests for response.

**27.**    On December 1, 2021 I received a termination letter From Christine Bracco stating that "We simply are not permitted to allow unvaccinated employees in covered positions to continue to work even with appropriate PPE and subject to COVID-19 testing."

**28.**    The documents included with Exhibit A are true and correct copies of the originals.


DATED this _17_ day of May 2022

Andrew Kosiba, Affiant

SA-188

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
631-495-9968
ak764@protonmail.com

### UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF NEW YORK
100 Federal Plaza, Central Islip, New York 11722-9014

ANDREW KOSIBA

    PLAINTIFF

v.                           CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.
    DEFENDANT

### CERTIFICATE OF SERVICE

    I, Andrew Kosiba, hereby certify that a true and correct copy of the foregoing was duly served upon the defendant's attorney, Roy W. Breitenbach, the address of 333 EARLE OVINGTON BLVD, SUITE 901 UNIONDALE, NEW YORK 11553, via first class mail on this 17 day of May, 2022.

By: *Andrew Kosiba*

SA-189

# EXHIBIT A

written communications



## Fw: Message on behalf of Alan Guerci, M.D.
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                                    Thu, Apr 8, 2021 at 3:50 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Cudahy, Maryann
Sent: Friday, December 11, 2020 10:35 AM
To: Email Users - All
Subject: Message on behalf of Alan Guerci, M.D.

Dear Colleagues,

I know many of you have questions regarding a COVID vaccine. I am happy to inform you that the F.D.A.'s vaccine advisory panel, voted in favor of emergency authorization for people 16 and over. Although the F.D.A. does not have to follow the advice of its advisory panel, it usually does. Emergency Use Authorization (EUA) should follow by this weekend. Although the vaccines will not be widely available to the general public for many months, Pfizer and Moderna have produced enough doses for approximately 20 million people. These first doses will go to people in high-risk groups, including health care workers.

We expect to receive our first batch of vaccines the week of December 14th. CHS employees will be offered the vaccine based on risk of exposure to COVID-19. Top priority will be given to employees and physicians in our ICUs, emergency departments and dedicated COVID units, as well as long-term care, home care and hospice workers who regularly interact with patients and residents. We will make the vaccination more widely available as additional supplies are received. For more information, please refer to the attached FAQs and our COVID Vaccination Policy<http://chsit/assets/sys tem_wide_policies/COVID%20MERS%20SARS%20Co%20V%20Vaccination%20Policy.pdf>. Patients will be treated following a separate protocol.

While we are not making the vaccine mandatory at this time, we strongly urge all caregivers to be vaccinated. Please know the vaccine requires two doses. More information will be shared as the vaccine becomes more widely available. Meanwhile, we have prepared a comprehensive FAQs that we hope answers your questions. To address your concerns, we will be establishing a hotline in the near future so you can ask questions about the vaccine that are not addressed by the FAQs. Responses to your questions will be posted on the CHS intranet so that they are available to all employees.

Some of you may be apprehensive about receiving a COVID-19 vaccine. It is important to note that during Phase III trials, the vaccines showed better than 95% effectiveness with no serious adverse safety concerns. As health care providers, we have an obligation to lead the way for our patients, ourselves and our families, which is why I will be one of the first to be vaccinated. An effective vaccine will keep us safe and will be essential to putting this pandemic behind us.

Maryann Cudahy

**Assistant to Alan D. Guerci, M.D., President & CEO**

**Assistant to Salvatore F. Sodano, Chairman**

**Catholic Health Services of Long Island**

**992 North Village Avenue**

**Rockville Centre, NY 11570**

**(516) 705-3708**

maryann.cudahy@chsli.org<mailto:maryann.cudahy@chsli.org>

**[CHS_Logo_Revise_4C_Tagline cropped]**



## Fw: Agency/COVID-19 Update – January 17, 2021
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                    Thu, Apr 8, 2021 at 3:45 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Kranz, Kim
Sent: Sunday, January 17, 2021 10:08 AM
To: Email Users - Catholic Home Care; Email Users - Good Shepherd Hospice
Cc: Verzi, Dennis
Subject: Agency/COVID-19 Update – January 17, 2021

Message sent on behalf of Kim Kranz, President

As this week comes to a close, I'd like to reflect on our vaccination initiatives over the past several weeks and thank all of those involved for the work they have done to provide this much needed service to our employees. To date 455 of our employees have received the vaccination, this is only 50% of our employee base.  Dr. Kerrianne Page, CMO and myself continue to communicate the importance of vaccinating all. We highly recommend and encourage you to be vaccinated for the protection of yourself, your loved ones, our patients/families and your fellow employees. Please work with Chris Bracco, HR Partner, to schedule your 1st dose of the vaccine.

Dr. Page is available to discuss any questions or concerns you may have about receiving the vaccine.

As eligibility requirements for the COVID vaccine expand it will become more challenging for us to have supply.

Now is the time to work on scheduling an appointment.

In addition, I am excited to share the launch of the new system name of Catholic Health! Over the next few weeks, you will continue to see messaging relating to this new branding, as well as the launch of our new system logo on January 27. Following that release, there are a number of other branding changes that will continue to be mentioned throughout the system. Continue to visit our social media pages for the latest information on our new brand launch.

Below are some important highlights for all staff that I would like to share with you:

COVID

Our hospital(s) goal is to keep COVID volume at the appropriate levels so our system can continue to perform elective surgical procedures. We have been working with our hospitals closely to ensure patients are safely transferred to their homes.

SA-193

## Fw: COVID Survival Tip #1
1 message

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                                    Thu, Apr 8, 2021 at 3:44 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Frawley, Mary
Sent: Tuesday, January 5, 2021 7:45 PM
To: Email Users - Catholic Home Care
Subject: COVID Survival Tip #1

Dear Staff,

The attached article is about disconnecting from the electronic world during COVID. We have had so many challenges during the past 9 months. This article reminds me that it is important to disconnect, go outside and get some fresh air and remember that we will survive COVID!!!

Take some time to read, think about disconnecting and spending some quality time with your family and GET VACCINATED!!!

Stay Safe,

Mary

Mary Frawley DNP, RN

Director of Patient Services

Catholic Home Care

110 BiCounty Blvd Ste 114

Farmingdale, NY 11735

Ph: 631-828-7408

Email: mary.frawley@chsli.org<mailto:mary.frawley@chsli.org>

SA-194

Currently we are caring for over 250 patients who are COVID positive or a person under investigation (PUI). I want to thank all our employees and volunteers who are keeping our staff safe by ensuring protective equipment is ordered, inventory is tracked & maintained, supplies are packaged and supplies are distributed, remarkable teamwork!!

COVID update calls with Dr. Page, our program Directors and myself will continue during the week of January 25th.

ACUTE HOSPITAL AT HOME PROGRAM

A new innovative model of patient care, the acute Hospital At Home program is scheduled to launch next week. This program has been approved by Center for Medicare and Medicaid Services (CMS) for all six hospitals. A multidisciplinary group of leaders have built a level of quality and safety to patients who qualify for the Catholic Health Hospital At Home program. This care allows for a select set of COVID-19 patients who would most benefit from the opportunity to continue their acute hospitalization at home. A strict inclusion criteria will be used and patients identified will receive their continued Remdesivir infusion therapy at home. Over 40 of our clinicians from Home Care are trained in this new model of care.

I would like to thank all of the clinicians involved in delivering this new model of care and level of service.

A special thank you to Dr. Page and Barbara Rowe for their unwavering leadership and support of launching and operationalizing this program.

In closing, I would like to share with you a prayer from Catholic Health Services:

Lord grant that our lives may amaze. Make us staunch advocates of the freedom you proclaimed in the synagogue in Nazareth and tirelessly work to bring your glad tidings to the poor.

Thank you for delivering our mission and ministry to serve our communities.

With gratitude,

Kim

SA-195

9/20/21, 8:47 AM                                    Gmail - Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

 Gmail                                        Andrew Kosiba <kosproducts@gmail.com>

## Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

**Kosiba, Andrew <Andrew.Kosiba@chsli.org>**                         Fri, Sep 3, 2021 at 5:32 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Dolan, Sarah
Sent: Thursday, September 2, 2021 1:46 PM
To: AllCHSLIEmailUsers
Subject: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

I write with an important update on the New York State COVID-19 vaccination mandate for covered healthcare workers
and the accompanying Catholic Health policy, which is required by the New York State mandate.  On August 26, 2021,
New York State issued regulations requiring COVID-19 vaccinations for all covered healthcare workers in the state.
These regulations eliminated the availability of religious exemptions for covered healthcare workers.  The New York State
Department of Health cited public health reasons for the elimination of religious exemptions and noted that New York
State has existing vaccination requirements for healthcare workers, such as for measles, which are not subject to
religious exemptions.

As a health care institution in New York State, Catholic Health is required to follow Department of Health mandates.
Therefore, Catholic Health entities will not be able to consider requests for religious exemptions and will only be able to
consider requests for medical exemptions based on pre-existing conditions. All covered healthcare workers who do not
receive an approved medical exemption will have to receive at least one dose of the COVID-19 vaccination by the State
deadlines of September 27, 2021 (for hospital and nursing home staff) and October 7, 2021 (for staff of home health,
hospice and diagnostic and treatment centers).

A copy of Catholic Health's revised COVID-19 Vaccination Policy, which is in compliance with regulations, is attached and
includes the Catholic Health form for requesting medical exemptions. The form is also posted on the Catholic Health
intranet. Please note that all requests for medical exemptions must be submitted by Monday, September 20th so we have
enough time to review the request and ensure employees are eligible to report to work on the applicable deadline.

Thank you for your attention to this important matter.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

SA-196



## Fw: New York State COVID Vaccine Mandate
1 message

**Kosiba, Andrew <Andrew.Kosiba@chsli.org>**                    Wed, Sep 8, 2021 at 8:01 PM
To: ak764@optonline.net <ak764@optonline.net>

From: Bracco, Christine
Sent: Wednesday, September 8, 2021 4:36 PM
To: Bracco, Christine
Subject: New York State COVID Vaccine Mandate

I am reaching out to you as a follow up to the recently announced New York State vaccination mandate for Healthcare employees, which will take effect for Home Care and Hospice on October 7th.

For over six years now I have been a proud team member of Catholic Health Home Care and Good Shepherd Hospice and I am inspired and humbled on a daily basis by the incredible work you all do on behalf of our patients and family members. Having had the opportunity to speak individually with many of you, I know this announcement has been distressing and I wanted to reach out to each of you to offer my support as we navigate through this new requirement.

At this time, my records indicate you have not received a COVID vaccination.  If that information is not up to date or if you have a scheduled vaccination, please let me know as soon as possible.

If you are considering not being vaccinated, please let me know by the end of this week, 9/10/2021, so I can work towards assisting you with options and/or next steps.

Thank you for all you do!

Chris

Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

**(631) 828-7603 (Tel)**

**(631) 566-5656 (Cell)**

**(631) 828-7610 (Fax)**

SA-197

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-198

9/20/21, 8:46 AM                                          Gmail - Fw: Hospice & Home Care Agency Update

## Gmail                                                    **Andrew Kosiba <kosproducts@gmail.com>**

## Fw: Hospice & Home Care Agency Update

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                              Fri, Sep 10, 2021 at 7:30 PM
To: "ak764@optonline.net" <ak764@optonline.net>

> From: Kranz, Kim
> Sent: Friday, September 10, 2021 1:58 PM
> To: Email Users - Catholic Home Care; Email Users - Good Shepherd Hospice
> Subject: Hospice & Home Care Agency Update
>
> GSH/CHC Team Members,
>
>
> Please allow this to serve as an agency update which includes:
>
> • We will Never Forget
>
> • Current Status – Census & COVID cases
>
> • Recruitment
>
> • Vaccination Plan
>
> • Patient Experience
>
>
> This Saturday, September 11th in remembrance of 9/11 we will have our Chaplains present in our Farmingdale Office, Port Jefferson and Rockville Centre IPUs to provide our staff with prayer and remembrance for the 20th anniversary of this tragic event.
>
>
> Current Status – Census & COVID cases (we continue to track and trace daily)
>
> CHC
>
> 9/7/2021
>
> 9/8/2021
>
> 9/9/2021
>
> 9/10/2021
>
> Total Census

2653

2614

2598

2584

Patient PUI

12

10

11

16

Patient Positive

26

25

27

35

Staff in Quarantine

1

1

1

2

Staff Test Positive

3

1

9/20/21, 8:46 AM                                     Gmail - Fw: Hospice & Home Care Agency Update

1

2


Hospice

9/7/2021

9/8/2021

9/9/2021

9/10/2021

Total Census

376

372

371

379

Patient PUI

4

4

4

3

Patient Positive

1

1

1

SA-201

9/20/21, 8:46 AM                              Gmail - Fw: Hospice & Home Care Agency Update

4

Staff in Quarantine

1

2

2

2

Staff Test Positive

1

1

1

1

SA-202

9/20/21, 8:46 AM                                    Gmail - FW: Hospice & Home Care Agency Update

- Please do not come to work if you are sick or experiencing any COVID symptoms.

- COVID testing for non-symptomatic employees is occurring in our Farmingdale office Monday's and Wednesday's 8:00am – 1:00pm

Recruitment

I am happy to announce we have over 30 new employees starting in our September 13th orientation. This includes clinical and support team members in both Hospice & Home Care. A very special thank you to all our Managers and Recruitment Team, Human Resources and Education Team for your positive efforts in making this a possibility.  We will have another Open House in September along with daily on-site interviewing for walk-ins.  Our October orientation already includes clinicians for both programs.

Vaccination Plan

- Approximately 80% of our staff have been vaccinated.

- If vaccination is received proof of vaccination must be brought to Human Resources.

- CH Policy on Employee Vaccination issued 09.02.2021, please follow and notify Chris Bracco of any questions.

- Requirement by New York State for all staff to be vaccinated with at least one shot by October 7, 2021.

- Operations is working on a Flex & Sustain Plan identifying the impact that non-vaccinated staff will have on each department operations. This will require daily monitoring for needed alterations.

Patient Experience

- We have seen incremental positive results with our overall patient experience scores and have opportunity for improvement to reach our CH goal. Our managers will continue to provide Appreciative Coaching training. We have shared with our management team our most recent scores for July.

Focus on our I-CARE golden key behaviors Every Patient….Every Time makes every encounter a Positive Experience for Our Patients.

THANK YOU for being our Heroes.

Please be careful and safe. I am available if you have any questions.

With gratitude,

Kim

SA-203

Kim Kranz

President

Catholic Health

Home Care and Good Shepherd Hospice

110 Bi-County Blvd. Ste. 114

Farmingdale, NY 11735

T  (631) 828-7410

F  (631) 828-7494

Kim.kranz@chsli.org


[cid:image001.png@01D7A64B.DEBE7220][cid:image002.png@01D7A64B.DEBE7220]

Vaccination

**2 attachments**



**image001.png**
6K



**image002.png**
8K

Case 23-6, Document 49, 04/12/2023, 3497807, Page207 of 286

SA-205

Case 2:21-cv-06416-GRB-ARL Document 25 Filed 05/13/22 Page 41 of 106 PageID #: 471
9/20/21, 8:44 AM                    Gmail - Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

 Gmail

**Andrew Kosiba <kosproducts@gmail.com>**

## Fw: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

Kosiba, Andrew <Andrew.Kosiba@chsli.org>
To: "ak764@optonline.net" <ak764@optonline.net>

Thu, Sep 16, 2021 at 7:08 PM

From: Dolan, Sarah
Sent: Thursday, September 16, 2021 2:38 PM
To: AllCHSLIEmailUsers
Subject: Message on behalf of Tony Pellicano / Re: NYS Vaccination Mandate

Dear colleague,

On September 14, 2021 an upstate federal court granted a temporary restraining order (TRO) prohibiting the State "from enforcing any requirement that employers deny religious exemptions from COVID-19 vaccination." This TRO will go into effect on September 27, 2021. Please note the court ruling does not suspend the NYS COVID-19 vaccination mandate, however it temporarily prohibits New York State from blocking employers from considering religious exemptions. The mandate remains in effect in all other respects. The issue of the availability of religious accommodations is now on appeal to the U.S. Court of Appeals, which has been asked to rule on the State's position on religious exemptions on an expedited basis. A decision from this Court will have binding effect on all health systems in the State, including Catholic Health and its entities.

We continue to receive requests for religious accommodations and will evaluate these once we receive further direction from the courts and regulatory guidance. These requests should be submitted to your local Human Resources department so we can keep accurate track of all that are received. In the meantime we continue to move forward with our plans based on the NYS COVID-19 vaccination mandate. This includes reminding employees about the mandate deadline, providing educational resources and providing ready access to appointments to receive the vaccination.

We will continue to monitor and keep you informed on the status of these legal proceedings and will comply with all applicable judicial orders and regulatory directives. Please know that we will not take any adverse employment actions against an unvaccinated employee seeking a religious exemption from the vaccination mandate while we await further legal and regulatory direction.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

SA-206

9/25/21, 8:16 AM                                              Gmail - Fw: NY State COVID Vaccination Mandate

 Gmail                                                    Andrew Kosiba <kosproducts@gmail.com>

## Fw: NY State COVID Vaccination Mandate
1 message

**Kosiba, Andrew <Andrew.Kosiba@chsli.org>**                                    Fri, Sep 24, 2021 at 6:47 PM
To: "ak764@optonline.net" <ak764@optonline.net>

From: Bracco, Christine
Sent: Friday, September 24, 2021 9:07 AM
To: Bracco, Christine
Cc: Verrengia, Michael
Subject: NY State COVID Vaccination Mandate

I hope this email finds you well.


As a follow up to the email distributed by Catholic Health yesterday afternoon, I wanted to reach out to you again with regards to the New York State COVID Mandate.


The New York State COVID Vaccination Mandate for Home Care and Hospice will be effective on October 7th.  While an upstate New York federal judge has issued a temporary restraining order prohibiting consideration of religious exemptions, all other vaccine mandates remain in effect.  In order to continue working on and after October 7th, employees will need to provide one of the following:


1)   Evidence of at least the first dose of vaccination.  If you have already received your first dose or are fully vaccinated, please send a copy of your NY State COVID card to Jennifer Temple, Employee Health Nurse, as quickly as possible.


2)   CH approval for a Medical Exemption.  Medical Exemption Applications were due on September 20, 2021,so if you are still planning to apply for a Medical Exemption please do so immediately.  Medical Exemption applications must be submitted using the CH Medical Exemption Form.


3)   Religious Exemption; Employees with a Religious Exemption will be permitted to continue working pending CH Committee review and the outcome of the temporary suspension.  Religious exemptions should be submitted by today, 9/24, at noon.


Employees who do not meet one of the above criteria will be furloughed, without pay, beginning on October 7th. Employees may only be furloughed for up to 2 weeks, during which time health insurance benefits for you and all covered dependents will be maintained.


Tony Pellicano, our Chief HR Officer, said it best – "we hope we can continue to all work together to ensure that we meet our promise to the patients we serve".

SA-207

9/25/21, 8:18 AM                                    Gmail - Fw: NY State COVID vaccination Mandate

Please let me know if I can answer any questions or assist you in anyway.


All the best,

Chris



Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-208

SA-209

Christine Bracco, Human Resources
Catholic Health
christine.bracco@chsli.org

October 7th, 2021.

RE: Your email on September 24th, 2021.

You (Catholic Health) admit that you do not regard Andrew Kosiba (Andrew) as having any contagious disease, yet you purport to require him to disclose his medical history and submit to medical interventions (accommodations such as mask wearing and vaccines)[1]. This violates 29 CFR Part 1630.9(d) and 21 U.S.C. 360bbb-3. You are not exempted from complying with the law under 29 U.S.C. §654.

There are no vaccines during a period of emergency use authorization.

No vaccines have been approved by the FDA and no vaccines are currently in production for the so-called "Coronavirus" or any of its purported derivatives. Your statement that a vaccine has been approved by the FDA is false.

Any medical interventions during an emergency use authorization period are by definition, clinical trials and no one is required to participate in clinical trials for any reason, and certainly not as a condition for employment. 21 CFR Part 50.20.

You state that you have a legal obligation yet failed to cite any legal duty. (What law?). You thereby admit that you have no duty of care or insurable risk to protect employees or anyone from any contagious disease.

You admit that you have no new legal duty of care to protect anyone from any contagious disease. Workman's compensation does not cover contagious diseases. Let me explain the reason for this. First of all, the risk cannot be calculated under any actuarial scheme and secondly, it is statistically impossible to establish the proximate cause of who infected whom.

You provide no supporting facts of any contagious disease but this is not relevant because whether or not there is a contagious disease, or any "pandemic" as you falsely claim, you still have no new legal duty of care, and Andrew Kosiba has no legal duty to disclose his medical records to you. Likewise, he has no legal duty to submit to any of your accommodations (mask wearing, vaccines, or whatever). This is a matter of law, 29 CFR Par. 1630.9(d). **Read the law; and yes, it does apply to Catholic Health.**

You fail to cite any law that exempts you from this actual legal duty, and you fail to cite any law that exempts you from complying with the requirement to conduct an individualized assessment to determine whether Andrew Kosiba is a direct threat to anyone. Commentary and news reports do not satisfy the legal criteria for an individualized assessment.

Please be advised that claiming there is a pandemic is not a legal defense for disability discrimination and retaliation claims. While not relevant, it should be noted that the standard deviation in the mortality rate for the years 2017, 2018, 2019 and 2020 is zero, unchanged. This is the very definition of no pandemic. Moreover, no public health officer, including the CDC, has

---

[1]The FDA defines wearing a mask when intended for health purposes as a medical device. Section 201(h) Food, Drug & Cosmetic Act.

SA-210

any record of any contagious disease culture or specimen for "Covid-19" or "SarsCov-2" or anything similar, it doesn't exist.

Speaking in pertinent legal terms again, Title I of the ADA prohibits employment discrimination based on disability. Among other things, Title I prohibits employers (you) from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c).

Your requests for Andrew's medical records are not part of any job-related employee health program.

You fail to allege any facts that would constitute an undue burden for Andrew's refusal to accept your accommodations.

You fail to allege any fact that would establish any fundamental alteration in the manner in which your business operates. Your policies themselves have created a fundamental alteration in the way your business operates.

You fail to allege facts that the disability you are in fact regarding Andrew as having is not transitory and minor.

Your policies have created a disability for Andrew.

29 CFR Sections 1630.2(r):

"Direct Threat means a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation. The determination that an individual poses a 'direct threat' shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:

(1) The duration of the risk,

(2) The nature and severity of the potential harm,

(3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm."

Your policies have nothing to do with anyone's safety, in fact, your policies violate the safety of your employees and violate your actual duty of care toward those employees. Safety requirements must be based on actual risks (not "guidelines" published on a website) and not on mere speculation, stereotypes, or generalizations about individuals with disabilities.

Since you are not regarding Andrew Kosiba as having any contagious disease and you have no diagnosis or records of the same, you will immediately cease and desist from your illegal conduct of discrimination based upon such a disability and retaliation against Andrew and allow him to do his job without unnecessary interruption. Unless you can show you have conducted an individualized assessment of Andrew and determined that he is a direct threat, by the criteria set forth in the actual law, you will cease and desist from any further communication, harassment, discrimination, intimidation, or retaliation against Andrew.

SA-211

# Re: NYS Vaccination Mandate

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:   Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>

CC:   ak764@protonmail.com <ak764@protonmail.com>

Date: Thursday, November 18th, 2021 at 9:14 AM


Hello Christine.

This is my response to Tony Pellicano's email which you forwarded regarding the newest
illegal "policy" Catholic Health Services has set forth. Please note that his first point
in regards to "all employees in positions such that if they were infected with Covid-19,
they could potentially expose other personnel, patients or residents to the disease" also
applies to those who were injected or deemed "vaccinated" and yet they are not being
fired. Therefore your policy is illegal and discriminatory. I would hope that for the sake
of the agency, you would all rethink this policy and return to work as usual without
"mandates" which are not law and discriminatory.


Thank you for your attention and please file this again in my confidential file.


Sincerely,


Andrew Kosiba


_____
From: Bracco, Christine
Sent: Wednesday, November 17, 2021 12:33 PM
To: Bracco, Christine
Subject: NYS Vaccination Mandate


I am forwarding an update on the status of the NYS Vaccination Mandate from our Chief HR
Officer, Tony Pellicano.  I am available all week if you have questions or need any
assistance so please don't hesitate to contact me at 631-828-7603.  Chris

-----------------------------------------------------------------------------------------
-----------------------------------------------------------------------------------------
-----------------------------------------


This is to provide an important update on the status of the NYS COVID-19 vaccination
mandate, following my most recent communication on September 23, 2021.  There have been
some recent, significant developments so it is very important that you review the
following information carefully.

SA-212

Case 2:21-cv-00491-GRB-ARL Document 25 Filed 05/13/22 Page 8 of 24 PageID #: 478

As you know, while we awaited further direction from the courts and the NYS Department of Health (DOH), we permitted employees seeking religious exemptions to continue to work subject to PPE and testing requirements.  On November 4 and 12, 2021, the U.S. Court of Appeals for the Second Circuit upheld the state mandate without a religious exemption as constitutional and vacated the temporary injunctions that had been issued against the mandate. This means that the Court of Appeals has permitted the DOH to proceed with the mandate without "religious exemptions".

In a letter dated November 15, 2021, the DOH has advised that individuals employed in positions where, if they were infected with COVID-19, they could potentially expose other "covered personnel, patients, or residents to the disease" must receive the first dose of the vaccination by Monday November 22, 2021 in order to be permitted to remain in their positions.  The only exceptions allowed are those with religious accommodation requests who also have approved medical exemptions or who can perform their jobs in a way where they will not come into contact with patients, residents or co-workers.   We expect there will be few if any positions that satisfy this criteria.

In light of this development, please be advised of the following:

•     All employees in "positions such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease" must have the first dose of the COVID-19 vaccination by Monday, November 22, 2021.  This includes all individuals working in hospitals, nursing homes, home care and hospice who have in-person interaction with co-workers, patients or residents as part of their job responsibilities.

•     Employees who do not receive the first dose of the vaccination by Monday, November 22, 2021 will be placed on a two week unpaid leave.  After that time employees who still have not received the first dose will be terminated and receive their accrued unused vacation time in accordance with our normal policies.  However, we will maintain health and welfare benefits until the end of the year. Employees who are terminated due to this action and are fully vaccinated within six months of termination will be eligible to return to work in an available position for which they qualify with no loss of seniority.

•     During this time, Catholic Health will consider on an individualized basis whether there are reasonable accommodations available, which might permit employees who have applied for an exemption to the vaccine due to their sincerely held religious beliefs to continue working remotely such that there would be no in-person contact with co-workers, patients or residents.  We must advise, however, that most if not all of the positions held by those who have applied for religious accommodations require in-person work in covered facilities such that co-workers, patients or residences could be exposed to COVID-19 should the employee become infected.

•     As a result, we strongly encourage our employees who have not yet been vaccinated to consider receiving the first dose of the vaccine by Monday, November 22,

SA-213

by Friday, November 19th if you intend to receive the vaccination so that work schedules can be planned accordingly.

As we have stated in earlier communications, as a healthcare system operating in the state of New York we are required to follow the directives issued by the NYS DOH and by the courts.  We appreciate your patience and understanding as we continue to navigate through this difficult time. In the final analysis, we owe it to our patients to provide the safest environment possible. We greatly appreciate that 93% of our employees have chosen to take the vaccine and hope that we can continue to all work together to ensure that we meet our promise to the patients we serve.

Tony Pellicano

Chief HR Officer

(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>

[cid:image002.png@01D7DBAF.266FF470]

**12.69 KB** ⌀ 2

image002.png (5.59 KB)                    N of Timely Response (2).odt (7.10 KB)

 **Catholic Health**

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew

This will confirm that you have been placed on an unpaid furlough due to your failure to meet the requirements of the NYS mandate for receiving the COVID-19 vaccination. According to the mandate, employees are required to have evidence of at least the first dose of vaccination in order to continue working as of November 22, 2021. In accordance with our previous letter dated November 16th, you will be placed on an unpaid leave for a period of two weeks ending on Monday, December 6th. If you fail to comply with the vaccination requirement by that date, you will be considered to have resigned and your employment will be terminated. In this case your health benefits will be continued through the end of the month and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley in order to be eligible for COBRA benefits.  In the event you return to work during the period of the unpaid leave the contributions will be deducted from your next paycheck.

If you decide to get the vaccination and return into an available position with six months of termination you will be eligible for re-employment with no loss of seniority and resume health care coverage on the first of the month following the date of return.

We regret having to take this action and hope that you will reconsider your decision to receive the vaccination and return to Catholic Health. Please direct any questions relating this matter to Christine Bracco at 631-828-7603.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

SA-215

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

Christine Bracco, Human Resources
Catholic Health

christine.bracco@chsli.org

## CONFIDENTIAL COMMUNICATION
### 29 CFR §1630.14(c)(1)

September 20th, 2021.

RE      Employment discrimination & retaliation

Hello Christine,

This is a confidential communication that I am requesting be included into my personnel file and I want this and subsequent communications to be kept confidential within human resources. I am documenting acts of retaliation and harassment of which I have been subjected to on the job. I also want to speak confidentially to the Catholic Health designated employee or representative for matters involving Title I of the Americans with Disabilities Act and grievances.

Please explain why Catholic Health and its employees are discriminating against me based upon a disability you are regarding me as having? I am invoking my rights under the Americans with Disabilities Act as a qualified individual with a disability.

I am being regarded as having a contagious disease without any individualized assessment and continually being asked for my medical records and to submit to medical examinations and interventions (accommodation or mitigation measures) without any informed consent. It has been extremely difficult to perform my employment duties because of these interruptions and harassment.

Regarding the mitigation measures including but not limited to mask-wearing, vaccines, social distancing, hand-washing and submitting to medical examinations such as the collection of vital statistics (body temperature) or tissue samples (diagnostic testing), I am not required to accept these or any mitigation measures under Title I of the ADA, 29 CFR Part 1630.9(d). If you have some legal authority that overrides this, please provide me with a legal citation.

Title I of the ADA prohibits employers from requiring medical examinations or making disability-related inquiries of employees unless such examination or inquiry is shown to be job-related and consistent with business necessity; see, 42 U.S.C. §12112(d)(4); 29 CFR §1630.14(c)

My questions are:

1.  Why do you regard me as having a disability and what records have you made of this?

2.  **What physician, what medical records, and what complaint made by a physician to a health officer, and "orders of isolation and quarantine" do you rely upon**

SA-216

for diagnosing me as having a contagious disease?  Please include all, evidence, court records and records from the individualized assessment used in making this determination or diagnosis as required under Title I of the Americans with Disabilities Act.[1]

3.  Please identify the statute and regulation imposing your legal duty of care to protect me and others from any contagious disease and the commissioner's pertinent "hazard assessments".

4.  Please provide a copy of documentary evidence from the departments of health or labor establishing the existence of a disease that has been isolated by modern scientific standards and documentary evidence proving that such disease is airborne and contagious.

5.  Please identify your insurable risk with a copy of your insurance binder showing that you are insured for protecting employees from a contagious disease, and any adverse health consequences they may suffer as a result of your mitigation measures.

6.  Regarding the mitigation measures, a)  why have you refused to include notice that this is under an emergency use authorization, and disclose the risks and benefits of the product, and also advise me of my right to either accept or refuse the product,[2] and b)  which of these mitigation measures has the proven efficacy to prevent transmission or infection of the contagious disease for which you regard me as having?

7.  How are your requests for my medical information and submitting to medical examinations and interventions necessary for the performance of my employment duties?

8.  Why are you able to diagnose me with a deadly disease and impose restrictions and medical interventions without my informed consent, without any physician's oversight or judicial approval, yet I am required to obtain written permission from my physician to exercise my rights to informed consent and medical privacy?   We can stipulate that I have never waived any of my rights to medical privacy which includes the right of informed consent as a condition for employment.

Please identify the designated employee responsible for resolving matters concerning the Americans with Disabilities Act and grievances.   On the other hand, if you refuse to answer these questions, I will consider the matter closed and we can set it aside and continue with our business without further interruption.

Be advised that if my employment is conditioned upon submitting to your mitigation measures, this constitutes discrimination based upon disability, a violation of state and federal law, and retaliation under the ADA, for which I would have a claim for employment discrimination based upon disability.

Sincerely,


Andrew Kosiba


Please be advised that this communication and all related communications are confidential and must not be disclosed as per the Americans with Disabilities Act explained below.

---

1   29 CFR 1630.2 et seq.
2   21 USC 360bbb-3

SA-217

Addendum

# DEMAND FOR RETRACTION

### White House, Department of Justice
### and Fox News, CNN, MSN, MSNBC

The White House and Department of Justice, via Jen Psaki, made a false and misleading statement in the White House press briefing dated July 6th, 2021.[3]

Demand is made the White House and Department of Justice and all news agencies to retract its false statement:

**"Section 564(e)(1)(A)(ii)(III) of the Food, Drug, and Cosmetic Act concerns only the provision of information to potential vaccine recipients and does not prohibit public or private entities from imposing vaccination requirements for a vaccine that is subject to an emergency use authorization."**

and the same demand for retraction of the false and misleading title from the article published by Fox News dba Fox TV Digital Team, CNN, MSN, MSNBC and all news agencies that published the following statement in any way:

### "Federal law doesn't prohibit COVID-19 vaccine mandates"

and all commentary supporting this statement, and correct this false statement with the complete opinion which the Department of justice failed to include, which states:

"Whether Section 564 of the Food, Drug and Cosmetic Act Prohibits Entities from Requiring the Use of a Vaccine Subject to an Emergency Use Authorization."[4]

"We do not address whether other federal, state, or local laws or regulations, such as the Americans with Disabilities Act ("ADA"), might restrict the ability of public or private entities to adopt particular vaccination policies. See, e.g., Equal Employment Opportunity Commission, What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (updated June 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws (discussing the ADA)."[5]

Demand is made upon the White House, Department of Justice and all news media agencies to retract its false and misleading statements and publish a correction by disclosing its complete and accurate opinion and to correct this in the same manner in which the false and misleading statement was first made (not on the back page of some newspaper).

These false and misleading statements create a danger and public health hazard by encouraging private businesses and government agencies to violate the law.  This is the way the government can push its agenda and avoid being challenged, by distributing a policy to literally millions of locations instead of adopting an actual law, it can mislead millions of people into making the wrong conclusions, an din many cases, result in the death or permanent injury of many thousands or millions of people.

---

3   https://rumble.com/embed/vhso17/?pub=mt1mb
4   21 USC §360bbb-3
5   https://www.justice.gov/sites/default/files/opinions/attachments/2021/07/26/2021-07-06-mand-vax.pdf

SA-218

### Post Script Memorandum of Law

Title I of the ADA, 42 U.S.C. § 12111, et seq., and its implementing regulation, 29 C.F.R. Part 1630, permits covered employers, such as Catholic Health, to make inquiries into the ability of an employee to perform job-related functions and make inquiries into the nature and severity of the employee's disability, so long as the examination is job-related and consistent with business necessity. 42 U.S.C. §§ 12112(d)(4)(A)–(B); 29 C.F.R. § 1630.14(c). See also Darby v. Childvine, Inc. 964 F.3d 440 (2020)

Information obtained as a result of such an examination or inquiry regarding the medical condition or history of any employee must be treated as a confidential medical record. 42 U.S.C. §§ 12112(d)(4)(C), (d)(3)(B); 29 C.F.R. § 1630.14(c)(1).

Confidential medical information may be disclosed in three instances: (1) to inform supervisors or managers regarding necessary restrictions on the work of the employee and necessary accommodations, (2) to medical personnel when emergency treatment is required, and (3) to government officials investigating compliance with this regulation. 42 U.S.C. §§ 12112(d)(4)(C), (d)(3) (B); 29 C.F.R. § 1630.14(c)(1). None of these exceptions apply with regard to my employment with Catholic Health.

SA-219

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

David L. Reinman, ADR Coordinator
New York District Office EEOC
33 Whitehall Street, 5th Floor
New York, NY 10004
david.reinman@eeoc.gov

CRTIU Supervisor
New York District Office EEOC
33 Whitehall Street, 5th Floor
New York, NY 10004

Christine Bracco, Human Resources
Catholic Health
110 Bi-County Blvd
Farmingdale, NY 11735
christine.bracco@chsli.org

## For New York District Office EEOC
## Charge of Discrimination and Request for Mediation

Re: Catholic Health
110 Bi-County Blvd
Farmingdale, NY 11735

### STATEMENT IN SUPPORT OF COMPLAINT

I am making this complaint against my employer for its discrimination against me based upon disability.  The EEOC has the authority and legal duty to investigate this complaint.

My employer regards me as having a disability.
My employer has made a record of such disability.

My employer has failed to conduct any individualized assessment to determine if I am a direct threat to anyone.  My employer has failed to engage in any interactive process with me concerning disability rights or resolutions.

Witness List:

Elizabeth Nallan-Potter   Elizabeth.Nallan-Potter@chsli.org   631-828-7400

Christine Bracco   Christine.Bracco@chsli.org   631-828-7400

Kim Kranz   Kim.Kranz@chsli.org   631-828-7400

- 1 -

SA-220

Tony Pellicano   Tony.Pellicano@chsli.org   631-828-7400

Mary Frawley   Mary.Frawley@chsli.org   631-828-7400

I have asked to speak confidentially with my employer's designated employee or representative that is responsible for resolving matters involving the Americans with Disabilities Act and grievances thereunder, but my employer refuses to provide me access to such a person.

Instead, my employer has offered various accommodation measures, including, but not limited to mask-wearing, staying six feet away from others, frequent hand-washing, collection, use and storage of my vital statistics, histological samples and biometric data and biometric identifiers without adequate or proper notice, adequate disclosures, adequate data retention security or my informed consent, working in isolation, video-graphic and audio-graphic communications in lieu of face to face communications, working behind clear shielding, and injections of certain types of suspensions which are being called "vaccinations" yet do not prevent infection or transmission of any contagious disease and in fact create more disabilities by altering the normal function of my immune system and other cellular functions. My employer has not merely "offered" such accommodation measures, but threatened me with penalties including those described herein for refusing such accommodations in violation of 29 CFR Part 1630.9(d).

I have thereby informed my employer that I am a qualified individual with a disability that substantially limits my ability to engage in one or more major life activities.

My employer asked me to describe my disability and discuss it with certain employees, even though such disability does not adversely affect my ability to perform the duties of my employment and has done so without any offer or attempt to make such disclosures in confidence or privately.

I have requested information regarding the risks and benefits of my employers accommodation measures and in response, my employer has retaliated against me by humiliating me in front of others, by reprimanding me and has threatened or intimidated or coerced me with the threat of suspension of my pay, reduced hours or pay or the termination of my employment for refusing such accommodation measures instead of providing me with the information I requested so that I could make an informed decision.

I have exercised my right to refuse such accommodation measures and proposed instead that I be permitted to perform my employment duties without harassment, retaliation, coercion, or intimidation as a result of my exercise of such rights, and my employer has prevented and interfered with this occurring.

I have not requested reasonable modifications but only that I be permitted to perform my employment duties without harassment, retaliation, coercion or intimidation.

- 2 -

My employer has instead retaliated against me for exercising my rights under the Americans with Disabilities Act by threatening me with disciplinary measures and penalties for refusing such accommodation measures, including but not limited to suspension or reduction of pay,  limiting my access to the premises where I work, segregation, isolation, termination of employment, exclusion from programs or services that would permit me to improve my employment skills or become eligible for advancement, and denied me the possibility for promotion even when I was eligible or would become eligible.

Each day my employer permits and encourages other employees, including my supervisor and managers to harass and intimidate me and ask me for medical, health and other personal information that does not pertain to, or is not necessary for, the performance of my employment duties.

I am thereby being denied equal access to the same programs, activities, benefits, jobs or other opportunities for which I am otherwise qualified, while other employees are not.  I am being segregated, excluded and relegated to lesser services by my employer based solely upon disability.

My employer has written and adopted policies that exacerbate my disabilities and create disabilities while also encouraging others to retaliate against me for exercising my rights under the Americans with Disabilities Act.

My employer has failed or refused to fulfill its duty to aid and encourage me in the exercise of my rights which are protected under the Americans with Disabilities Act.

My employer has demonstrated by the actions of its employees and by its own written policies that it intends to continue such violations and failures to comply with the law and violation my rights.

## REQUEST FOR MEDIATION

By filing this Charge, I am formally requesting a mediation hearing to resolve these issues.  I request that my Charge be entered manually and a hearing be scheduled.  I request the CRTIU Supervisor to enter my Charge into the EEOC system personally as I do not find the online portal acceptable or accessible for entering my Charge.  I request a written response from the CRTIU Supervisor confirming that my Charge has been filed within 14 business days of receipt of this Notice.

_____
Andrew Kosiba

Enclosure Copies:

1.) Notice of Employment Discrimination & Harassment Based on Disability

- 3 -

SA-222

10/2/21, 8:41 AM                                   Inbox | ak764@protonmail.com | ProtonMail

# Fwd: Harrassment

From:  Andrew Kosiba <kosproducts@gmail.com>

To:     ak764@protonmail.com <ak764@protonmail.com>

Date:  Saturday, October 2nd, 2021 at 6:50 AM

---------- Forwarded message ---------
From: **Kosiba, Andrew** <Andrew.Kosiba@chsli.org>
Date: Fri, Oct 1, 2021, 8:27 AM
Subject: Harrassment
To: Bracco, Christine <Christine.Bracco@chsli.org>
Cc: ak764@optonline.net <ak764@optonline.net>

Hi Christine,

Thank you for your response. I was not asking for a medical exemption. I am claiming my rights under the ADA since I am being regarded as having an infectious disease and I am asking to be left alone to do my job as I have done faithfully for the last 20 plus years. I want the harassment and discrimination to stop.

By law my employer is required to have an ADA representative. Since you are saying it is you that handles ADA then I want to add 2 incidents to my confidential file.

On Tuesday when entering the building I was told I must take a temperature reading. When I stated "But I already had one and submitted it to my supervisor" and asked "is it still necessary?" I was told yes it is. When I displayed my frustration at this policy, I took the temp reading. As I walked away from the counter I heard "That's one of the ones that will be leaving".

On Thursday I came into the office for a team meeting. During the meeting we were told that if you are vaccinated, they have a sticker to be placed on your badge in order to display the fact that you were vaccinated.

Please enter these incidents into my file. Any further harassment or coercion will be directed to you.

Thank you for your attention.

Sincerely,

Andrew Kosiba

https://mail.protonmail.com/u/0/inbox/21xbeGV49OE8Gfcz5DterSwGLcYAzgPlqFbiXFE0r1lNJEdcPAoAPazupFBrLr7V7k7jiF3hRGOILFEgbGHI6g==     1/1

SA-223

10/19/21, 10:06 AM                                                Gmail - Confidential file

 Gmail                                        Andrew Kosiba <kosproducts@gmail.com>

## Confidential file
2 messages

**Kosiba, Andrew** <Andrew.Kosiba@chsli.org>                     Mon, Oct 18, 2021 at 6:15 PM
To: "Bracco, Christine" <Christine.Bracco@chsli.org>
Cc: "ak764@optonline.net" <ak764@optonline.net>

Hello Christine,

I wanted to reach out to you so you can add this complaint to my confidential file. I found out that Catholic Health is allowing patients to demand "vaccinated staff only". This is an extremely offensive and discriminatory policy to allow this to happen in the face of a disability. No one should be subjected to this.

It makes me disheartened and sad to find this out. I would hope that the agency would take a stand against this and educate people that this is a discriminatory policy that you cannot abide by.


Thank you for your attention to this matter.


Andrew Kosiba


**Bracco, Christine** <Christine.Bracco@chsli.org>               Tue, Oct 19, 2021 at 7:59 AM
To: "Kosiba, Andrew" <Andrew.Kosiba@chsli.org>
Cc: "ak764@optonline.net" <ak764@optonline.net>


Good Morning, Andrew.


I will add this to your file.


Take care,

Chris

[Quoted text hidden]

11/5/21, 5:39 PM                                    (4) Inbox | ak764@protonmail.com | ProtonMail

# Fw: UPDATE - New York State COVID-19 Mandate

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:   ak764@protonmail.com <ak764@protonmail.com>

Date: Wednesday, November 3rd, 2021 at 5:13 PM

```
From: Bracco, Christine
Sent: Wednesday, November 3, 2021 3:35 PM
To: Bracco, Christine
Cc: Verrengia, Michael; Temple, Jennifer; Russo, Adriana L; Kranz, Kim; Alfred, Iyabode
(Yabo); Frawley, Mary; Wilson, Christine K. [CHC]; Joachim, Pamela; Sullivan, Roger;
Mckeever, Maribeth; O'Connor, Carolynn; Winchester, Dionne; Maddock, Kathryn; Donahue,
Margaret (Peggy); Silipo, Samantha; Cucci, Patricia; D'Anna, Susan; Koppelman, Syndee;
Mirabella, Christine; Savarese, Peter; Schilling, Ann; Lyons-McCreary, Nicole; Sam-
Matthews, Suzette; Duggan, Thomas; Farr, Robin A; Wagner, Beth; Nallan-Potter, Elizabeth;
Nelson, Christina; Madonia, Ramona; Prisco, Suzanne; Tapley, Jacqueline; Magnani, Lucas;
Rowe, Barbara; Page, Kerrianne
Subject: UPDATE - New York State COVID-19 Mandate


I write to you with respect to your pending request for a religious exemption from the New
York State COVID-19 vaccine mandate for healthcare workers. As you no doubt are aware, on
Friday October 29, 2021, the U.S. Court of Appeals for the 2nd Circuit vacated a lower
court preliminary injunction which had blocked New York State from preventing employers
from considering requests for religious exemptions from the mandate. In so doing, the
Court of Appeals has permitted the New York State COVID-19 vaccine mandate for healthcare
workers to proceed without the availability of religious exemptions.


The U.S. Court of Appeals has promised a more detailed opinion, and we have learned that
the litigants challenging the vaccine mandate have sought relief from the U.S. Supreme
Court. We await further direction in the legal proceedings but must share that the U.S.
Supreme Court recently permitted a similar vaccine mandate in the State of Maine to
proceed without the availability of religious exemptions.


As we await further direction from the courts, which we expect in the very near term, you
will be permitted to continue to work, subject to existing PPE and testing requirements.


Catholic Health Home Care and Good Shepherd Hospice currently perform COVID testing every
Monday and Wednesday, between 8am and 1pm, in Farmingdale. Please reach out to Jennifer
Temple, Employee Health Nurse, to schedule your bi-weekly COVID test, beginning the week
of 11/8/2021.
```

11/5/21, 5:39 PM                                (4) Inbox | ak764@protonmail.com | ProtonMail

Thanks,

Chris



Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-226

11/8/21, 5:07 PM                                                    (6) Inbox | ak764@protonmail.com | ProtonMail

## Fw: COVID testing requirement

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date: Friday, November 5th, 2021 at 5:13 PM

```
From: Temple, Jennifer
Sent: Friday, November 5, 2021 11:20 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID testing requirement


Good Morning,

As per previous emails from Human Resources, bi-weekly COVID testing will be required by
CH for any employee who is not COVID vaccinated effective week of 11/7/2021, and every
other week thereafter. COVID swabbing is performed in Employee Health in Farmingdale on
Mondays and Wednesdays between the hours of 8am and 1 pm. You may get tested here or
choose to be tested elsewhere. However, if you are tested elsewhere, it is your
responsibility to promptly  provide me with the results every other week. The test must be
PCR, as rapid tests are not acceptable.  If you'd like to be tested here in Farmingdale ,
bi-weekly, you will choose either Monday or Wednesday , and that will be your regular
testing day. Please reach out to me via email or practice unite   to schedule your day
ASAP. If you are already coming to me for testing, please continue to come as usual . If
you are being tested elsewhere, or plan to begin testing elsewhere, please let me know
where you are being tested . If  you have already communicated with me in regards to your
testing plans, please disregard this email. As always, feel free to contact me with any
questions or concerns.

Thank you,

Jennifer


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610
```

SA-227

11/5/21, 5:38 PM                              (4) Inbox | ak764@protonmail.com | ProtonMail

## Fw: COVID testing requirement

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:     ak764@protonmail.com <ak764@protonmail.com>

Date:  Friday, November 5th, 2021 at 5:13 PM

_____

From: Temple, Jennifer
Sent: Friday, November 5, 2021 11:20 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID testing requirement


Good Morning,

As per previous emails from Human Resources, bi-weekly COVID testing will be required by
CH for any employee who is not COVID vaccinated effective week of 11/7/2021, and every
other week thereafter. COVID swabbing is performed in Employee Health in Farmingdale on
Mondays and Wednesdays between the hours of 8am and 1 pm. You may get tested here or
choose to be tested elsewhere. However, if you are tested elsewhere, it is your
responsibility to promptly  provide me with the results every other week. The test must be
PCR, as rapid tests are not acceptable.  If you'd like to be tested here in Farmingdale ,
bi-weekly, you will choose either Monday or Wednesday , and that will be your regular
testing day. Please reach out to me via email or practice unite  to schedule your day
ASAP. If you are already coming to me for testing, please continue to come as usual . If
you are being tested elsewhere, or plan to begin testing elsewhere, please let me know
where you are being tested . If  you have already communicated with me in regards to your
testing plans, please disregard this email. As always, feel free to contact me with any
questions or concerns.

Thank you,

Jennifer


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610

SA-228

11/11/21, 10:09 PM                                               (5) Inbox | ak764@protonmail.com | ProtonMail

# Fw: COVID Testing

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:     ak764@protonmail.com <ak764@protonmail.com>

Date: Tuesday, November 9th, 2021 at 5:25 PM

```
From: Temple, Jennifer
Sent: Tuesday, November 9, 2021 8:58 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID Testing


Good Morning ,

As you are aware, effective 11/8/2021, bi-weekly covid swabbing is required for anyone who
has a medical or religious exemption . You are receiving this email because you have not
provided me  information on when and where you will be tested . Testing is available in
Farmingdale EHS Mondays and Wednesdays 8a-1pm . if you'd like to begin testing here
tomorrow, please let me know ASAP. Otherwise please let me know your testing plans. If you
are going to be tested outside of here, it is your responsibility to provide me with the
bi-weekly results promptly.

Thank you,


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610

Jennifer.temple@chsli.org


[cid:image001.png@01D7D547.0DDADB00][cid:image005.png@01D7143E.5A5DBEE0]
```

SA-229

11/11/21, 10:10 PM                    (5) Inbox | ak764@protonmail.com | ProtonMail

Subject: Re: COVID Testing


Good morning Jennifer.


I am aware of the testing that Catholic Health has implemented. I have already spoken with HR regarding these matters ie. mandates, vaccination, testing. These policies are discriminatory. I also feel that they are retaliatory towards those individuals who did not comply. I know there is a list of non-compliant employees. I know that those employees are being treated differently and this is against the law, ie. ADA, Civil Rights Act.


I have logged a complaint with HR. I have also logged a complaint with EEOC as I am regarded as having a disability. This is harassment at this point and I want it to stop.


As you may or may not know, under Emergency Use Authorization (EUA), Informed Consent must be given. I have inquired as to the long term effects of using PCR tests, efficacy, what is done with my personal medical information, how it is stored and have not been able to obtain an answer. Even if these questions are answered, this is a discriminatory policy and I do not consent.


It is also against the law to retaliate against anyone who does not consent to these measures under the EUA.


As I have told HR, I am not asking for any accommodations. I simply wish to be left to perform the job I was hired for over twenty years ago without interruption, a job I take seriously and have done faithfully. If I am ill I will stay home and if need be I will seek medical attention at that point.


I also ask Christine Bracco to add this email correspondence and response to my confidential file as another example of on the job harassment.


Thank you for your attention to this matter.


Sincerely,


Andrew Kosiba

---

Case 23-6, Document 49, 04/12/2023, 3497807, Page232 of 286

SA-230

Case 2:21-cv-06416-GRB-ARL   Document 25   Filed 05/18/22   Page 66 of 106 PageID #: 496

11/11/21, 10:10 PM                                      (5) Inbox | ak764@protonmail.com | ProtonMail

From: Temple, Jennifer
Sent: Tuesday, November 9, 2021 8:58:18 AM
To: Temple, Jennifer
Cc: Bracco, Christine
Subject: COVID Testing


Good Morning ,

As you are aware, effective 11/8/2021, bi-weekly covid swabbing is required for anyone who
has a medical or religious exemption . You are receiving this email because you have not
provided me  information on when and where you will be tested . Testing is available in
Farmingdale EHS Mondays and Wednesdays 8a-1pm . if you'd like to begin testing here
tomorrow, please let me know ASAP. Otherwise please let me know your testing plans. If you
are going to be tested outside of here, it is your responsibility to provide me with the
bi-weekly results promptly.

Thank you,


Jennifer Temple, RN, BSN

Employee Health Nurse

Good Shepherd Hospice & Catholic Home Care


T  (631)828-7613

F  (631) 828-7610

Jennifer.temple@chsli.org<mailto:Jennifer.temple@chsli.org>


[cid:image001.png@01D7D652.82BAEDF0][cid:image005.png@01D7143E.5A5DBEE0]


**606.51 KB** ⬛ 3

⬛ image001.png (6.06 KB)                    ⬛ image002.png (7.27 KB)

⬛ COVID-19 Vaccinations Final 9121.pdf (593.18 KB)

SA-231

11/11/21, 10:10 PM                                    (5) Inbox | ak764@protonmail.com | ProtonMail

# Fw: COVID Testing

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>

To:      ak764@protonmail.com <ak764@protonmail.com>

Date: Thursday, November 11th, 2021 at 7:53 AM

---

```
From: Bracco, Christine
Sent: Wednesday, November 10, 2021 4:59 PM
To: Kosiba, Andrew; Temple, Jennifer
Subject: RE: COVID Testing

Hi Andrew,


In accordance with the Catholic Health Policy, COVID-19 Vaccinations effective September
27, 2021, employees not vaccinated must adhere to bi-weekly COVID-19 testing. Attached is
a copy of the policy for your review.


As an employee with a pending request for an accommodation which remains under review, you
will be required to have negative COVID-19 test results on a bi-weekly basis in order to
continue reporting to work.  COVID testing may be conducted in the Employee Health
department or you may choose an outside testing site that is more convenient for you as
long as the test results are submitted within five (5) days of the test date.


Please work with Jen to ensure the testing is completed within the time frame specified.


Thank you for your cooperation.


Take care,

Chris


From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, November 10, 2021 4:01 PM
To: Temple, Jennifer <Jennifer.Temple@chsli.org>
Cc: Bracco, Christine <Christine.Bracco@chsli.org>
```


**Catholic Health**

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew

This will confirm that you have been placed on an unpaid furlough due to your failure to meet the requirements of the NYS mandate for receiving the COVID-19 vaccination. According to the mandate, employees are required to have evidence of at least the first dose of vaccination in order to continue working as of November 22, 2021. In accordance with our previous letter dated November 16th, you will be placed on an unpaid leave for a period of two weeks ending on Monday, December 6th. If you fail to comply with the vaccination requirement by that date, you will be considered to have resigned and your employment will be terminated. In this case your health benefits will be continued through the end of the month and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley in order to be eligible for COBRA benefits.  In the event you return to work during the period of the unpaid leave the contributions will be deducted from your next paycheck.

If you decide to get the vaccination and return into an available position with six months of termination you will be eligible for re-employment with no loss of seniority and resume health care coverage on the first of the month following the date of return.

We regret having to take this action and hope that you will reconsider your decision to receive the vaccination and return to Catholic Health. Please direct any questions relating this matter to Christine Bracco at 631-828-7603.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

SA-233

12/15/21, 4:03 PM                                    (9) Inbox | ak764@protonmail.com | ProtonMail

# Fw: NYS Vaccination Mandate

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date: Wednesday, November 17th, 2021 at 1:43 PM

---

From: Bracco, Christine
Sent: Wednesday, November 17, 2021 12:33 PM
To: Bracco, Christine
Subject: NYS Vaccination Mandate

I am forwarding an update on the status of the NYS Vaccination Mandate from our Chief HR
Officer, Tony Pellicano.  I am available all week if you have questions or need any
assistance so please don't hesitate to contact me at 631-828-7603.  Chris

--------------------------------------------------------------------------------------
--------------------------------------------------------------------------------------
-----------------------------------

This is to provide an important update on the status of the NYS COVID-19 vaccination
mandate, following my most recent communication on September 23, 2021.  There have been
some recent, significant developments so it is very important that you review the
following information carefully.

As you know, while we awaited further direction from the courts and the NYS Department of
Health (DOH), we permitted employees seeking religious exemptions to continue to work
subject to PPE and testing requirements.   On November 4 and 12, 2021, the U.S. Court of
Appeals for the Second Circuit upheld the state mandate without a religious exemption as
constitutional and vacated the temporary injunctions that had been issued against the
mandate. This means that the Court of Appeals has permitted the DOH to proceed with the
mandate without "religious exemptions".

In a letter dated November 15, 2021, the DOH has advised that individuals employed in
positions where, if they were infected with COVID-19, they could potentially expose other
"covered personnel, patients, or residents to the disease" must receive the first dose of
the vaccination by Monday November 22, 2021 in order to be permitted to remain in their
positions.  The only exceptions allowed are those with religious accommodation requests
who also have approved medical exemptions or who can perform their jobs in a way where
they will not come into contact with patients, residents or co-workers.   We expect there
will be few if any positions that satisfy this criteria.

In light of this development, please be advised of the following:

- All employees in "positions such that if they were infected with COVID-19, they could potentially expose other covered personnel, patients or residents to the disease" must have the first dose of the COVID-19 vaccination by Monday, November 22, 2021. This includes all individuals working in hospitals, nursing homes, home care and hospice who have in-person interaction with co-workers, patients or residents as part of their job responsibilities.

- Employees who do not receive the first dose of the vaccination by Monday, November 22, 2021 will be placed on a two week unpaid leave. After that time employees who still have not received the first dose will be terminated and receive their accrued unused vacation time in accordance with our normal policies. However, we will maintain health and welfare benefits until the end of the year. Employees who are terminated due to this action and are fully vaccinated within six months of termination will be eligible to return to work in an available position for which they qualify with no loss of seniority.

- During this time, Catholic Health will consider on an individualized basis whether there are reasonable accommodations available, which might permit employees who have applied for an exemption to the vaccine due to their sincerely held religious beliefs to continue working remotely such that there would be no in-person contact with co-workers, patients or residents. We must advise, however, that most if not all of the positions held by those who have applied for religious accommodations require in-person work in covered facilities such that co-workers, patients or residences could be exposed to COVID-19 should the employee become infected.

- As a result, we strongly encourage our employees who have not yet been vaccinated to consider receiving the first dose of the vaccine by Monday, November 22, 2021 in order to ensure their continued employment. We ask that you notify your manager by Friday, November 19th if you intend to receive the vaccination so that work schedules can be planned accordingly.

As we have stated in earlier communications, as a healthcare system operating in the state of New York we are required to follow the directives issued by the NYS DOH and by the courts. We appreciate your patience and understanding as we continue to navigate through this difficult time. In the final analysis, we owe it to our patients to provide the safest environment possible. We greatly appreciate that 93% of our employees have chosen to take the vaccine and hope that we can continue to all work together to ensure that we meet our promise to the patients we serve.

Tony Pellicano

SA-235

12/15/21, 4:03 PM                                    (9) Inbox | ak764@protonmail.com | ProtonMail

Chief HR Officer


(516) 705-3716

tony.pellicano@chsli.org<mailto:tony.pellicano@chsli.org>



[cid:image002.png@01D7DBAF.266FF470]












5.59 KB  🖉 1

        📷 image002.png (5.59 KB)

SA-236

11/29/21, 2:19 PM                                      (1) Sent | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:     Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
        Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:     ak764@protonmail.com <ak764@protonmail.com>

Date:   Monday, November 29th, 2021 at 8:08 AM


Hello Christine.


I am writing this email after I was on a scheduled vacation for the past week. This is in
response to the letter I received about my being placed on "unpaid leave" due to not
receiving the shot.


I want to be very clear. I have no intention of resigning my position as physical
therapist. This was never made as a condition of my employment that I was hired for, to be
involuntarily injected with a shot under experimental use authorization. I have the right
to refuse ANY experimental procedures which this falls under.


I am ready, able and willing to return to work. You have no evidence that proves that I am
a threat to anyone's health over anyone else that is employed by Catholic Health,
including your "vaccinated" staff. According to the CDC and the WHO, those individuals can
be infected and spread the illness called Covid-19. Yet, I, and others like me who know
their rights, are being disciplined and under threat to being fired.


If it is your intention to fire me, I will need a letter stating that I am fired for this
reason and signed by you.


I feel this is an outrageous stance that Catholic Health and you have taken. Saying that
your "hands are tied" is not an excuse. Instead of fighting the unlawfulness of these
"mandates" with your legal team, you have chosen to discipline your faithful employees. No
one should have to face this kind of tyranny.


Sincerely,


Andrew Kosiba, PT, DPT

11/30/21, 9:50 AM                                    (5) Inbox | ak764@protonmail.com | ProtonMail

# Return to work

From:  Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
       Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Tuesday, November 30th, 2021 at 9:47 AM


Hello Christine,


Today is Tuesday, 11/30/2021. I wanted to send this email to emphasize that I am healthy
and I am ready, willing and able to return to work.


Regards,


Andrew Kosiba



Catholic Health
Home Care

December 1, 2021

Andrew Kosiba
33 Neal Path
South Setauket, NY  11720

Dear Andrew:

I write with respect to your request for a religious exemption from the NYS Covid-19 vaccine mandate for healthcare workers.  As we previously communicated, the NYS Department of Health (DOH) and the U.S Court of Appeals for the Second Circuit have directed that religious exemptions from the vaccine mandate are not available.

While religious exemptions from the NYS vaccine mandate are not available, the DOH and the Court of Appeals have authorized religious accommodations in very limited circumstances.  In particular, the DOH and the U.S. Court of Appeals have stated that unvaccinated employees may continue to work for "covered entities" such as Catholic Health Home Care only where they can perform their jobs in a way where if they were to contract COVID-19, they could not potentially expose covered personnel, patients or residents to COVID-19.  In other words, the position must be one in which an unvaccinated employee will not come into contact with patients, residents or co-workers of Catholic Health Home Care. We simply are not permitted to allow unvaccinated employees in covered positions to continue to work even with appropriate PPE and subject to COVID-19 testing.

We have carefully considered your religious accommodation request in accordance with these judicial and regulatory directives.  We have assumed for purposes of this review only that your accommodation request is premised on a sincerely held religious belief.  Having made that assumption, we must next determine whether you are able to perform your work in a manner where you will not come into contact with patients, such as through remote work, so that if you were to contract COVID-19, you could not potentially expose patients, co-workers or residents to COVID-19.

As you know, your position as Physical Therapist requires that you work in-person in patient homes and that you have frequent, direct contact with patients.  Having you perform your work duties in an isolated or remote manner simply is not feasible and would pose an undue hardship for Catholic Health Home Care as it carries out its important health care work.  Similarly, as a regulated health care entity, we must follow the directives of the DOH and the U.S. Court of Appeals.  Not following those directives would pose an undue hardship for Catholic Health Home

SA-239

Care as we would be subject to, among other things, enforcement actions, penalties and even the potential loss of our ability to continue operations.

We regret to inform you of this decision. We hope that you will consider receiving the COVID-19 vaccination during your unpaid leave of absence period so that you can continue in employment with us and return to work. Please feel free to contact me with any questions.


Sincerely,

Christine Bracco
Director of Human Resources
Catholic Health Home Care/Good Shepherd Hospice

SA-240

12/1/21, 10:01 AM                                (5) Inbox | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
       Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Wednesday, December 1st, 2021 at 9:56 AM


```
Hello Christine.


As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare
workers and has deemed the "mandate" put forth by the Biden administration to be
unconstitutional nationwide.


Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I
am ready, willing and able to work. I am no more of a threat to anyone's health than
anyone else who is currently working.


Sincerely,


Andrew Kosiba, PT, DPT
```

SA-241

12/2/21, 8:30 AM                                    (J) Inbox | ak764@protonmail.com | ProtonMail

# Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>
       Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>

CC:    ak764@protonmail.com <ak764@protonmail.com>

Date:  Thursday, December 2nd, 2021 at 8:46 AM


Hello Christine.


Today is 12/2/2021. I wanted to again state that I am healthy, willing, ready and able to
work.


Regards,


Andrew Kosiba, PT, DPT

Case 23-6, Document 49, 04/12/2023, 3497807, Page244 of 286

SA-242

Case 2:21-cv-06416-GRB-ARL   Document 25   Filed 05/18/22   Page 73 of 106 PageID #: 508
12/3/21, 8:53 AM                          (11) Inbox | ak764@protonmail.com | ProtonMail

## Fw: Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:    ak764@protonmail.com <ak764@protonmail.com>

Date: Friday, December 3rd, 2021 at 8:29 AM

```
From: Bracco, Christine
Sent: Thursday, December 2, 2021 10:05 AM
To: Kosiba, Andrew; Nallan-Potter, Elizabeth
Subject: RE: Work


Hi Andrew,


This is in response to your inquiry about the recent court decision in Louisiana, where a
federal district judge issued a temporary injunction against the implementation of the
vaccine mandate for healthcare workers issued by the Centers for Medicare and Medicaid
Services (CMS).  That ruling only applies to the CMS vaccine mandate and was premised on a
determination that CMS, as an administrative agency, lacked the authority to issue a
vaccine mandate.  It has nothing at all to do with the New York State vaccine mandate for
healthcare workers which was upheld by the U.S. Court of Appeals for the 2nd Circuit,
which is the highest federal court with jurisdiction over New York (apart from the U.S.
Supreme Court).  The New York State vaccine mandate for healthcare workers remains in
effect and we continue to be subject to it as a health care entity regulated by the NYS
Department of Health.


Chris




From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, December 1, 2021 9:57 AM
To: Bracco, Christine <Christine.Bracco@chsli.org>; Nallan-Potter, Elizabeth
<Elizabeth.Nallan-Potter@chsli.org>
Cc: ak764@protonmail.com
Subject: Work




Hello Christine.
```

12/3/21, 8:53 AM                                          (11) Inbox | ak784@protonmail.com | ProtonMail

As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare workers and has deemed the "mandate" put forth by the Biden administration to be unconstitutional nationwide.


Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I am ready, willing and able to work. I am no more of a threat to anyone's health than anyone else who is currently working.


Sincerely,


Andrew Kosiba, PT, DPT

SA-244

12/3/21, 8:57 AM                                                    (10) Inbox | ak764@protonmail.com | ProtonMail

# Fw: Work

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:     ak764@protonmail.com <ak764@protonmail.com>

Date: Friday, December 3rd, 2021 at 8:41 AM

```
From: Kosiba, Andrew
Sent: Friday, December 3, 2021 8:41 AM
To: Bracco, Christine; Nallan-Potter, Elizabeth
Subject: Re: Work


Hello Christine,


The judge who ruled in the case in Louisiana ruled that the mandate is unconstitutional.
If it is unconstitutional then that means across the board against the constitution. I
feel that Catholic Health is entering into dangerous territory under the color of law.
Also, the behavior of Catholic Health and it's employees is unlawful against the ADA and
Civil Rights Act which was my point from the beginning. Many healthcare entities in many
states are backing away from the mandates already. I really feel that Catholic Health
should also reconsider.


I also reiterate that today is 12/3/2021 and I am healthy, able, willing and ready to
work. Your excuse that I would be a danger to anyone I treat as a patient any more than
any "vaccinated" employee is erroneous and false as per the studies that show that
"vaccinated" people can also get infected and spread the "virus".


Sincerely,


Andrew Kosiba, PT, DPT


From: Bracco, Christine
Sent: Thursday, December 2, 2021 10:05 AM
To: Kosiba, Andrew; Nallan-Potter, Elizabeth
Subject: RE: Work


Hi Andrew,


This is in response to your inquiry about the recent court decision in Louisiana, where a
```

**SA-245**

12/3/21, 6:57 AM                          ProtonMail | Inbox | ak764@protonmail.com | ProtonMail

federal district judge issued a temporary injunction against the implementation of the vaccine mandate for healthcare workers issued by the Centers for Medicare and Medicaid Services (CMS).  That ruling only applies to the CMS vaccine mandate and was premised on a determination that CMS, as an administrative agency, lacked the authority to issue a vaccine mandate.  It has nothing at all to do with the New York State vaccine mandate for healthcare workers which was upheld by the U.S. Court of Appeals for the 2nd Circuit, which is the highest federal court with jurisdiction over New York (apart from the U.S. Supreme Court).  The New York State vaccine mandate for healthcare workers remains in effect and we continue to be subject to it as a health care entity regulated by the NYS Department of Health.

Chris

From: Kosiba, Andrew <Andrew.Kosiba@chsli.org>
Sent: Wednesday, December 1, 2021 9:57 AM
To: Bracco, Christine <Christine.Bracco@chsli.org>; Nallan-Potter, Elizabeth <Elizabeth.Nallan-Potter@chsli.org>
Cc: ak764@protonmail.com
Subject: Work

Hello Christine.

As you may or may not know, yesterday, a federal judge has ruled in favor of healthcare workers and has deemed the "mandate" put forth by the Biden administration to be unconstitutional nationwide.

Today is Wednesday, December 1, 2021. I wanted again to reiterate that I am healthy and I am ready, willing and able to work. I am no more of a threat to anyone's health than anyone else who is currently working.

Sincerely,

Andrew Kosiba, PT, DPT

SA-246

12/3/21, 9:02 AM | (9) Inbox | ak764@protonmail.com | ProtonMail

# Re: Religious Exemption

From: Andrew.Kosiba@chsli.org <Andrew.Kosiba@chsli.org>

To:   Christine.Bracco@chsli.org <Christine.Bracco@chsli.org>

CC:   ak764@protonmail.com <ak764@protonmail.com>

Date: Friday, December 3rd, 2021 at 8:50 AM

Hello Christine,

In response to this email, I want to reiterate that I pose no more danger to any of my patients than any "vaccinated" employee as per the science. They can become infected and they can spread the infection as you assume that I would.

I am also reiterating that I am not resigning my position and if you intend to fire me over this then I want a signed letter stating this.

Sincerely,

Andrew Kosiba, PT, DPT

From: Bracco, Christine
Sent: Thursday, December 2, 2021 9:10 AM
To: Kosiba, Andrew
Subject: Religious Exemption

Hi Andrew,

I write with respect to your request for a religious exemption from the NYS Covid-19 vaccine mandate for healthcare workers.  As we previously communicated, the NYS Department of Health (DOH) and the U.S Court of Appeals for the Second Circuit have directed that religious exemptions from the vaccine mandate are not available.

While religious exemptions from the NYS vaccine mandate are not available, the DOH and the Court of Appeals have authorized religious accommodations in very limited circumstances. In particular, the DOH and the U.S. Court of Appeals have stated that unvaccinated employees may continue to work for "covered entities" such as Catholic Health Home Care only where they can perform their jobs in a way where if they were to contract COVID-19, they could not potentially expose covered personnel, patients or residents to COVID-19. In other words, the position must be one in which an unvaccinated employee will not come into contact with patients, residents or co-workers of Catholic Health Home Care. We simply are not permitted to allow unvaccinated employees in covered positions to continue

SA-247

12/3/21, 9:02 AM                                       ProtonMail | akrdc@protonmail.com | ProtonMail

to work even with appropriate PPE and subject to COVID-19 testing.

We have carefully considered your religious accommodation request in accordance with these judicial and regulatory directives. We have assumed for purposes of this review only that your accommodation request is premised on a sincerely held religious belief. Having made that assumption, we must next determine whether you are able to perform your work in a manner where you will not come into contact with patients, such as through remote work, so that if you were to contract COVID-19, you could not potentially expose patients, co-workers or residents to COVID-19.

As you know, your position as Physical Therapist requires that you work in-person in patient homes and that you have frequent, direct contact with patients. Having you perform your work duties in an isolated or remote manner simply is not feasible and would pose an undue hardship for Catholic Home Care as it carries out its important health care work. Similarly, as a regulated health care entity, we must follow the directives of the DOH and the U.S. Court of Appeals. Not following those directives would pose an undue hardship for Catholic Health Home Care as we would be subject to, among other things, enforcement actions, penalties and even the potential loss of our ability to continue operations.

We regret to inform you of this decision. We hope that you will consider receiving the COVID-19 vaccination during your unpaid leave of absence period so that you can continue in employment with us and return to work. Please feel free to contact me with any questions.

Chris

Christine Bracco

Director of Human Resources

Catholic Health Home Care/Good Shepherd Hospice

(631) 828-7603 (Tel)

(631) 566-5656 (Cell)

(631) 828-7610 (Fax)

christine.bracco@chsli.org<mailto:christine.bracco@chsli.org>

110 Bi-County Blvd, Suite 114

Farmingdale, NY  11735

SA-248

12/3/21, 9:02 AM

(9) Inbox | ak764@protonmail.com | ProtonMail

SA-249



**Catholic Home Care**

Catholic Health Services
At the heart of health

December 7, 2021

Andrew Kosiba
33 Neal Path
South Setauket, NY  11720

Dear Andrew:

As of Monday December 6, 2021, you have not notified us of your vaccination status being in compliance with the New York State Department of Health mandate requiring covered healthcare facility employees in New York receive the first dose of the COVID 19 vaccination. You have been previously notified that given the nature of your work responsibilities we are unable to grant your requested religious accommodation. Further, the two week unpaid furlough that began in late November ended Monday, December 6, 2021.

I regret to inform you that your employment with Catholic Health Home Care is being terminated, effective immediately. If you prefer to have this action recorded as a resignation, please submit a letter of resignation to the Human Resources department. In either case, you will continue to receive health benefits through the end of December and the contribution for December will be deducted from your final pay. If you do not have final pay to cover this cost you will need to self-pay the contribution directly to Baker Tilley.

If you have been vaccinated, please contact me immediately so any discrepancy in our records can be resolved. Also, if you decide to get vaccinated in the future please contact me to discuss possible return to work options.

Please make arrangements to return all Catholic Health Home Care property, including your company-issued laptop, with your Manager.

On behalf of Catholic Health Home Care, we wish you the best in your future professional endeavors. Please contact me at (631) 828-7603 if you have any questions or need assistance.

Sincerely,

Christine Bracco
Director of Human Resources
Catholic Health Home Care/Good Shepherd Hospice

110 Bi-County Blvd, Suite 114 • Farmingdale, NY  11735
Direct: 631-828-7400 • Fax: 631-828-7475

 **Catholic Health**
Home Care

 **Catholic Health**
Good Shepherd Hospice

December 8, 2021

Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

Dear Andrew:

Your employment with Catholic Health will end on **12/6/2021.** If you are enrolled in the Benefits of Caring Program, your medical, prescription, dental, and vision coverage (if enrolled) will remain active through the end of the month of your employment termination date, and all other benefits will terminate on your last day of employment.

**Continuation of Coverage: Medical, Prescription, and/or Dental Coverage**
If you (and your dependents, if applicable), are enrolled in medical/prescription and/or dental coverage, you will be eligible to continue this coverage for yourself and/or your dependents. You will receive a separate packet in the mail to your home address from Baker Tilly regarding your continuation of coverage, which includes information including cost and the duration of your continuation eligibility.

You have a limited number of days to elect continuation coverage, so if you do not receive the packet within two weeks from your separation date, please contact **MyHR at 516-705-6947** or email chsbenefits@chsli.org.

As a reminder, you may only continue medical (including prescription) and/or dental coverage through continuation of coverage only if you are currently enrolled. If you have any questions related to your continuation of coverage, please contact Baker Tilly at 1-800-307-0230.

Listed below is the contact information, for questions related to ID cards, network providers, claims, etc.
- Medical (Empire BlueCross BlueShield): 1-800-496-6132, www.empireblue.com
- Prescription (OptumRX): 1-844-642-9089 http://www.optumrx.com
- Dental (Cigna): 1-800-244-6224, www.cigna.com

**Vision Coverage**
If enrolled, your vision coverage through the Blue View Vision Plus Plan will continue through the end of the month of your employment termination date.  For questions, visit www.empireblue.com or call 1-866-723-0515.

**Life Insurance and Disability Coverage**
Life Insurance, Short-Term Disability, and Long-Term Disability coverage will end on your last day of employment.

You may be eligible to convert your group life insurance to an individual policy, and will receive a packet in the mail to your home address from Prudential with more information.  Please contact Prudential at 1-877-889-2070 for questions related to conversion of coverage.

**Health Care Flexible Spending and Dependent Care Flexible Spending Accounts**
Your Health Care and/or Dependent Care Flexible Spending Account will terminate on your last day of employment.

You have until December 31st of the year your employment ends to submit eligible expenses to Baker Tilly for reimbursement.  In order to be eligible for reimbursement, the expense must be incurred prior to the termination date.

Please contact Baker Tilly at 1-800-307-0230 (Prompt 9), or online at www.myflexdollars.com for information related to the Health Care and/or Dependent Care Flexible Spending Accounts.

**Transit Flexible Spending Account**
If you have a transit pass/voucher, you can continue to use the remaining balance.  Please do not send your current pass/voucher back to WageWorks/Conexis.
If you have a commuter parking election with a balance on the account and you did not use Wire Commuter to purchase your parking pass/voucher, you can file a claim by submitting receipts to WageWorks/Conexis.  Please note that you must submit the claim to WageWorks/Conexis no later than March 31st of the following year, but not to exceed 180 days from the date on the receipt.
If you need a parking claim form or have any questions, please contact WageWorks/Conexis at 1-866-599-3061.

**Pension Plan**
Please contact the Diocese of Rockville Centre Pension Department at 516-678-5800 X 259 or email hr@drvc.org.

**403(b) Plan**
Your contributions will conclude with your last paycheck as an active employee.  Please contact your 403(b) Plan provider for details:

Mutual of America: 516-937-9177    TransAmerica: 631-495-0318
HANYS: 1-800-433-9832              Fidelity: 1-800-343-0860

**Critical Illness Insurance, Accident Insurance, Hospital Indemnity Insurance**
Please contact MetLife for Accident Insurance and Hospital Indemnity Insurance information at 1-800-438-6388.

**Legal Plan:**  1-800-821-6400 Identity Theft Protection Plan: 1-800-789-2720

**529 College Savings Plan**
Please contact the vendor directly to discuss options by calling 1-800-420-8580, or visit www.ny529atwork.com.

**Work/Life Assistance Plan**
The Work/Life Assistance Plan through Corporate Counseling Associates (CCA) is an available resource for you even after your employment ends.  Please contact CCA by calling 1-800-833-8707 or visit www.myccaonline.com (Company Code: CHS) for more information.

Very truly yours,

Christine Bracco
Director of Human Resources
Catholic Home Care/Good Shepherd Hospice

SA-252

# EXHIBIT B

Guidance for Industry and FDA

SA-253

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff

## *FINAL GUIDANCE*

*Additional copies are available from:*
*Office of Combination Products*
*Food and Drug Administration*
*WO32, Hub/Mail Room #5129*
*10903 New Hampshire Avenue*
*Silver Spring, MD 20993*
*(Tel) 301-796-8930*
*(Fax) 301-847-8619*
*http://www.fda.gov/CombinationProducts/default.htm*

For questions regarding this document contact the Office of Combination Products at 301-796-8930 or combination@fda.gov.

**U.S. Department of Health and Human Services**
**Food and Drug Administration**
**Office of Combination Products**
**Office of Special Medical Programs**
**Office of the Commissioner**

**September 2017**

SA-254

*Contains Nonbinding Recommendations*

## Table of Contents

I.  **INTRODUCTION** ................................................................................2

II.  **WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?** ...........................................3

III.  **WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?** ................................................4

    A.  STATUTORY DEFINITIONS ................................................................5

        1.  *Drug* ........................................................................................5

        2.  *Device* ......................................................................................5

    B.  CERTAIN KEY PROVISIONS OF THE DEFINITION OF DEVICE ........................5

        1.  *"Similar or related article" in the definition of device* ................6

        2.  *"Primary intended purposes" in the definition of device* .............6

        3.  *"Chemical action" in the definition of device* ...........................7

        4.  *"Within or on the body" in the definition of device* ...................7

        5.  *Illustrative Examples* ...............................................................8

    C.  HOW IS A PRODUCT CLASSIFIED IF IT MEETS THE DEFINITION FOR DRUG (OR FOR BOTH DRUG AND DEVICE) AND ALSO MEETS THE DEFINITION FOR BIOLOGICAL PRODUCT? ................................10

IV.  **ADDITIONAL INFORMATION** ...........................................................11

**FREQUENTLY ASKED QUESTIONS** ...........................................................12

*Contains Nonbinding Recommendations*

# Classification of Products as Drugs and Devices & Additional Product Classification Issues: Guidance for Industry and FDA Staff[1]

> This guidance represents the current thinking of the Food and Drug Administration (FDA or Agency) on this topic. It does not establish any rights for any person and is not binding on FDA or the public. You can use an alternative approach if the approach satisfies the requirements of the applicable statutes and regulations. To discuss an alternative approach, contact the FDA office responsible for this guidance as listed on the title page of this guidance.

## I.   INTRODUCTION[1]

FDA regularly receives questions from medical product sponsors concerning the classification of their products.[2] We believe that efficient, effective regulation is facilitated by providing guidance on issues frequently raised in relation to Requests for Designation (RFDs) and other classification activities. In addition, providing as much clarity and predictability as possible with respect to product classifications should enable informed planning for product development. Accordingly, we have prepared this guidance to make the Agency's current thinking concerning certain product classification issues more readily and widely available.

While issues have arisen relating to whether a product should be classified as a drug, device, biological product, or combination product, most of these issues have related to whether a product should be classified as either a drug or a device.[3] Accordingly, this guidance focuses particularly on cases in which a product[4] may be classified as a drug or device.[5] This guidance also addresses additional issues relating to product classification, including how to obtain classification determinations from FDA for medical products.

This guidance is organized into two substantive sections.

---

[1] This guidance has been prepared by the Office of Combination Products in consultation with the Center for Biologics Evaluation and Research, the Center for Devices and Radiological Health, and the Center for Drug Evaluation and Research.

[2] Please note that "classification" as used in this guidance refers to a product's designation as a drug, device, biological product, or combination product. This is distinct from the use of the term "classification" in reference to the class (Class I, II, or III) of a device as described in section 513(a) of the Federal Food, Drug, and Cosmetic Act (FD&C Act).

[3] This guidance addresses the definitions for the terms drug, device, and biological product in section III. The term "combination product" is defined in 21 CFR 3.2(e). For further information regarding the definition for the term combination product and the regulation of combination products, please visit the webpage for the Office of Combination Products at www.fda.gov/CombinationProducts/default.htm.

[4] The guidance's discussion of the classification of products is also relevant to classification of the constituent parts of a combination product.

[5] This guidance focuses on classification of products for human use. Distinct considerations may apply in determining how to classify a product intended for use in animals.

*Contains Nonbinding Recommendations*

Section II offers guidance on the RFD process for obtaining a formal determination of a product's classification.

Section III presents general concepts regarding FDA's decision-making process for classification determinations and addresses issues that may arise in determining whether products should be classified as drugs or devices.[6]

The Agency recommends that sponsors contact the Office of Combination Products (OCP) to confirm the classification of any products they may wish to market if the appropriate classification is unclear or in dispute.  Section IV provides contact information for OCP and responses to frequently asked questions.

FDA's guidance documents, including this guidance, do not establish legally enforceable responsibilities.  Instead, guidances describe the Agency's current thinking on a topic and should be viewed only as recommendations, unless specific regulatory or statutory requirements are cited.  The use of the word "should" in Agency guidances means that something is suggested or recommended, but not required.

## II.    WHAT IS THE PROCESS FOR OBTAINING A FORMAL CLASSIFICATION DETERMINATION FOR A PRODUCT?

If the classification of a product as a drug, device, biological product, or combination product is unclear or in dispute, a sponsor can submit an RFD to OCP in accordance with Part 3 of Title 21 of the Code of Federal Regulations (21 CFR Part 3) to obtain a formal classification determination for the product, as provided for under section 563 of the FD&C Act (21 USC 360bbb-2).  Any RFD determined to be incomplete will be returned to the sponsor with a request for the missing information.[7]  21 CFR 3.8(a).  Once OCP determines the RFD is complete for filing, the Agency reviews the RFD.

The sponsor recommends a classification in the RFD, and should explain the basis for the recommendation.  While the sponsor should justify why it believes the product meets the recommended classification, we generally consider both the information provided in the RFD and other information available to the Agency at that time in making our designation.

Generally, OCP will respond to the sponsor in writing within sixty days of the RFD filing, identifying the classification of the product as a drug, device, biological product, or

---

[6] This section generally focuses on approaches for determining whether a product should be classified as a drug or a device, based on application of the statutory definitions for these terms under sections 201(g) and 201(h) of the FD&C Act (21 USC 321(g) and (h)), respectively.  Please note that this document does not focus on the classification of products as biological products regulated under section 351(i) of the Public Health Service Act (PHS Act) (42 USC 262(i)).  It also does not address under what circumstances certain human cells, tissues, or cellular or tissue-based products (HCT/Ps), as defined in 21 CFR Part 1271, are regulated solely under section 361 of the PHS Act.  For guidance concerning HCT/Ps, please visit http://www.fda.gov/BiologicsBloodVaccines/GuidanceComplianceRegulatoryInformation/Guidances/Tissue/.
[7] See 21 CFR 3.7 for content requirements for RFDs.

3

*Contains Nonbinding Recommendations*

combination product. If the Agency does not provide a written response within sixty days, the sponsor's recommendation respecting the classification of the product is considered to be the final determination. 21 USC 360bbb-2(b) and (c).

RFD determinations pertain only to the product as described in the designation letter, including its proposed use(s) or indication(s) for use. The Agency may modify a determination made under section 563 regarding the classification of a product or the component of FDA that will regulate the product either with the written consent of the sponsor or for public health reasons based on scientific evidence. 21 USC 360bbb-2(b) and (c).[8]

A new determination may be appropriate if there is a change in, for example, a proposed indication for use or in a component of the product, or if the sponsor or Agency becomes aware of additional information that reveals that the means by which the product achieves its primary intended purposes differ from what was originally described in the RFD. For example, if a sponsor wished to change the indication for a product and that new indication would be achieved through a different mechanism than the original indication, a different classification for the new indication might be appropriate.

Please contact OCP if you have questions regarding whether to submit an RFD, what information to provide, or issues to address in an RFD to ensure its completeness and clarity.[9]

## III.   WHAT DOES FDA CONSIDER IN DETERMINING WHETHER TO CLASSIFY A PRODUCT AS A DRUG OR DEVICE?

FDA's determination of whether to classify a product as a drug or device is based on statutory definitions, as set forth in sections 201(g) and 201(h) of the FD&C Act, respectively. We apply these definitions to products, relying on the scientific data that are available to FDA at the time of the classification determination concerning the product for its proposed use(s)/indication(s).[10]

---

[8] The sponsor may request reconsideration of the decision if its classification recommendation is not adopted by the Agency. See 21 CFR 3.8, 10.75. If the sponsor develops or becomes aware of new information that may affect the product's classification, the sponsor may also submit a new RFD seeking a new determination.

[9] More detailed information on the RFD process is provided in OCP's guidance *How to Write a Request for Designation (RFD)*, available at http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm. A pre-RFD process is available if a sponsor wishes to obtain a preliminary, non-binding classification determination or to engage in preliminary classification discussions with the Agency before filing a formal RFD. The RFD and pre-RFD processes are also available to sponsors to clarify the Center assignment for medical products, though this issue is beyond the scope of this guidance. More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf.

[10] If a product type has been classified by regulation, FDA would generally classify the product (including as a constituent part of a combination product) in accordance with the regulation, if the product (or constituent part) falls within the scope of that regulation. If the Agency concludes that it may be appropriate to propose changing a classification established by regulation, FDA would initiate notice and comment rulemaking to do so.[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

SA-258

*Contains Nonbinding Recommendations*

Medical product classification determinations often focus substantially on whether a product that meets the definition of drug also meets the statutory definition of device. This section presents the drug and device definitions and discusses how the Agency addresses certain issues that arise when determining whether a product should be classified as a drug or device.

**A.    Statutory Definitions**

**1.    Drug**

Section 201(g) of the FD&C Act (21 USC 321(g)) provides that the term "drug" means:

> (A) articles recognized in the official United States Pharmacopoeia, official Homoeopathic Pharmacopoeia of the United States, or official National Formulary, or any supplement to any of them; and (B) articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals; and (C) articles (other than food) intended to affect the structure or any function of the body of man or other animals; and (D) articles intended for use as a component of any articles specified in clause (A), (B), or (C). . . .

**2.    Device**

Section 201(h) of the FD&C Act (21 USC 321(h)) provides that the term "device" means:

> an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article, including any component, part, or accessory, which is--
> (1) recognized in the official National Formulary, or the United States Pharmacopoeia, or any supplement to them,
> (2) intended for use in the diagnosis of disease or other conditions, or in the cure, mitigation, treatment, or prevention of disease, in man or other animals, or
> (3) intended to affect the structure or any function of the body of man or other animals, and
>
> which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals and which is not dependent upon being metabolized for the achievement of its primary intended purposes.

**B.    Certain key provisions of the definition of device**

Conceptually, all FDA-regulated medical products meet the definition of "drug" under section 201(g) of the FD&C Act, due to the broader scope of the drug definition. For a medical product also to meet the more restrictive device definition under section 201(h) of the FD&C Act, it must (i) be "an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or other similar or related article," and (ii) "*not* achieve its primary intended purposes through *chemical action* within or on the body of man or other animals" and (iii) "*not* [be] dependent upon being *metabolized* for the achievement of its primary intended purposes" (emphasis added).

5

*Contains Nonbinding Recommendations*

The sponsor presumably has the most complete information relevant to how its proposed product achieves its primary intended purpose(s). Sponsors seeking a classification determination should present all available data and other information potentially relevant to that determination (without regard to whether the data or information supports the sponsor's preferred outcome). For example, for a sponsor seeking to classify its proposed product as a device, those data should demonstrate that its product meets the definition of a device.

At the classification stage, sponsors would not be expected to have gathered sufficient data to demonstrate that their proposed product meets the applicable marketing authorization standard (e.g., data demonstrating effectiveness). Therefore, the focus of FDA's classification analysis is on how the product would be expected to achieve its primary intended purposes, assuming it is capable of achieving its primary intended purposes at all. FDA will use its best scientific judgment to evaluate all available information relevant to the classification determination, including information submitted by the sponsor or available in the literature.

The following discussion presents the Agency's current thinking on certain issues that arise with respect to the statutory definition of device.

### 1. "Similar or related article" in the definition of device

The first clause of the device definition provides that the term "means an instrument, apparatus, implement, machine, contrivance, implant, in vitro reagent, or *other similar or related article* . . ." (emphasis added). The issue of whether a product may be considered a "similar or related article" under this clause can arise, for example, with regard to products in liquid, semi-liquid, gel, gas, or powder form. In some cases, such products are appropriately considered "similar or related articles," and may be classified as devices, so long as they also satisfy the remainder of the device definition under section 201(h) of the FD&C Act, including the chemical action exclusion discussed in section III.B.3 below. This could be the case, for example, for gels or powders put on the skin as a barrier, gases used as space fillers, or liquids used to clean either surgical instruments or contact lenses.

### 2. "Primary intended purposes" in the definition of device

Most often, in determining whether a product meets the device definition, questions arise concerning the exclusionary clause of the definition, which provides that a device is a product "which does not achieve its primary intended purposes through chemical action within or on the body of man or other animals . . . ."[11] A product that has chemical action could be a device if it does not achieve its primary intended purposes through that chemical action.

---

[11] The device definition also includes a second exclusionary clause stating that a device "is not dependent upon being metabolized for the achievement of its primary intended purposes." This clause has not been at issue frequently in classification determinations. Accordingly, we do not offer guidance on its construction here. If sponsors have questions regarding the Agency's interpretation of this clause, they may contact OCP.

6

*Contains Nonbinding Recommendations*

For example, if the primary intended purpose of a hip joint replacement implant is to restore movement, and the implant also elicits a foreign body response through chemical action, that response would not be considered a primary intended purpose of the implant. Accordingly, such an implant could be classified as a device despite the chemical action, because such action does not achieve the product's primary intended purpose. Similarly, if the primary intended purpose of an absorbable suture is to rejoin tissue, and the suture is also designed to be resorbed by the body through a combination of chemical action and metabolic activities, such resorption would not be considered a primary intended purpose of the product. Accordingly, such an absorbable suture could be classified as a device despite the chemical action and metabolic activity, because such action or activity does not achieve the product's primary intended purpose.

### 3.   "Chemical action" in the definition of device

FDA frequently receives questions from product sponsors concerning the Agency's interpretation of the term "chemical action." This term must be read in the context of the statutory definition of "device" as a whole. The determination of whether a product meets the device definition does not depend solely on whether the product exhibits "chemical action." In particular, as explained in section III.B.2 and 4, a product that exhibits chemical action will still meet the device definition if the product "does not achieve its primary intended purposes through" that chemical action "within or on the body," and otherwise satisfies the device definition.

Under the Agency's interpretation of the device definition, a product exhibits "chemical action" if it interacts at the molecular level with bodily components (e.g., cells or tissues) to mediate (including promoting or inhibiting) a bodily response, or with foreign entities (e.g., organisms or chemicals) so as to alter that entity's interaction with the body.[12] We note that this type of interaction is consistent with the term "pharmacological action" as that term is generally understood in the medical field. Accordingly, we have used "pharmacological action" as a short-hand throughout the rest of this guidance for ease of explication and recognition. The examples presented in section III.B.5 offer illustration of FDA's interpretation of chemical action.

### 4.   "Within or on the body" in the definition of device

Because a device "does not achieve its primary intended purposes through chemical action *within or on the body* of man or other animals" (emphasis added), a product can be a device even if it achieves its primary intended purposes through chemical action, so long as the chemical action does not occur "within or on the body" (and the product meets the other elements of the definition of device under section 201(h)).

Whether chemical action is occurring "within or on the body" is generally a straightforward matter. If the chemical action is occurring inside the body or on the surface of the body, it is within or on the body. For example, the chemical action of an orally ingested pill

---

[12] For purposes of this interpretation, an interaction at the molecular level occurs through either chemical reaction (i.e., formation or breaking of covalent or ionic bonds), intermolecular forces (e.g., electrostatic interactions), or both. The mere exchange of non-chemical energy (e.g., electromagnetic or thermal energy) between a product and the body would not constitute "chemical action."

SA-261

*Contains Nonbinding Recommendations*

or tablet of a decongestant would be "within the body," and the chemical action of a spray or cream for treatment of dermatitis when applied to the skin would be "on the body." Similarly, it is generally a straightforward matter to determine that chemical action is not occurring within or on the body. For example, the chemical action of an antimicrobial agent used to clean a surgical instrument before that instrument is used is not occurring within or on the body.

However, the Agency has on occasion considered some situations in which it may be less clear whether chemical action is occurring within or on the body. For example, we have determined that chemical action occurring solely within an extracorporeal device, specifically a kidney hemodialysis machine, is not occurring within or on the body. Similarly, we have determined that the chemical action of a transport solution to preserve a donor organ for transplantation while in an organ transport container is not occurring within or on the body.

   5.   **Illustrative Examples**

The following examples further illustrate the application of some of the key provisions of the device definition discussed above. Table 1 contains some examples of medical products that achieve their primary intended purposes through chemical action within or on the body. Table 2 contains some examples of medical products that do not achieve their primary intended purposes through chemical action within or on the body.

**Table 1:  Examples of Medical Products that Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
|---------|-------------|
| Aspirin | Aspirin is used for pain relief. Acetylsalicyclic acid (aspirin) contains an acetyl group that has the ability to covalently bind to a serine residue of a cyclooxygenase enzyme (COX-1 or COX-2). This is considered pharmacological action because it inactivates the enzyme and thereby inhibits the synthesis of prostaglandin and thromboxanes, which suppresses the body's inflammatory response for pain relief. |
| Beta Blockers | Beta blockers are used to reduce blood pressure. Cells contain beta receptors that can be stimulated by neurotransmitters such as adrenaline/epinephrine. Beta blockers, like propranolol, bind beta receptors (b1 and b2) and exhibit pharmacological action by inhibiting the activation of the signaling cascade. This blockage causes cardiac cells to reduce the strength of cardiac contractions and heart rate. |
| Magnesium Sulfate | Magnesium sulfate is used as replacement therapy for magnesium deficiency. It acts as a catalyst in enzymatic reactions (a molecular-level interaction). While the chemical or atomic structure of magnesium sulfate is not altered, its participation in enzymatic reactions is considered a pharmacological action because it impacts various cellular and molecular processes. |

8

*Contains Nonbinding Recommendations*

| Polymyxin B Sulfate | Polymyxin B sulfate is an antibiotic that is used to treat bacterial infection. It is composed of a cationic protein surfactant that has fatty acid functional groups. Polymyxin B sulfate acts through intermolecular forces, by binding to components of the bacterial membrane (i.e., the membrane of the foreign entity) and by association/fusion of the fatty acid portion of the molecule with the lipid bilayer via hydrophobic interactions.  This binding is a pharmacological action because it disrupts the integrity of the bacterial membrane, which causes organism death, thereby treating the bacterial infection. |
| --- | --- |
| Hydroxocobalamin | Hydroxocobalamin is used as an antidote to cyanide poisoning. The cobalt moiety of hydroxocobalamin exhibits pharmacological action because it chemically reacts with cyanide, a toxic chemical agent, to form cyanocobalamin, a non-toxic compound, and the ability of hydroxocobalamin to interact with cyanide facilitates the removal of the toxic agent in order to inhibit the toxic effects of cyanide on the body. |

**Table 2:   Examples of Medical Products That Do Not Achieve Their Primary Intended Purposes through Chemical Action within or on the Body**

| Product | Description |
| --- | --- |
| Abdominal Adhesion Barrier | Inert, biodegradable synthetic polymers can be used to reduce post-operative adhesions with tissues and organs within the abdominal cavity. An implanted physical barrier sheet composed of such polymers would act to reduce adhesion through physical separation of tissue and not through pharmacological action on the surrounding tissue. |
| Polymethylmethacrylate (PMMA) | PMMA is an acrylate polymer that is used as a temporary bone spacer. PMMA is built from methyl methacrylate monomer units, which undergo free radical polymerization in the presence of an initiator compound. The molecules that are part of the polymerization process interact with each other to create a solid mass to fill a bone void physically. The process does not require an interaction between the PMMA and the bone at the molecular level and, therefore is not considered chemical action within or on the body. |
| Topical Surgical Adhesive | Cyanoacrylate is an acrylic resin that is used to approximate skin tissue as an adjunct to a wound closure product. The resin undergoes anionic polymerization in the presence of water. The chemical reaction that occurs between the resin and ions in the water allows it to form into long polymer chains. This type of adhesive can bond to a cut/incision, creating a physically-intact film to aid in keeping skin edges together.  While the product binds to tissue, it does not exhibit pharmacological action because that binding does not mediate a bodily response. |

*Contains Nonbinding Recommendations*

| Gold Nanoparticles | Nanoparticles composed of gold can be used to treat cancer. When gold nanoparticles are injected into a tumor site and exposed to electromagnetic energy, they absorb the electromagnetic energy and convert it to thermal energy, and this heat is transferred to the surrounding cells or tissue.  The heat transfer, as opposed to a binding interaction with the nanoparticle, causes the cancer cells to die. Therefore, this effect is not achieved through chemical action. |
|---|---|
| Cryosurgery for Wart Removal | Cryogen (liquid gas), such as nitrogen or dimethyl ether, is used to treat common and plantar warts. The liquid gas is extremely cold and freezes the wart, resulting in damage to the topmost layer of cells.  A physiological effect (i.e., cell death) results from heat transfer, not from a binding interaction with the gas.  Therefore, the freezing is not considered chemical action. |
| Dental Amalgam | A resin that fills a cavity in a tooth as part of the treatment of dental caries may bind to the tooth via covalent bonding, or rely in part on intermolecular forces to change from liquid or paste to solid form.  However, this binding and/or state change does not mediate a bodily response, but rather produces a solid mass, to fill the cavity. Therefore, it would not be considered chemical action. |
| Respirator Mask with Antimicrobial Filter | An antimicrobial product impregnated into a filter on a respirator mask to kill microbes that the user might otherwise inhale would exhibit pharmacological action.  However, while the mask is in contact with the user's face, the filter is not.  So, the chemical action occurring on the filter is not occurring within or on the body. |

C.    **How is a product classified if it meets the definition for drug (or for both drug and device) and also meets the definition for biological product?**

As explained in section III.B, products that meet the device definition in 201(h) of the FD&C Act also meet the drug definition in 201(g) of the FD&C Act.  In addition, products that meet the drug definition, or both the drug and device definitions, may also meet the definition of biological product under section 351(i) of the PHS Act (42 USC 262(i)).

Section 351(i) provides that:

The term "biological product" means a virus, therapeutic serum, toxin, antitoxin, vaccine, blood, blood component or derivative, allergenic product, protein (except any chemically synthesized polypeptide),[13] or analogous product, or arsphenamine or derivative of arsphenamine (or any other trivalent organic arsenic compound), applicable to the prevention, treatment, or cure of a disease or condition of human beings.

---

[13] For guidance on FDA's interpretation of the category "protein (except any chemically synthesized polypeptide)" see *Biosimilars:  Questions and Answers Regarding Implementation of the Biologics Price Competition and Innovation Act of 2009*, at Q.II.1 (April 2015), *available at* http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/UCM444661.pdf.

*Contains Nonbinding Recommendations*

Products that meet the drug definition and that also meet the definition of biological product are classified as biological products, and are generally subject to licensure under the PHS Act.[14] Products that meet the definitions for drug, device, and biological product may also be classified as biological products. If you have questions regarding whether a product meets the definition of biological product or how this might affect its classification, please contact OCP.

## IV.    ADDITIONAL INFORMATION

For further information on the classification of products as devices, drugs, biological products, or combination products, please refer to the Frequently Asked Questions on the next page, OCP's webpage at https://www.fda.gov/CombinationProducts/default.htm or contact OCP at:

> Office of Combination Product
> Food and Drug Administration
> WO32, Hub/Mail Room #5129
> 10903 New Hampshire Avenue
> Silver Spring, MD 20993
>
> (Tel) 301-796-8930
> (Fax) 301301-847-8619
> combination@fda.gov

---

[14] Certain biological products have been historically approved under the FD&C Act and may continue to be subject to approval under the FD&C Act until March 23, 2020. See Section 7002(e) of the Biological Price Competition and Innovation Act of 2009; see also FDA, *Implementation of the "Deemed to be a License" Provision of the Biologics Price Competition and Innovation Act of 2009, available at* https://www.fda.gov/ucm/groups/fdagov-public/@fdagov-drugs-gen/documents/document/ucm490264.pdf.

*Contains Nonbinding Recommendations*

## FREQUENTLY ASKED QUESTIONS

1. Can a product be classified as a device if it exhibits "chemical action"?

   Yes, if the product does not achieve its primary intended purposes through chemical action within or on the body and otherwise meets the definition of a device. However, products that meet the device definition may be regulated as drugs or biological products in some cases. See question 2.

2. If a product meets the definition for drug at 21 USC 321(g) and for device at 21 USC 321(h), how is it classified?

   Generally, the product would be classified as a device, unless it falls within a special category (for example, apparatuses used in the preparation of compounded positron emission tomography drugs are classified as drugs, see 21 USC 321(ii)).

3. Can the proposed use or indication of a product affect its classification?

   Yes. Two products with exactly the same composition can be classified differently based on their primary intended purposes. For example, if a vaginal product is intended solely to facilitate ease and comfort during sexual intercourse and it achieves this through lubrication that decreases friction (via mechanical/physical action) and not through chemical action, it is classified as a device. However, the same product can be classified as a drug if it is intended, for instance, to alter pH, control odor, or prevent infection, and does so through chemical action as discussed in III.B.3 above.

4. What should you do if, after reviewing this guidance, you are unsure of how your product is classified?

   You should contact the Office of Combination Products (Combination@FDA.GOV) for feedback. OCP will provide you feedback, including on whether a pre-RFD or an RFD may be appropriate and what information you should provide.

5. Where can you find additional information about product classification?

   Additional information on classification is posted on OCP's webpage at:(https://www.fda.gov/CombinationProducts/AboutCombinationProducts/ucm101496.htm)

   For additional information on how to submit an RFD, see *How to Write a Request for Designation (RFD)* (http://www.fda.gov/RegulatoryInformation/Guidances/ucm126053.htm).

   More information about the pre-RFD process is available at https://www.fda.gov/downloads/RegulatoryInformation/Guidances/UCM534898.pdf .

SA-266

# EXHIBIT C

Job Description

SA-267

### JOB DESCRIPTION

**Department/Service:**     Patient Services

*Title:*     ***PHYSICAL THERAPIST***

**Reports to:**     Supervisor of Physical Therapy

**Work Area:**     Branch Office (Nassau, Suffolk, Brooklyn)

**Position Summary:**

Assesses, plans, provides and develops with the patient/client or responsible caregiver a home health plan of care for Physical Therapy, and identifies problems which warrant the placement of other disciplines and services provided by the Agency. Coordinates and evaluates the plan of care with all other disciplines providing care through the Agency, the Supervisor of Patient Services as warranted, other organizations and physicians for an assigned caseload.

Instructs patient/client or responsible caregiver in the projected care plan and expected outcomes. Provides written instructions appropriately as reinforcement of teaching and directions. Conferences with Supervisor of Patient Services or designated nurse coordinator regarding patient status, progress and discharge plan. Documents Physical Therapy skilled services in accord with Agency standards and expectations of third party payors. Obtains physician orders appropriately.

**Qualifications:**

    **Education:**

1.    Graduate of a Physical Therapy curriculum approved by the Council on Medical Education of the American Medical Association and the American Physical Therapy Association.

2.    Current registration to practice Physical Therapy in New York State.

**Experience/Skills:**

1.    Possesses a minimum of 1 year of satisfactory experience in a home care setting, preferably in a CHHA.

2.    Knowledgeable regarding Federal, State, regulations and JCAHO standards as they apply to physical therapy services in a CHHA.

3.    Demonstrates a commitment to continuing professional growth and development.

4.    Good communication and teaching skills; verbal and written.

5.    Ability to relate and work well with patients/caregivers and Agency personnel.

6.    Ability to prioritize activities.

7.    Exercises good clinical judgments in planning and implementing physician orders.

8.    Demonstrates ability to analyze clinical audits and apply this to appropriate problem-solve and plan interventions.

9.    Is a licensed driver with an automobile that is appropriately insured and is in good working order.

**Responsibilities:**

1.    Represents the Agency's mission, philosophy and objectives through compassionately and competently providing Physical Therapy services.

2.    Demonstrates an understanding and respect for patient rights and responsibilities.

3.    Understands and applies Agency policy and procedures appropriately in the admission, treatment and discharge of patients.

4.    Completes work assignment and documentation within allotted time.

5.    Establishes clear, measurable goals and plan of care for the patient/client.

6.    Communicates initial visit findings and the need for additional services appropriately.

7.    Demonstrates ability to identify need for other disciplines in developing patient/client care plans.

8.    Provides home health aide supervision according to Agency policies and procedures.

9.    Records accurate information for billing, payroll and data entry.

10.   Knowledgeable in Agency protocols and procedures applied to the coordination of managed care patients, benefits management for commercial insurance.

11.   Projects schedule for a caseload.

12.   Maximizes conferencing as a functional means through which a caseload will be coordinated, supervisory guidance will be provided and professional development will be fostered.

13.   Participates in the quality improvement process and practices of the Agency to improve the quality of patient care, organizational functions, and to resolve identified problems.

14.   Takes responsibility for personal professional development.

15.   Performs other related duties assigned.

2

SA-269

**Functional Abilities:**
(Including, but not limited to)

1.  Must be able to hear and speak in a manner understood by most persons.

2.  Must be able to read 12 point or larger type.

3.  May lift, carry, push/pull maximum up to 50 lbs.

4.  Must be able to stoop and bend; must be able to lift and transfer patients.

5.  Must be able to travel to prospective patients' residences.

_____
Employee Signature

5/19/00
Date

Job-pt 2/93

3







**PRIORITY**
★ MAIL ★

FROM:

Andrew Kosiba
33 Neal Path
South Setauket, NY 11

**TO:**

Brenna B. Mahoney
100 Federal Plaza
Central Islip, NY

Label 228, March 2016          FOR DOMESTIC AND INT

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

Long Island Federal Courthouse, Central Islip, New York 11722-9014

ANDREW KOSIBA
   PLAINTIFF

v.                                          CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND, INC.
   DEFENDANT

_____/

## RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Defendant's motion to dismiss plaintiff's complaint is improperly before the court.  Much of this motion should properly be expressed in an "answer" rather than a motion to dismiss because the defense is making general denials of the allegations.  Plaintiff asks the court to order the defense to convert its general denials of allegations into a properly submitted answer.

Defendant's motion is required to admit all well-pleaded allegations and then present a legal defense as to the reason why the complaint failed to state a cause of action; instead, the motion makes naked and general denials of the allegations and fails to support its denials with any facts.

Defendant claims under its Factual Background that "Many of the COVID-19 safety protocols implemented by the Defendant were required by law…" and lists "See 42 C.F.R. § 484.70" and "See 10 N.Y.C.R.R. § 2.61."

1

42 CFR 484.7 in section (a) "The HHA must follow <u>accepted standards of practice,</u> including the use of <u>standard precautions,</u> to prevent the transmission of infections and communicable diseases."

1. This regulation has no provision that creates any new legal duty of care, nor any new authority to impose any measures upon the plaintiff.

2. This regulation does not diminish or remove any rights plaintiff has to medical privacy, or the right to informed consent.

3. This regulation is implemented during the Emergency Use Authorization Period, which continues to this day with no published date of expiration.

The defendant's motion fails to include any physician's affidavit as required by <u>accepted standards of practice,</u> including the use of <u>standard precautions.</u>

Accepted standards of practice are clearly set forth in the New York State Public Health Legal Manual, specifically as expressed under sections 1.22 and 1.32 - 1.36.

42 C.F.R. §484.70 and 10 N.Y.C.R.R. §2.61 do not conflict with 18 NYCRR §515.2(13)(13) "Unlawful discrimination. Illegally discriminating in the furnishing of medical care, services or supplies based upon the client's race, color, national origin, religion, sex, age or handicapping condition."  These regulations also do not conflict with 42 C.F.R. §484.100 "Condition of participation: Compliance with Federal, State, and local laws and regulations related to the health and safety of patients.  The HHA and its staff must operate and furnish services in compliance with all applicable federal, state, and local laws and regulations related to the health and safety of patients. If state or local law provides licensing of HHAs, the HHA must be licensed." Also neither of these regulations conflict with 42 C.F.R. §484.50 (b) which require judicial oversight.

Furthermore, 42 C.F.R. §484.70" and 10 N.Y.C.R.R. §2.61, each includes language that presumes employees (staff members), have a disability, such as being infected with a deadly contagious disease referred to by the term 'COVID-19". Therefore each and every member of the staff and each and every patient included in this regulation is thereby regarded as having a disability and thereby a part of a protected class under the Americans with Disabilities Act. Additionally, each of these two regulations mis-classifies each staff member

2

and each patient as having an impairment that can only be cured by participating in the vaccination programs described in each of the regulations.

Neither of these regulations have any provision that requires anyone to disclose his medical records, medical history, vital statistics, or waive his rights to informed consent. This regulation cannot be implemented unless a staff member or a patient waives his rights voluntarily. Again, neither of these regulations have any force or effect of any legal duty or any legal authority erroneously described by the defendant.

On its face, each of these regulations cited by the defendant, satisfies two prongs of the Americans with Disabilities Act; specifically, the "regarded as" prong and the "record of" prong, each of which has already been sufficiently alleged in the complaint. The defendant's mistaken interpretation makes the case for the plaintiff.

Quoting the defendant, "Plaintiff objected to Defendant's policies but did not claim that he was disabled or in need of a reasonable accommodation for a disability." That is factually incorrect. In the Second Amended Complaint paragraphs 9, 15, 23, 25, 33, 45, 47 plaintiff clearly alleged that he was a qualified individual with disability and was regarded as having a disability and that he was not required to ask for accommodations or accept accommodations.

Defendant again is factually incorrect by claiming "Plaintiff has not yet filed his Second Amended Complaint." Plaintiff filed his Second Amended Complaint ("SAC") on May 18, 2022 (Dkt. No. 25).

**RESPONSE TO <u>ARGUMENT</u>**

Plaintiff has submitted second amended complaint which sufficiently adheres to the general standards of pleading as laid down by Bell Atlantic Corp. v. Twombly (550 U.S. at 555). Foremost, the amended complaint clearly "stat(es) a claim upon which relief may be granted" which is neither "formulaic" or "speculative". Second, the allegations contained in the amended complaint, "however in-artfully pleaded, are sufficient to call for the opportunity to offer supporting evidence". Finally, the amended complaint has "a short and plain statement of the claim" that will give the defendant fair notice of what the plaintiff's cause of action is and the grounds upon which relief may be granted.

3

Plaintiff's amended complaint has sufficiently alleged that he may proceed under the "regarded as" prong and the "record of" prong and has stated a prima facie case under the ADA.

Quoting the defendant from paragraph 3 on page 4, "...misguided attempt to challenge lawful conditions of employment..." fails to include any supporting facts and in light of the obvious legal standard that employers cannot discriminate against employees based on disability.

When has it ever been lawful for employers to impose medical interventions upon employees against their will and when the medical interventions are not job related?

**RESPONSE TO POINT I.**

The defendant has no legal right to defend itself by simply denying the plaintiff's claim that he is regarded as having a disability or that he is a qualified individual with a disability.

Quoting the defendant from Paragraph 2 on page 5, "Defendant's policies and procedures were job related, consistent with business necessity, and/or legally required." Defendant failed to include any supporting facts demonstrating that defendant gave conspicuous notice as to manner in which the offered measures were job related and defendant failed to include any supporting facts demonstrating that the plaintiff suffered any physical or mental impairment that prevented him from doing his job without participating in the so-called "COVID-19" policies. Therefore, these policies were not job related in any way; and were not consistent with necessity; and were not required by any legal authority whatsoever.

**RESPONSE to A.**

Clearly the defendant misunderstands the law. The plaintiff informed the defendant that he was regarded as having a disability. It is not open for argument at that point. At that point the defendant was required to recognize that the plaintiff was in a protected class different from the other employees. At that point the defendant was required by law to identify any exemption it might have from complying with its legal duties under the ADA. The defendant ignorantly failed to do this and has clearly demonstrated its ignorance of the law by the language on page 6 of its Motion to Dismiss.

4

On page 6, second paragraph, again, defendant demonstrates that it has never contemplated the law by misquoting the "transitory and minor" provision of the ADA. This provision has to do with disabilities that are BOTH transitory AND minor and it would be the defendant's affirmative defense if it would take the time to learn the actual law. However, defendant's nonsensical commentary has nothing to do with any aspect of the law or facts in this case and demonstrates very clearly the problem we are dealing with here, attorneys mistakenly believe that because they graduated from law school, they know every single law. They also arrogantly believe, and judges as well, that just because the plaintiff is not represented by an attorney, he must automatically not know the law. It is not relevant as to whether or not the defendant denies regarding the plaintiff as having a disability. The fact is that the plaintiff is already regarded as having a disability. No other factual statements are required. The plaintiff has sufficiently alleged and notice of the same was duly given to the defendant and yet the defendant continued to impose its discriminatory policies in a discriminatory manner against the plaintiff. This is nothing different than telling a wheel-chair bound plaintiff that he would be required to use the stairs like everyone else or lose his job. The defendant goes on to cite a pending case (McDonald) as if it were a holding, in which the court makes the same ignorant conclusions as the defendant does here. In the McDonald case, the defendant has not even been served with the complaint since October of 2021 because the judge has taken it upon herself to argue the case and file her own motions to dismiss and make the same ignorant arguments as the defendant in this case.

Plaintiff requests this court to take judicial notice of U.S. District Court, Middle District, Judge Mizelle, Case No. 8:21-cv-1693-KKM-AEP, Order dated April18, 2022 where the Judge ruled that the CDC had no authority to require the airline to impose medical interventions upon passengers and that it had nothing to do with the airline's usual safety or sanitary practices. The plaintiff asks that the court take judicial notice of the actual holdings supporting the court's order to demonstrate that no one has any authority to impose the so-called "COVID-19" policies upon anyone. And that the defendant's policies themselves demonstrate that the defendant regards the plaintiff as having a disability, and that every government agency regards the plaintiff as having a disability, but without any evidence, without any diagnosis and without any individualized assessment.

5

**RESPONSE TO B.**

Defendant again erroneously states that the plaintiff claimed he was entitled to reasonable accommodations; this is false.  At no time did the plaintiff ask for reasonable modifications or accommodations and plaintiff was never required to make such a request because none of the defendant's policy measures were job related.  Plaintiff's choice not to request any reasonable modifications was not a waiver of his right's under the ADA and did not relieve the defendant of any of its legal duties of care under the ADA.

**RESPONSE TO C.**

What law and what guidance has become a law, "...accordance with CDC guidance..." obviously does not create any legal duty according to the Judge Mizelle.  Anyone who graduated law school should understand that guidelines are not laws, commentary on websites are not laws, executive orders are not laws, and laws do not conflict with each other. Specifically, the defendant has failed to cite any law that contravened the Americans with Disabilities Act.

The defendant never conducted any individualized assessment to determine whether or not the plaintiff was a direct threat, therefore has no standing to claim that medical examinations for the plaintiff are based upon him posing a direct threat.  By failing to comply with ADA defendant has now waived its right to claim that it has taken measures (medical examination) against the plaintiff as if he was a direct threat.

Again, paragraph 2 on page 9, the plaintiff has never claimed that "vaccination status" is a "protected characteristic", this is solely the defendant's own language because the defendant fails to understand the law.  There is no such thing as "vaccination status".  Whether or not someone has had a vaccine is a private matter between a physician and patient.  If the defendant wanted to discover what vaccines the plaintiff had taken, the defendant could simply ask his physician.  Oh, but here is the problem, the physician is legally prevented from disclosing plaintiff's medical records to plaintiff's employer.  In fact, the defendant is legally prevented from discovering the name and address of the plaintiff's physician in the first place. In addition to demonstrating an utter lack of understanding of disability law and medical privacy rights and duty of care, defendant clearly fails to recognize that no one is required to disclose his medical records except in certain situations; specifically, if doing so were related

6

SA-277

to an employee's essential job function, which is clearly not the case here.   Clearly, defendant's policy is based upon the presumption that the plaintiff may have or may become infected with a deadly contagious disease known as "COVID-19", even though it is not necessary for the defendant to admit this, it is already admitted.  It is enough that the plaintiff has given notice that he was already regarded as having a disability (not necessarily by the defendant).

Defendant quotes and refers to commentary on the EEOC website as if it is some perverse legal authority when in fact the EEOC disclaims liability from all commentary on its entire server, to wit:

https://www.eeoc.gov/disclaimer

Disclaimer

"The U.S. Equal Employment Opportunity Commission maintains this web site to enhance public access to the EEOC's information. This is a service that is continually under development. While we try to keep the information timely and accurate, we make no guarantees. We will make an effort to correct errors brought to our attention. Users should be aware that the information available on this web site may not reflect official positions of the Commission.

Reference herein to any specific commercial products, process, or service by trade name, trademark, manufacturer, or otherwise, does not constitute or imply its endorsement, recommendation, or favoring by the United States Government. The views and opinions of authors expressed herein do not necessarily state or reflect those of the United States Government, and shall not be used for advertising or product endorsement purposes.

With respect to documents available from this server, neither the United States Government nor any of their employees assumes any legal liability or responsibility for the accuracy, completeness, or usefulness of any information disclosed, or represents that its use would not infringe privately owned rights.

The documents on this web site contain hypertext pointers to information created and maintained by other public and private organizations. Please be aware that we do not control or guarantee the accuracy, relevance, timeliness, or completeness of this outside information. Further, the inclusion of pointers to particular items in hypertext is not intended to reflect their importance, nor is it intended to endorse any views expressed or products or services offered by the author of the reference or the organization operating the server on which the reference is maintained."

7

The EEOC is not a law-making authority, it's merely an executive agency of the United States Government, it is not the US Congress.

Defendant's motion fails to cite any law yet only commentary from EEOC's website and the legal authority and accuracy for which are clearly disclaimed by the United States Government.

Why not just quote George Carlin?

Once again defendant has failed to cite any legal authority that contravenes the ADA in this matter.

**RESPONSE TO D.**

Defendant has no "vaccine mandate". First, there is no legal duty for the defendant to impose any medical intervention upon the plaintiff, and there is no legal duty for the plaintiff to comply with his employer's policy which is not job related and which presumes he is infected with a deadly contagious disease (disability) without any evidence, diagnosis or individualized assessment. Likewise, the defendant has no legal authority to adopt any so-called "mandate" for a "vaccine", just because the word "mandate" is used in its policy does not suddenly waive the plaintiff's rights or give the defendant more rights over the plaintiff. And there are no vaccines during an emergency use authorization period, and there are no commercially available vaccines available for the so-called "COVID-19". This is the definition of a clinical a trial and prohibited under the Food, Drug and Cosmetic Act (21 CFR Part 50.20).

Finally, the defendant is not financially responsible for protecting its employees from being infected by the so-called "COVID-19" and the defendant is not financially responsible for any employee suffering any adverse health consequence from participating in its ridiculous policies that are not job related.

**RESPONSE TO POINT II**

Just because the defendant fails to understand disability law doesn't mean the plaintiff's complaint is insufficient.

Here is one example of adverse employment activity. The plaintiff was fired after months of suffering the same discrimination and retaliation. The defendant never ceased its

8

discrimination and retaliation once it received notice from the plaintiff that he was a qualified individual with a disability.  How is any of this not an adverse employment action?

WHEREFORE plaintiff requests an order denying the motion in its entirety or in the alternative the motion to be considered an answer and a general denial and for other relief as this court may deem appropriate.

DATED this 30th day of June, 2022.

Andrew Kosiba, Plaintiff

SA-280

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
ak764@protonmail.com

# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
Long Island Federal Courthouse, Central Islip, New York 11722-9014

ANDREW KOSIBA
    PLAINTIFF

v.                                                      CASE NO.  2:21-cv-06416-GRB-ARL

CATHOLIC HEALTH SYSTEM OF LONG
ISLAND, INC.
    DEFENDANT

_____/

## PROPOSED ORDER

    This matter having come before this court on defendant's motion to dismiss and the court having been fully advised in the premises, it is hereby,

ORDERED AND ADJUDGED,

____ Granting    ____ Denying plaintiff's motion to dismiss, and,

_____

_____

_____

                                      _____
                                          Judge Gary Brown

Copies to:

Andrew Kosiba Plaintiff *in Propria Persona*
33 Neal Path, South Setauket, NY 11720

Roy W. Breitenbach, Defendant's attorney
333 EARLE OVINGTON BLVD, SUITE 901 UNIONDALE, NEW YORK 11553

10

SA-281

Andrew Kosiba
Plaintiff *in Propria Persona*
33 Neal Path
South Setauket, NY 11720
631-495-9968
ak764@protonmail.com

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
100 Federal Plaza, Central Islip, New York 11722-9014

ANDREW KOSIBA
    **PLAINTIFF**

v.                          CASE NO.  <u>2:21-cv-06416-GRB-ARL</u>

CATHOLIC HEALTH SYSTEMS OF
LONG ISLAND, INC.
    **DEFENDANT**
_____/

**AFFIDAVIT IN SUPPORT OF COMPLAINT**

STATE OF NEW YORK    )
                      )ss
COUNTY OF NASSAU    )

**1.**    I, Andrew Kosiba, do hereby solemnly affirm that the statements herein are true and correct in substance and in fact and that I have personal knowledge of each.

**2.**    I have been harassed at my job, discriminated and retaliated against based on disability for refusing to accept my employer's accommodations for regarding me as impaired in my immune system and impaired in my respiratory system.

**3.**    I am absent and without evidence of any information from any health officer identifying myself as having any communicable disease or having been exposed to any toxic substance.

**4.**    I am absent and without knowledge of any evidence or court order, obtained by any petition of the Department of Health or a public health officer, that was based upon any physician's affidavit in which I have been identified as having any communicable disease or having been exposed to any toxic substance.

**5.**    I am absent and without knowledge of any evidence of any court order determining that I am or have been a direct threat to anyone.

SA-282

**6.** I am absent and without knowledge of any evidence of any individualized assessment required by law that has determined that I am or have been a direct threat to anyone.

**7.** I am absent and without knowledge of any evidence of any court order imposing any terms of isolation or quarantine or other measures upon myself.

**8.** On September 27, 2021 I noticed my employer that I am a qualified individual with disability and that I was regarded as having a disability, but my employer ignored the fact and continued to retaliate against me and impose non job related medical interventions upon me.

**9.** I have never claimed that I am entitled to reasonable accommodations. All I asked from my employer is to allow me to do my job as I have done for so many years without harassment.

**10.** My employer has never conducted an individualized assessment to determine whether I was a direct threat.

**11.** My employer has not given me conspicuous notice as to the manner in which the so called "COVID-19" policy was part of my essential job function.

**12.** After noticing my employer that I was a qualified individual with disability and I was regarded as having a disability my employer continued to discriminate and retaliate against me by treating me the same as every other employee, placing me on leave without pay for two weeks on different occasions, threatening with termination and terminating my employment without any regard to my protected rights under the ADA.

**13.** On May 18, 2022 I filed my Second Amended Complaint with the court and sent a copy to the defendant.

Andrew Kosiba, Affiant

STATE OF NEW YORK )
~~SUFOLK~~ )Ss
COUNTY OF ~~NASSAU~~ )

Subscribed and Sworn to before me a notary public this 5ᵗʰ day of July, 2022.

Signature of Notary                              [ls]

CARLA J BRODSKY
Notary Public - State of New York
NO. 01BR6332853
Qualified in Suffolk County
My Commission Expires Nov 9, 2023

1    Andrew Kosiba
     Plaintiff *in Propria Persona*
2    33 Neal Path
     South Setauket, NY 11720
3    ak764@protonmail.com

4

5

6

7

8

9                     **UNITED STATES DISTRICT COURT**
                       **EASTERN DISTRICT OF NEW YORK**
1              Long Island Federal Courthouse, Central Islip, New York 11722-9014
0    ANDREW KOSIBA
1         PLAINTIFF

1    v.                                     CASE NO.  2:21-cv-06416-GRB-ARL
1
     CATHOLIC HEALTH SYSTEM OF LONG
2    ISLAND, INC.
          DEFENDANT
1                                                                /
3
1                          **CERTIFICATE OF SERVICE**
4    I, Andrew Kosiba, hereby certify that a true and correct copy of the foregoing was duly served
1    upon the defendant's attorneys, Roy W. Breitenbach and Daniel J. Palermo, at the address of
5    333 EARLE OVINGTON BLVD, SUITE 901 UNIONDALE, NEW YORK 11553, via first class
1    mail on this 4th day of July, 2022.
6    By: *Andrew Kosiba*

1

7

1

8

1

                                          11

Case 2:21-cv-00420-GRB-ARL   Document 51   Filed 07/08/22



Andrew Kosiba
33 Neal Path
South Setauket, NY 11720

RECEIVED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
JUL 08 2022
LONG ISLAND OFFICE

PLACE STICKER AT TOP OF ENVELOPE TO THE RIGHT
OF THE RETURN ADDRESS, FOLD AT DOTTED

CERTIFIED MAIL

7021 1970 0001 7196

U. S. District
100 Federal
Central Islip
Attn: Pro Se